# EXHIBIT 1

PCA CASE NO. 2021-34

IN THE MATTER OF AN ARBITRATION
BEFORE A SOLE ARBITRATOR APPOINTED IN ACCORDANCE WITH THE
ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW 2010
(the "UNCITRAL Rules")

- between -

**OLIVE GROUP FZ-LLC (UNITED ARAB EMIRATES)**
**(the "Claimant")**

- and -

**AFGHANISTAN CIVIL AVIATION AUTHORITY, GOVERNMENT OF ISLAMIC**
**REPUBLIC OF AFGHANISTAN**
**(the "Respondent", and together with the Claimant, the "Parties")**

———————————————————————————

**FINAL AWARD**

———————————————————————————

**Sole Arbitrator**

Mr. Victor P. Leginsky

**Registry**

Permanent Court of Arbitration

**28 November 2023**

## TABLE OF CONTENTS

LIST OF DEFINED TERMS.................................................................................................4

I.   INTRODUCTION....................................................................................................8

  A.   The Parties.............................................................................................................8

  B.   The Dispute ...........................................................................................................9

II.  THE ARBITRATION AGREEMENT, LAWS AND SEAT...................................9

III. PROCEDURAL HISTORY ..................................................................................11

  A.   Commencement of the Arbitration......................................................................11

  B.   Appointment of the Sole Arbitrator and Initial Steps.........................................12

  C.   The Respondent's Request to Make Submissions................................................19

  D.   Interim Measures Request ...................................................................................19

  E.   Submission of the Response E-mails and the Claimant's Reply.........................24

  F.   The Suspension of the Arbitral Proceedings ......................................................28

  G.   The Hearing..........................................................................................................29

  H.   Post-Hearing Matters ..........................................................................................31

IV.  FACTUAL BACKGROUND ................................................................................36

  A.   Execution of the ANAP Contract, Key Terms ....................................................36

  B.   Delay in Paying the Invoices, "Penalties" and a 10% Retention .......................37

  C.   End of the ANAP Contract, Transition of the Security Services and Equipment to ACAA.....38

  D.   Requirement of Manning Cap Fees, Delay in the Renewal of the Claimant's Private Security
       Company License, and Loss of Opportunities of Entering into Other Security Contracts ...............39

V.   THE PARTIES' REQUESTS FOR RELIEF .........................................................42

VI.  THE PARTIES' POSITIONS ................................................................................43

  A.   Applicable Law ....................................................................................................43

    1.   The Claimant's Position..................................................................................43

    2.   The Respondent's Position..............................................................................43

  B.   The "Penalties".....................................................................................................43

    1.   The Claimant's Position..................................................................................44

    2.   The Respondent's Position..............................................................................44

  C.   The 10% Retention................................................................................................45

    1.   The Claimant's Position..................................................................................45

    2.   The Respondent's Position..............................................................................46

  D.   The Delay in Making Payments ...........................................................................46

    1.   The Claimant's Position..................................................................................46

    2.   The Respondent's Position..............................................................................47

  E.   The Alleged Delay in Returning the Performance Guarantee ..............................48

    1.   The Claimant's Position..................................................................................48



2.   The Respondent's Position ..................................................................................48

F.   The End of the ANAP Contract ................................................................................48

1.   The Claimant's Position .......................................................................................48

2.   The Respondent's Position ..................................................................................50

G.   Manning Cap Fees in relation to Employees under the ANAP Contract ..................51

1.   The Claimant's Position .......................................................................................51

2.   The Respondent's Position ..................................................................................53

H.   The Delay in the Renewal of the PSC License and the Alleged Interference with the Claimant's Contract with the Canadian Embassy ..............................................................53

1.   The Claimant's Position .......................................................................................53

2.   The Respondent's Position ..................................................................................56

**VII. ANALYSIS ..................................................................................................................56**

A.   PROCEDURAL MATTERS ........................................................................................56

1.   Respondent's Opportunity to Present its Case .....................................................56

2.   Time-Limit to Issue the Award .............................................................................65

B.   ISSUES OF MERITS .................................................................................................67

1.   Applicable Law ....................................................................................................68

2.   The "Penalties" ...................................................................................................69

3.   The Ten Percent Retention ...................................................................................72

4.   The Delay in Making Payments ............................................................................77

5.   The Alleged Delay in Returning the Performance Guarantee .................................83

6.   The End of the ANAP Contract .............................................................................86

7.   Manning Cap Fees in relation to Employees under the ANAP Contract ..................93

8.   The Delay in the Renewal of PSC License and the Alleged Interference with the Claimant's Contract with the Canadian Embassy ..............................................................97

**VIII.   COSTS AND POST-AWARD INTEREST ...............................................................101**

A.   Applicable Rules As to Costs ...................................................................................101

B.   Costs of the Sole arbitrator and the PCA .................................................................102

C.   Allocation of the Costs of the Arbitration ................................................................103

1.   The Claimant's Position .......................................................................................103

2.   The Respondent's Position ..................................................................................103

3.   Decision ..............................................................................................................103

D.   Post-Award Interest ................................................................................................104

**IX. DISPOSITIVE ............................................................................................................105**



## LIST OF DEFINED TERMS

| | |
|---|---|
| **ACAA** | Afghanistan Civil Aviation Authority, or the Respondent |
| **Advance Payment Request** | Claimant's request for the Respondent to make an immediate payment of AED 91,250 to the PCA for its share of tribunal-related expenses until that point dated 13 May 2022 |
| **Adverse Inference Request** | Request to Draw Adverse Inference from Respondent's Failure to Respond to Claimant's Document Requests, submitted by the Claimant on 6 April 2022 |
| **AIB** | Afghanistan International Bank |
| **ANAP** | Afghanistan National Airports Project |
| **ANAP Contract** | Contract No. NPA/ACAA/96/NCS-1889/ICB, dated 4 August 2018, signed by the Parties |
| **Canadian Embassy** | Embassy of Canada to Afghanistan in Kabul, Afghanistan |
| **Claimant** | Olive Group FZ-LLC, or Olive Group |
| **Claimant's Notice of Termination** | Notice of termination of the ANAP Contract issued by the Claimant on 13 June 2020 |
| **Document Production Objections** | Claimant's objections to the Sole Arbitrator Requests |
| **Document Production Requests** | Claimant's Requests for the Production of Documents, submitted on 23 December 2021 |
| **First Procedural Meeting** | First Procedural Meeting of the Parties held on 29 September 2021 |
| **GCC** | General Conditions of the ANAP Contract |
| **Hearing** | Hearing held by videoconference on 16 March 2023 |

| **IBA Rules** | IBA Rules on the Taking of Evidence in International Arbitration 2010 |
| **ICAO** | International Civil Aviation Organization |
| **Interim Measures Application** | The Claimant's formal application for Interim Measures, dated 27 May 2022 |
| **Interim Measures Request** | The Claimant's request, originating on 13 May 2022, that the Respondent provide security in the form of a bond or bank guarantee before the Sole Arbitrator grants it a further extension of time to secure external counsel. |
| **Item 29** | Item 29 of the Statement of Work & Terms of Reference of the ANAP Contract |
| **MOFA** | Ministry of Foreign Affairs of Afghanistan |
| **MOI** | Ministry of Interior of Afghanistan |
| **MOTA** | Ministry of Transport and Aviation of Afghanistan |
| **Notice of Arbitration** | The Claimant's Notice of Arbitration, dated 12 April 2021 |
| **NPC** | National Procurement Commission |
| **NPC's Resolution** | NPC Resolution number 4,305 dated 15 September 2020 |
| **NSC** | National Security Council of Afghanistan |
| **Olive Group** | Olive Group FZ-LLC, or the Claimant |
| **Parties** | The Claimant and the Respondent |
| **PCA** | The Permanent Court of Arbitration |
| **Procedural Order No. 1** | Procedural Order No. 1 issued by the Sole Arbitrator on 29 September 2021 |
| **Procedural Order No. 2** | Procedural Order No. 2 issued by the Sole Arbitrator on 29 September 2021 |

**Procedural Order No. 3**

Procedural Order No. 3 issued by the Sole Arbitrator on 22 January 2022

**Procedural Order No. 4**

Procedural Order No. 4 issued by the Sole Arbitrator on 4 October 2022

**Procedural Order No. 5**

Procedural Order No. 5 issued by the Sole Arbitrator on 14 March 2023

**Procedural Order No. 6**

Procedural Order No. 6 issued by the Sole Arbitrator on 14 November 2023

**PSC License**

Private Security Company License

**PSC Regulations**

Private Security Company Regulations

**Reply**

Claimant's Reply to Respondent's Information and Documents dated 7 November 2022

**Respondent**

Afghanistan Civil Aviation Authority, or ACAA

**Respondent's Notice of Termination**

Notice of termination of the ANAP Contract issued by the Respondent on 4 October 2020

**Respondent's Position**

Position taken by the Respondent on the substantive issues, taken from the Respondent's e-mails of 18 July 2022 and 2 August 2022

**Response E-mails**

Respondent's e-mails of 18 July and 2 August 2022 containing its response

**SCC**

Special Conditions of the ANAP Contract

**Sole Arbitrator**

Mr. Victor P. Leginsky

**Sole Arbitrator Requests**

Requests made by the Sole Arbitrator for the Claimant to produce documents on 22 January 2022

**SOW**

Statement of Work

**Statement of Claim**

The Claimant's Statement of Claim, dated 28 October 2021

**Transcript**

Transcript of the Hearing between the Parties dated 16 March 2023

**UAE**                          United Arab Emirates

**UAE Arbitration Law**          UAE Arbitration Law, Federal Law No. (6) of 2018
                                 on Arbitration

**UNCITRAL Rules**               The Arbitration Rules of the United Nations
                                 Commission on International Trade Law, 2010

## I.  INTRODUCTION

### A.  THE PARTIES

1.    The Claimant in this arbitration is Olive Group FZ-LLC, a limited liability company established under the laws of the United Arab Emirates, with its principal place of business at Al Thuraya Tower 1, Floor 22, P.O Box 502356, Dubai Internet City, Dubai, United Arab Emirates ("**Olive Group**" or the "**Claimant**").

2.    The Claimant is represented in this arbitration by:

> **Mr. Enayat Qasimi, Esquire**
> *Whiteford Taylor Preston LLP*
> 1800 M Street, N.W., Suite 450N
> Washington, D.C. 20036
> United States of America
>
> E-mail: eqasimi@wtplaw.com
>
> **Ms. Ilana Subar, Esquire**
> *Whiteford Taylor Preston LLP*
> Seven Saints Paul Street, Suite 1500
> Baltimore, Maryland 21202-1636
> United States of America
>
> E-mail: isubar@wtplaw.com

3.    The Respondent in this arbitration is the Afghanistan Civil Aviation Authority, an agency of the Islamic Republic of Afghanistan which operated pursuant to Afghanistan's Civil Aviation Law, Official Gazette No. 1903, 26/9/1391 ("**ACAA**" or the "**Respondent**", and together with the Claimant, the "**Parties**").[1]

4.    The Respondent is represented in this arbitration by:[2]

> **Captain Ghulam Jailani Wafa**
> **Mr. Farhad Perzad**
> **Mr. Muhib-Ullah Zahid**
> *Ministry of Transport & Aviation*
> Kabul, Afghanistan
>
> E-mail: jailaniw63@gmail.com
>           farhad.perzad@acaa.gov.af

---

[1]    According to the Respondent, ACAA was merged into the Ministry of Transport of Afghanistan and, as a result, it now operates under the umbrella of Afghanistan's Ministry of Transport and Aviation. See paragraph 69 below.

[2]    The Respondent has appointed its outside counsel but has failed to produce a power of attorney evidencing the authority of outside counsel to represent the Respondent.

farhad_przd@yahoo.com
mzahid.afg@gmail.com

## B.    THE DISPUTE

5.    The dispute arises from the Respondent's alleged breaches of Contract No.
NPA/ACAA/96/NCS-1889/ICB dated 4 August 2018, under which the Claimant was to procure
security services for four international airports in Afghanistan (the "**ANAP Contract**").[3] The
Claimant states that the Respondent failed to comply with its obligations under the ANAP
Contract, causing the Claimant damage in excess of USD 24,000,000. The Respondent refutes
the Claimant's allegations that it had failed to perform certain obligations under the ANAP
Contract.

## II.    THE ARBITRATION AGREEMENT, LAWS AND SEAT

6.    The General Conditions of the ANAP Contract ("**GCC**") provide:

> **8.1 Amicable Settlement**. The Parties shall use their best efforts to settle amicably all
> disputes arising out of or in connection with this Contract or its interpretation.
>
> **8.2 Dispute Settlement.**
>
> > **8.2.1** If any dispute arises between the Employer and the Service Provider in
> > connection with, or arising out of, the Contract or the provision of the Services,
> > whether during carrying out the Services or after their completion, the matter shall be
> > referred to the Adjudicator within fourteen (14) days of the notification of
> > disagreement of one party to the other.
> >
> > **8.2.2** The Adjudicator shall give a decision in writing within twenty-eight (28) days
> > of receipt of a notification of a dispute.
> >
> > **8.2.3** The Adjudicator shall be paid by the hour at the rate **specified in the BDS and
> > SCC**, together with reimbursable expenses of the types **specified in the SCC**, and the
> > cost shall be divided equally between the Employer and the Service Provider,
> > whatever decision is reached by the Adjudicator. Either party may refer a decision of
> > the Adjudicator to an Arbitrator within twenty-eight (28) days of the Adjudicator's
> > written decision. If neither party refers the dispute to arbitration within the above
> > twenty-eight (28) days, the Adjudicator's decision will be final and binding.
> >
> > **8.2.4** The arbitration shall be conducted in accordance with the arbitration procedure
> > published by the institution named and in the place **shown in the SCC**.
> >
> > **8.2.5** Should the Adjudicator resign or die, or should the Employer and the Service
> > Provider agree that the Adjudicator is not functioning in accordance with the
> > provisions of the Contract, a new Adjudicator will be jointly appointed by the
> > Employer and the Service Provider, within thirty (30) days, the Adjudicator shall be
> > designated by the Appointing Authority **designated in the SCC** at the request of

---

[3]    Namely, Hamed Karzai International Airport, Kabul; Herat International Airport, Herat; Mazar-e Sharif
International Airport; and Kandahar International Airport.

either party, within fourteen (14) days of receipt of such request.[4]

7.  The Special Conditions of the ANAP Contract ("**SCC**") provide the following in relation to Clause 8.2.4 of the GCC:

> Disputes shall be settled by arbitration in accordance with the following provisions:
>
> 1. Selection of Arbitrators. Each dispute submitted by a Party to arbitration shall be heard by a sole arbitrator or an arbitration panel composed of three arbitrators, in accordance with the following provisions:
>
>> (a) Where the Parties agree that the dispute concerns a technical matter, they may agree to appoint a sole arbitrator or, failing agreement on the identity of such sole arbitrator within thirty (30) working days after receipt by the other Patty of the proposal of a name for such an appointment by the Party who initiated the proceedings, either Party may apply to **Federation Internationals des Ingenieurs-Conseil (FIDIC) of Lausanne, Switzerland** for a list of not fewer than five nominees and, on receipt of such list, the Parties shall alternately strike names therefrom, and the last remaining nominee on the list shall be the sole arbitrator for the matter in dispute. If the last remaining nominee has not been determined in this manner within sixty (60) working days of the date of the list, **Federation Internationale des Ingenieurs-Conseil (FIDIC) of Lausanne, Switzerland** shall appoint, upon the request of either Party and from such list or otherwise, a sole arbitrator for the matter for dispute.
>>
>> (b) Where the Parties do not agree that the dispute concerns a technical matter, the Client and the Consultant shall each appoint one arbitrator, and these two arbitrators shall jointly appoint a third arbitrator, who shall chair the arbitration panel. If the arbitrators named by the Parties do not succeed in appointing a third arbitrator within thirty (30) working days after the latter of the two arbitrators named by the Parties has been appointed, the third arbitrator shall, at the request of either Party, be appointed by **the Secretary General of the Permanent Court of Arbitration, The Hague**.[5]

8.  The SCC further provide the following in relation to Clause 8.2.5 of the GCC:

>> (c) If, in a dispute subject to Clause SC 8.2 l. (b), one Party fails to appoint its arbitrator within thirty (30) working days after the other Party has appointed its arbitrator, the Party which has named an arbitrator may apply to **the Secretary General of the Permanent Court of Arbitration, The Hague** to appoint a sole arbitrator for the matter in dispute, and the arbitrator appointed pursuant to such application shall be the sole arbitrator for that dispute.
>
> 2. Rules of Procedure. Except as stated herein, arbitration proceedings shall be conducted in accordance with the rules of procedure for arbitration of the United Nations Commission on International Trade Law (UNCITRAL) as in force on the date of this Contract.
>
> 3. Substitute Arbitrators. If for any reason an arbitrator is unable to perform his function, a substitute shall be appointed in the same manner as the original arbitrator.
>
> 4. Nationality and Qualifications of Arbitrators. The sole arbitrator or the third arbitrator appointed pursuant to paragraphs (a) through (c) of Clause SC 8.2 1 hereof shall be an internationally recognized legal or technical expert with extensive experience in relation to the matter in dispute and shall not be a national of the Consultant's home country [or of the home country of any of their Members or Parties] or of the Government's country. For the

---

[4]  ANAP Contract, GCC, cl. 8.1, 8.2 (**Exhibit C-1**).

[5]  ANAP Contract, SCC, cl. 8.2.4 (**Exhibit C-1**).



purposes of this Clause, "home country" means any of:

(a) the country of incorporation of the Consultant [or of any of their Members or Parties]; or

(b) the country in which the Consultant's [or any of their Members' or Parties'] principal place of business is located; or

(c) the country of nationality of a majority of the Consultant's [or of any Members' or Parties'] shareholders; or

(d) the country of nationality of the Sub-Consultants concerned, where the dispute involves a subcontract.

5. Miscellaneous. In any arbitration proceeding hereunder:

(a) proceedings shall, unless otherwise agreed by the Parties, be held in Dubai, UAE;

(b) The law governing the Contract shall be the laws of Afghanistan;

(c) the English language shall be the official language for all purposes; and

(d) the decision of the sole arbitrator or of a majority of the arbitrators (or of the third arbitrator if there is no such majority) shall be final and binding and shall be enforceable in any court of competent jurisdiction, and the Parties hereby waive any objections to or claims of immunity in respect of such enforcement. [6]

9.   By means of the Parties having agreed that proceedings be held in Dubai, the seat of the arbitration is Dubai and the procedural law of this arbitration is the UAE Arbitration Law, Federal Law No. (6) of 2018 on Arbitration ("**UAE Arbitration Law**").

10.  The Parties have chosen that the laws of Afghanistan shall be the substantive law and the governing law of the ANAP Contract.

## III.  PROCEDURAL HISTORY

### A.   COMMENCEMENT OF THE ARBITRATION

11.  On 14 September 2020, the Claimant sent its Notice of Dispute to ACAA and, pursuant to Clause 8 of the ANAP Contract, requested the appointment of an Adjudicator within 14 days.

12.  On 21 September 2020, the Claimant requested the Ministry of Justice of the Islamic Republic of Afghanistan to appoint an Adjudicator.

13.  On 19 October 2020, the Ministry of Justice declined the request on the basis of a conflict of interest. Thereafter, on 24 October 2020, the Claimant requested that ACAA agree to have another independent authority appoint the Adjudicator for the dispute and proposed the Afghanistan Chamber of Commerce and Industry be the appointing authority. The Respondent failed to respond to the request.

---

[6]    ANAP Contract, SCC, cl. 8.2.5 (**Exhibit C-1**).

14.    The Claimant commenced this arbitration by way of a Notice of Arbitration dated 12 April 2021 (the "**Notice of Arbitration**"), under the ANAP Contract and pursuant to Clause 8.2 of the GCC and SCC. In its Notice of Arbitration, the Claimant appointed Mr. Phillip Punwar as arbitrator pursuant to Clause 8.2.4 of the SCC.

15.    On 17 May 2021, in light of the Respondent's failure to appoint a second arbitrator within 30 days thereafter, the Claimant wrote to the Secretary-General of the Permanent Court of Arbitration ("**PCA**"), requesting that he act as appointing authority for the appointment of a sole arbitrator in this matter pursuant to Clause 8.2.5 of the SCC and the Arbitration Rules of the United Nations Commission on International Trade Law, 2010 ("**UNCITRAL Rules**").

16.    On 19 May 2021, the PCA wrote to the Parties, acknowledging receipt of the Claimant's request of 17 May 2021 and inviting the Respondent to provide comments with respect to that request by 2 June 2021.

17.    On 4 June 2021, the PCA noted that it had not received any correspondence from the Respondent. Accordingly, the PCA indicated to the Parties that it would submit the matter to the PCA Secretary-General for determination.

18.    On 18 June 2021, the PCA wrote to the Parties and sought further clarifications with respect to the Claimant's request of 17 May 2021.

19.    On 30 June 2021, the Claimant responded to the PCA's letter of 18 June 2021 and submitted comments on the desired profile of the arbitrator to be appointed.

20.    On 20 August 2021, the PCA asked the Parties to provide any comments they may have regarding the change of regime in Afghanistan and any impact on this arbitration by 26 August 2021.

21.    On 23 August 2021, the Claimant stated that, in its view, the change of regime in Afghanistan would not be likely to impact this arbitration and reiterated its request for the appointment of a sole arbitrator.

**B.     APPOINTMENT OF THE SOLE ARBITRATOR AND INITIAL STEPS**

22.    On 30 August 2021, the PCA Secretary-General appointed Mr. Victor P. Leginsky, a national of Canada, as the Sole Arbitrator in this matter pursuant to Article 8(2) of the UNCITRAL Rules ("**Sole Arbitrator**"). Mr. Leginsky's contact details are:

       **Mr. Victor P. Leginsky**

Arbitralis ADR
2108 Regal Tower, Business Bay
Dubai, United Arab Emirates

E-mail: vleginsky@arbitralis.com

23.    On 6 September 2021, the Sole Arbitrator communicated to the Parties a draft Terms of Appointment and a draft Procedural Order No. 1 and invited them to provide comments. Additionally, the Sole Arbitrator proposed that the PCA act as registry in this matter and proposed his own hourly fees for this arbitration.

24.    On 15 September 2021, the Claimant provided its written comments in respect of the draft documents, approved the PCA acting as registry in this matter, and agreed to the Sole Arbitrator's proposed fees.

25.    The Sole Arbitrator did not receive any comments from the Respondent regarding his communication of 6 September 2021. Thus, the Respondent was given an extension until 22 September 2021 to provide a response.

26.    On 23 September 2021, in light of the fact that no response had been received from the Respondent, the Sole Arbitrator decided to proceed with this arbitration.

27.    The Parties were invited to propose a time for a First Procedural Meeting in the week of 27 September to 1 October 2021 ("**First Procedural Meeting**").

28.    On 25 September 2021, the Claimant proposed a number of times for the First Procedural Meeting. The Respondent was directed to provide any comments before 27 September 2021, after which point the Sole Arbitrator would fix a time for the First Procedural Meeting.

29.    On 28 September 2021, the Sole Arbitrator directed for the First Procedural Meeting to be held by videoconference on 29 September 2021. The Sole Arbitrator also re-circulated draft Procedural Orders No. 1 and No. 2, updated versions of the documents which, in their original form of 6 September 2021, were titled the Terms of Appointment and Procedural Order No. 1 respectively.

30.    On 29 September 2021, the Claimant made various comments in respect of the draft procedural documents.

31.    Prior to the First Procedural Meeting, the Sole Arbitrator and the PCA made arrangements to record the videoconference, so that it could be made available to the Respondent at a later date.

32.  On 29 September 2021, the Sole Arbitrator and the Parties held their First Procedural Meeting via videoconference, at which various initial procedural steps in this arbitration were discussed. The following individuals attended the First Procedural Meeting:

> **Sole Arbitrator**
> Mr. Victor P. Leginsky
>
> **Claimant**
> Mr. Enayat Qasimi (Counsel)
> Ms. Ilana Subar (Counsel)
>
> **Respondent**
> No participants present
>
> **Registry: Permanent Court of Arbitration**
> Ms. Allison Goh, Legal Counsel
> Ms. Nadhrah Naella Abdullah, Case Manager

33.  On the same date, the Sole Arbitrator issued his Terms of Appointment in the form of Procedural Order No. 1 ("**Procedural Order No. 1**"), pursuant to which he confirmed his independence and impartiality *vis-à-vis* the Parties. The Sole Arbitrator also confirmed that the applicable rules in this arbitration are the UNCITRAL Rules, that the governing law in this case is the law of Afghanistan, that the language of the arbitration is English, and that the place of the arbitration is Dubai, United Arab Emirates ("**UAE**"). He further directed the Parties to establish an initial deposit of AED 91,250 in accordance with Article 43 of the UNCITRAL Rules.

34.  Also that day, the Sole Arbitrator issued Procedural Order No. 2 ("**Procedural Order No. 2**"), which outlined, *inter alia*, the procedural calendar for this arbitration, the manner in which the Parties' written submissions should be presented, a schedule for document production, and the rules governing the submission of evidence and legal authorities.

35.  On 30 September 2021, on the Sole Arbitrator's instructions, the PCA shared with the Parties the minutes of the First Procedural Meeting.

36.  On 8 October 2021, the PCA acknowledged receipt of the payment of the Claimant's share of the initial deposit made on 5 October 2021.

37.  On 20 October 2021, the Sole Arbitrator wrote to the Parties, reminding the Claimant that, per Procedural Order No. 2, its written submission was due on 28 October 2021. The Respondent was also reminded that, per Section 13.1 of Procedural Order No. 1, its share of the deposit was due on 29 October 2021.

38.    On 28 October 2021, the Claimant filed its Statement of Claim ("**Statement of Claim**"), to which it appended Exhibits C-1 to C-88, Legal Authorities CLA-1 to CLA-19, and Witness Statement CWS-1.

39.    On 31 October 2021, the PCA informed the Parties that it had not received the Respondent's share of the deposit by 29 October 2021, as required by Section 13.1 of Procedural Order No. 1. On the instructions of the Sole Arbitrator, and pursuant to Article 43(4) of the UNCITRAL Rules, the PCA requested that the Claimant make a substitute payment for the remainder of the deposit by 30 November 2021.

40.    On 28 November 2021, the Sole Arbitrator wrote to the Parties, reminding the Claimant that, per the PCA's letter of 31 October 2021, it was required to make a substitute deposit payment by 30 November 2021. The Respondent was also reminded that its Statement of Defence was due on 2 December 2021.

41.    On 30 November 2021, the Claimant informed the Sole Arbitrator that it made the substitute deposit payment to the PCA on 29 November 2021.

42.    On 14 December 2021, the Sole Arbitrator reminded the Parties that any requests for document production would be due on 23 December 2021.

43.    On 23 December 2021, the Claimant submitted its Requests for the Production of Documents (the "**Document Production Requests**").

44.    On 7 January 2022, the Sole Arbitrator wrote to the Parties, noting that the deadline for the submission of objections to the Document Production Requests had elapsed and no submission had been made. The Sole Arbitrator gave the Respondent until 9 January 2022 to furnish a submission.

45.    On 10 January 2022, the Sole Arbitrator noted that no submission from the Respondent had been received in relation to the Document Production Requests. Accordingly, he noted that he would commence his consideration of the Document Production Requests.

46.    On 22 January 2022, the Sole Arbitrator issued Procedural Order No. 3 ("**Procedural Order No. 3**"), in which he made a number of orders in relation to the Document Production Requests and further requested the Claimant to produce documents in accordance with Article 27(3) of the UNCITRAL Rules (the "**Sole Arbitrator Requests**"). Under paragraph 4.2 of Procedural Order

No. 3, the Claimant was permitted to make objections to the Sole Arbitrator Requests (the "**Document Production Objections**").

47. On 6 February 2022, the Claimant requested an extension of time to submit its Document Production Objections.

48. On the same date, the Sole Arbitrator responded to the Claimant's request of 6 February 2022. The Sole Arbitrator noted that the deadline for the Document Production Objections was that day, 6 February 2022, and that insufficient time had been left for the Respondent to provide its views. Accordingly, the Sole Arbitrator granted an interim extension of time until 8 February 2022, by which time the Respondent was to make known its views on the Claimant's request for a time extension.

49. On 7 February 2022, the Sole Arbitrator noted that he had not received any of the documents that he had ordered to be produced in Procedural Order No. 3. The Sole Arbitrator sought the Parties' confirmation that the documents had not been produced.

50. On the same date, the Claimant confirmed that said documents had not been produced. In response, again on the same date, the Sole Arbitrator directed the Respondent to urgently confirm whether it intended to comply with the provisions of Procedural Order No. 3, and by no later than 9 February 2022.

51. On 9 February 2022, the Sole Arbitrator noted that the Respondent had not commented on the Claimant's request for a time extension in relation to the submission of the Document Production Objections. Accordingly, the Sole Arbitrator granted the Claimant a time extension until 11 February 2022.

52. On 11 February 2022, the Claimant submitted its Document Production Objections. The Claimant objected to the Sole Arbitrator's request that the Claimant produce a number of documents concerning the ANAP Contract. The Document Production Objections were made on the basis that, since the change of regime in Afghanistan, it was incapable of accessing documents located in that country.

53. On the same date, the Sole Arbitrator acknowledged receipt of the Document Production Objections and noted that the Respondent had not indicated whether it intended to comply with Procedural Order No. 3, as the Sole Arbitrator had directed it to do on 7 February 2022.

54. On 15 February 2022, the Sole Arbitrator dismissed the Claimant's Document Production Objections. The Sole Arbitrator clarified that the Claimant would be required to only submit relevant documentation which was in its possession and that, if the Claimant lacked possession or control of any requested documentation, it could specify as much. The Sole Arbitrator noted that this order was without prejudice to the production of any document which, albeit out of the Claimant's possession at this point, came to be in the Claimant's possession in the future.

55. On 17 February 2022, the Claimant requested a time extension until 10 March 2022 to provide the documentation requested by the Sole Arbitrator, on account of staffing issues it was facing. The Claimant stated that this would not affect any other dates set out in the procedural calendar for this arbitration.

56. On 18 February 2022, the Sole Arbitrator granted the Claimant's time extension request and ordered it to produce the requested documentation by 10 March 2022.

57. On 11 March 2022, the Claimant produced documents responsive to the Sole Arbitrator's requests of 22 January 2022, for the benefit of both the Sole Arbitrator and the Respondent.

58. On 4 April 2022, the Sole Arbitrator wrote to the Parties, reminding the Respondent that its Rejoinder (the "**Respondent's Rejoinder**") was due on 14 April 2022. The Sole Arbitrator sought an understanding from the Respondent as to whether it intended to provide a written submission. Following receipt of this information, the Sole Arbitrator stated that he would revisit the procedural calendar in this arbitration to determine if any revisions were appropriate.

59. On 6 April 2022, the Claimant submitted its Request to Draw Adverse Inference from Respondent's Failure to Respond to Claimant's Document Requests ("**Adverse Inference Request**").

60. On 8 April 2022, the Sole Arbitrator acknowledged receipt of the Claimant's Adverse Inference Request and invited the Respondent to provide comments thereupon by 14 April 2022.

61. On 18 April 2022, the Sole Arbitrator wrote to the Parties and noted that it had received neither a reply to the Adverse Inference Request, nor the Respondent's Rejoinder. On the basis that the Sole Arbitrator also had not received applications for time extensions in relation to the production of either document, he decided to proceed with this arbitration.

62. On 19 April 2022, the Claimant sought clarifications as to a potential oral phase of proceedings. The Claimant specifically enquired whether it was the Sole Arbitrator's intention to convene an

oral hearing and, if so, whether that hearing would be virtual or in person. Additionally, the Claimant sought clarifications as to the matter of witnesses, including notifying the Sole Arbitrator and the other Party of the attendance of witnesses at that prospective hearing or tendering additional witness statements. These matters had been earmarked in the procedural calendar as having a deadline of 28 April 2022.

63.　On the same date, the Sole Arbitrator enquired, without prejudice to the Respondent's own position, whether the Claimant intended to call a witness. The Sole Arbitrator noted that the hearing was in principle due to be held between 23 and 26 May 2022, but made no decision in this communication to retain or postpone it.

64.　On 21 April 2022, the Claimant stated that (i) it would not call a witness to an oral hearing, if one was convened; (ii) that it might provide another written witness statement to support its position; and (iii) that its preference was for the Sole Arbitrator to decide this case based on written submissions alone.

65.　On the same date, the Sole Arbitrator stated that, subject to the Parties' views, he envisaged convening a one-day hearing by videoconference. The Sole Arbitrator suggested that such a hearing would provide him an opportunity to pose questions to counsel or to hear from witnesses, if called. The Parties were invited to comment on this proposal by 24 April 2022.

66.　In a separate e-mail also dated 21 April 2022, the Sole Arbitrator rejected the Claimant's Adverse Inference Request, taking into consideration the Commentary to the IBA Rules on the Taking of Evidence in International Arbitration 2010 (the "**IBA Rules**"). According to the Sole Arbitrator, the Claimant had not met the threshold stipulated in the IBA Rules. Namely, it failed to identify with sufficient precision the evidentiary costs that it had borne through the Respondent's failure to tender specific documents. Instead, it sought the Sole Arbitrator to draw adverse inferences from the Respondent's general failure to provide multiple documents.

67.　By e-mail dated 25 April 2022, the Claimant stated that it was agreeable to the hosting of a hearing by videoconference and confirmed that it would not call witnesses thereto. Relatedly, the Claimant reserved its right to submit an additional witness statement by 28 April 2022.

68.　By e-mail dated 26 April 2022, the Sole Arbitrator acknowledged receipt of the Claimant's position *vis-à-vis* the virtual hearing and witnesses. The Respondent was requested to provide its views by 28 April 2022.



## C.    THE RESPONDENT'S REQUEST TO MAKE SUBMISSIONS

69.    On 28 April 2022, the Sole Arbitrator received an e-mail from Captain Ghulam Jailani Wafa, "Deputy Minister ACAA," sent on behalf of the Ministry of Transport and Aviation ("**MOTA**"). He apologised for the Respondent's hitherto non-participation in this arbitration, which he attributed to the change of regime in Afghanistan and associated interruptions to institutions of the government. Specifically, he noted that the ACAA had been collapsed into the Ministry of Transport, resulting in the formation of the MOTA. The MOTA requested a time extension so that it could present its arguments to the Sole Arbitrator.

70.    On the same date, the Sole Arbitrator notified the Claimant and the PCA of the Respondent's correspondence. In the same e-mail, the Sole Arbitrator provided his response to the Respondent, requesting clarifications as to the sort of participation in this arbitration the Respondent was seeking, what form of submission it would provide, and the length of the time extension it would need. The Sole Arbitrator gave the Respondent until 3 May 2022 to provide this information.

71.    On 4 May 2022, the Respondent notified the Sole Arbitrator that it was having internal discussions regarding the hiring of counsel and would revert in due course. It also apologised for its delayed response, which was a result of Eid-Al-Fitr holidays in Afghanistan.

72.    On the same date, the Sole Arbitrator gave the Respondent a deadline of 12 May 2022 to instruct counsel, indicate the type of submission it wished to make, and state whether it would require an oral hearing.

73.    On 12 May 2022, the Respondent notified the Sole Arbitrator that it was having difficulties finding external counsel due to the global non-recognition of the Afghan government since the change of regime. The Respondent stated that it was in contact with a number of legal entities, but requested a further ten-day extension from the Sole Arbitrator.

## D.    INTERIM MEASURES REQUEST

74.    On 13 May 2022, the Claimant stated that it did not oppose the Respondent's request for an additional extension of ten days to secure counsel. However, it stated that this was conditional upon (i) the Respondent making an immediate payment of AED 91,250 to the PCA for its share of tribunal-related expenses until that point (the "**Advance Payment Request**"), and (ii) the Respondent providing security in the form of a bond or financial guarantee, so that any arbitration remedy would not be rendered ineffectual (the "**Interim Measures Request**"). In support of these requests, the Claimant noted that the Respondent had not provided any explanation as to



why it had not participated from the outset of this arbitration, in April 2021, at which time the change of regime in Afghanistan was yet to materialize.

75.    By e-mail dated 13 May 2022, the Sole Arbitrator acknowledged receipt of the e-mails of 12 and 13 May 2022 exchanged between the Parties. The Sole Arbitrator asked the Respondent to provide its position on the Advance Payment Request by 15 May 2022. The Sole Arbitrator deferred his decision on the Interim Measures Request, stating that this would require further submissions from the Parties at a later stage.

76.    By e-mail dated 16 May 2022, the Respondent provided its position on the Advance Payment Request. It stated that it was arranging for the funding of this arbitration from the internal budget of the MOTA, however this required confirmation from the Prime Minister's office of Afghanistan, which it was in the process of obtaining.

77.    By e-mail dated 16 May 2022, the Sole Arbitrator acknowledged receipt of the Respondent's e-mail concerning the Advance Payment Request. The Sole Arbitrator gave the Respondent until 23 May 2022 to secure outside counsel. Additionally, the Sole Arbitrator gave the Claimant until 27 May 2022 to submit an application in relation to its Interim Measures Request. As a result of these developments, the Sole Arbitrator adjourned both the pre-hearing conference and the hearing, which had been scheduled for 16 and 23 May 2022 respectively.

78.    By e-mail dated 24 May 2022, the Sole Arbitrator sought an update on the Respondent's progress in securing outside counsel.

79.    The Respondent provided an update on the same date, again stating that the political situation in Afghanistan had complicated its effort to secure outside counsel. The Respondent requested that it be provided an extra twenty days, until 12 June 2022, to secure and brief counsel.

80.    On 25 May 2022, the Sole Arbitrator acknowledged the Respondent's request for a further time extension and invited the Claimant to provide its views on such a request.

81.    By an e-mail dated 26 May 2022, the Claimant objected to the grant of a further unconditional extension of time for the Respondent's hiring of counsel. This position was justified on the basis that (i) the Respondent had already enjoyed over a month's extension; (ii) the Respondent had failed to request a further extension before the expiration of the 23 May 2022 deadline; (iii) the Respondent had made no progress in effecting the payment of its share of the costs for this arbitration to the PCA; and (iv) that further delay was unreasonable and extremely prejudicial to the Claimant. Nevertheless, the Claimant stated that it would not oppose an extension of time, on

the condition that the Respondent fulfil the Advance Payment Request and the Interim Measures Request.

82.    On the same date, the Sole Arbitrator sent an e-mail to the Parties, acknowledging their positions in respect of a further time extension for the Respondent to secure counsel. In respect of its Interim Measures Request, the Sole Arbitrator reiterated that the Claimant should submit, as had been proposed, an application by 27 May 2022. The Sole Arbitrator also directed the Respondent to provide an update on its government's position in respect of the Advance Payment Request by 30 May 2022. By the same deadline, the Respondent was directed to provide an update on its progress or plans to secure counsel.

83.    By letter dated 27 May 2022, the Claimant submitted an application for interim measures (the "**Interim Measures Application**"), requesting that the Respondent provide security, in the form of a bond or bank guarantee, in the amount of USD 24,000,000. The Claimant justified the issuance of such interim measures on the basis that (i) it would suffer substantial and irreparable harm if financial security was not ordered; (ii) that the Respondent would suffer no substantial harm were it ordered to provide security in the form of a bond or bank guarantee; and (iii) that there was a reasonable possibility that it would succeed on the merits of its claims.

84.    By e-mail dated 28 May 2022, the Sole Arbitrator acknowledged receipt of the Interim Measures Application. The Sole Arbitrator resolved to set a date for the Respondent's reply to said application after receiving the Respondent's position on the Advance Payment Request and on its plans to obtain counsel, both due 30 May 2022.

85.    By e-mail dated 30 May 2022, the Respondent outlined its position on the Advance Payment Request and provided an update on its efforts to secure counsel. The Respondent stated that MOTA could not fulfil the Advance Payment Request (or, for that matter, the Interim Measures Request) without prior approval from the Prime Minister's office. It noted that the matter had been referred to the Prime Minister's office and would be decided at a Cabinet meeting. In regards to its efforts to secure counsel, the Respondent again stressed the difficulty of finding counsel given the political situation in Afghanistan. However, the Respondent stated that it had met virtually with prospective counsel on 29 May 2022 and that it was hopeful that this would lead to a "possible agreement."

86.    On the same date, the Sole Arbitrator acknowledged receipt of the Respondent's positions via e-mail and indicated his intention to provide a reply in due course.

87.   By e-mail dated 2 June 2022, the Sole Arbitrator provided his decision on the Respondent's request for a further time extension to retain and instruct external counsel. The Sole Arbitrator held the reason for the Respondent's late participation in this arbitration to be in issue. Specifically, he noted that this arbitration was commenced on 12 April 2021, predating the political changes in Afghanistan, and yet the Respondent did not participate until 28 April 2022. Accordingly, the Sole Arbitrator sought clarification from the Respondent as to why it could not have participated earlier than 28 April 2022. To this end, the Sole Arbitrator made an order under Article 27(3) of the UNCITRAL Rules that the Respondent furnish a witness statement from an individual connected with the MOTA. The Respondent was given until 13 June 2022 to provide the requested witness statement and, in the meantime, was directed to provide a further update on its efforts to secure counsel. Additionally, the Sole Arbitrator stated that he would set a deadline for the Respondent's reply to the Interim Measures Application once further information had been provided on its efforts to secure counsel.

88.   By e-mail dated 11 June 2022, the Respondent provided an update on the possibility of it fulfilling the Advance Payment Request. Specifically, it stated that the matter had been referred to the office of the Acting Prime Minister and would be discussed at an upcoming Economic Commission meeting.

89.   By e-mail dated 13 June 2022, the Sole Arbitrator requested clarification as to the timing of the Economic Commission meeting, which was not clear from the correspondence of 11 June 2022. The Sole Arbitrator also sought an update on the Respondent's efforts to retain counsel for this arbitration.

90.   By e-mail dated 15 June 2022, the Respondent replied to the Sole Arbitrator's directions of 2 June 2022. The Respondent explained its delay in providing such a response, stating that the MOTA did not have authority to handle this present arbitration without counsel. Instead, the Respondent stated that it was required to refer the matter upwards through various other entities in the Afghan government for approval, including the Prime Minister's Office and the Economic Commission. With respect to its efforts to retain counsel, the Respondent outlined that it was having continuous difficulties because of three main factors: (i) the international sanctions and restrictions on Afghanistan; (ii) the global non-recognition of the Afghan government and counsel's fear of reputational damage incurred in working for it; and (iii) domestic laws which prevent counsel from working with the Afghan government. On account of these factors and its desire to be afforded procedural fairness, the Respondent requested an additional three-month extension to secure counsel.

91.   On the same date, the Sole Arbitrator requested the Claimant's comments on the granting of a
      three-month time extension to the Respondent.

92.   By e-mail dated 20 June 2022, the Claimant opposed the granting of a three-month time extension
      to assist the Respondent in securing counsel. The Claimant noted that the Respondent had not
      answered the Sole Arbitrator's specific questions of 2 June 2022, and that it had failed to provide
      the requested witness statement which outlined its inability to participate in this arbitration prior
      to 28 April 2022. The Claimant also noted that the Respondent had failed to answer the Sole
      Arbitrator's question of 13 June 2022, relating to the timing of the Economic Commission
      meeting and the fulfilment of the Advance Payment Request. Furthermore, the Claimant
      highlighted that the Respondent had not indicated how exactly a three-month time extension
      would allow it to secure international counsel, or why counsel in Afghanistan were unsuitable
      for these proceedings. Overall, the Claimant stated that the Sole Arbitrator should only grant a
      three-month time extension to the Respondent on the condition that it immediately pay its share
      of the arbitration costs and provide the financial security stipulated in the Claimant's Interim
      Measures Request.

93.   On 26 June 2022, the Sole Arbitrator decided on the Respondent's request that it be granted a
      three-month time extension to secure outside counsel. The Sole Arbitrator held that nothing
      would be gained by suspending this present arbitration for three months, stating that the
      Respondent had produced limited evidence suggestive of a contrary result. The Sole Arbitrator
      proposed that he ask various questions of the Respondent's active current representatives to
      ascertain the Respondent's position on the substantive claims of the Claimant, and then afford
      the Claimant an opportunity to reply to the Respondent's comments. The Sole Arbitrator invited
      the Parties' comments on this proposed procedure.

94.   By e-mail dated 27 June 2022, the Respondent shared its views regarding the Sole Arbitrator's
      decision of 26 June 2022. The Respondent reiterated that (i) due to the change in regime in
      Afghanistan, most of the e-mails sent prior to 28 April 2022 did not reach the Respondent, and
      (ii) that the political situation in Afghanistan was complicating its efforts to secure outside
      counsel, without which it would not be able to properly defend itself. In addition, the Respondent
      stated that it was not aware of any suitable counsel options within Afghanistan, owing to the fact
      that most lawyers had left the country during the regime change. With respect to the Advance
      Payment Request, the Respondent stated that the Economic Commission had not yet reached a
      decision, but that a follow-up meeting would be convened that week. Regarding the Claimant's
      request that the Respondent pay its share of the costs of this arbitration, the Respondent queried
      how this would be possible in light of the sanctions placed on Afghanistan. Lastly, the

Respondent said that it would speak with the leadership of the MOTA about the Sole Arbitrator's proposed procedure for progressing these proceedings, as outlined in his e-mail of 26 June 2022.

## E.   SUBMISSION OF THE RESPONSE E-MAILS AND THE CLAIMANT'S REPLY

95.   By e-mail dated 28 June 2022, the Sole Arbitrator indicated that he would pose various questions to the Respondent in the course of the following week, and therefore expected the Respondent to have obtained relevant authority to respond to such questions by that point.

96.   On 10 July 2022, the Sole Arbitrator posed a number of questions to the Respondent, in order for it to have an opportunity to present its case on substantive questions raised in this arbitration. The Sole Arbitrator provided the Claimant an opportunity to correct any incorrect or incomplete summarization of its claims by the Sole Arbitrator by 18 July 2022. By the same date, the Parties were requested to suggest an appropriate time limit within which the Respondent would answer the Sole Arbitrator's questions.

97.   On 18 July 2022, the Respondent provided its answers to the Sole Arbitrator's questions.

98.   By e-mail of the same day, the Claimant stated that it did not have any major corrections to make in respect of the Sole Arbitrator's questions of 10 July 2022, but requested that the questions be accompanied by various pieces of documentary evidence on the record. The Claimant stated that the Respondent should be provided three weeks to provide its answers to those questions, and that each answer should be accompanied by supporting documentation. Finally, the Claimant requested that the Respondent provide a letter that the individual in contact with it and the Sole Arbitrator – Mr. Muhib-Ullah Zahid – is authorized to act and appear on behalf of the Respondent for this arbitration.

99.   Also on the same date, the Sole Arbitrator acknowledged receipt of the Respondent's answers to the questions of 10 July 2022 and stated that he intended to take them as the Respondent's position. In a separate e-mail, the Sole Arbitrator acknowledged receipt of the Claimant's own e-mail of earlier that day.

100.   On 19 July 2022, the Sole Arbitrator referred the Respondent to various pieces of documentary evidence on the record,[7] including exhibits that the Claimant had mentioned in its e-mail of 18

---

[7]   Namely, Letter from Olive Group to ACAA requesting payment of invoices, 17 November 2019 (**Exhibit C-50**); Letter from Olive Group to ACAA requesting payment of invoices, 28 March 2020 (**Exhibit C-51**); Letter from Olive Group to ACAA requesting payment of invoice for equipment, 28 March 2020 (**Exhibit C-52**); Claimant's Notice of Termination, 13 July 2020, 13 June 2020 (**Exhibit C-53**).

July 2022. The Sole Arbitrator also requested from the Respondent any documentary evidence that supported its answers of 18 July 2022, as well as a notarized or sworn letter authorizing Mr. Muhib-Ullah Zahid to act on the Respondent's behalf.

101. By e-mail dated 2 August 2022, the Respondent further explained its position on various issues, expanding on its answers to the Sole Arbitrator's questions of 18 July 2022 and filing exhibits C-1 to C-4 (together with the e-mail dated 18 July 2022, the "**Respondent's Position**"). The Respondent also stated its preference was to secure counsel, instead of utilizing Mr. Muhib-Ullah Zahid as representative and submitting the notarized or sworn letter requested of it on 19 July 2022.

102. On the same date, the Sole Arbitrator clarified that Mr. Muhib-Ullah Zahid could represent the Respondent on an interim basis, pending the appointment of external legal counsel.

103. On 11 August 2022, the Sole Arbitrator asked the Parties whether they still required an oral phase for this arbitration, as had been included in the procedural calendar contained in Procedural Order No. 2. If they did wish to participate in an oral phase, the Sole Arbitrator requested that the Parties discuss between themselves when this should occur.

104. On 18 August 2022, the Respondent stated that it was not minded to require an oral phase of this arbitration, owing to the fact that it was unable to submit a Statement of Defence and, therefore, could not attend an oral hearing.

105. On the same date, the Claimant responded to the Sole Arbitrator's query regarding the oral phase of this arbitration. The Claimant objected to the form of the Respondent's response, said to be contained in its e-mails of 18 July and 2 August 2022 (the "**Response E-mails**"), insofar as they did not answer the Sole Arbitrator's questions and were non-compliant with the Sole Arbitrator's procedural orders, as well as the IBA Rules. The Claimant requested a period of at least two weeks to reply to the Response E-mails. It also reaffirmed its view that a remote oral hearing should take place, limited to the Sole Arbitrator asking the Parties' counsel and legal advisors questions.

106. On 19 August 2022, the Sole Arbitrator set the Respondent an ultimate deadline of 12 September 2022 for it to either secure outside counsel, indicating that he would otherwise proceed on the basis that the Respondent was represented by in-house personnel.

107. On 31 August 2022, the Sole Arbitrator requested that the Parties together establish a supplementary deposit of AED 200,000 for the Sole Arbitrator's fees and expenses, by way of bank transfer to the PCA.

108. By letter dated 12 September 2022, the Respondent indicated that it had been unable to secure outside counsel before the Sole Arbitrator's ultimate deadline and did not adduce any power of attorney. The Respondent requested further consideration of its situation by the Sole Arbitrator.

109. On the same date, the Sole Arbitrator requested the Claimant's comments on the Respondent's letter of 12 September 2022.

110. On 18 September 2022, the Claimant urged the Sole Arbitrator to deny any further extension requests from the Respondent on the grounds that further delay to these proceedings would be unreasonable and prejudicial to the Claimant.

111. On 4 October 2022, the Sole Arbitrator issued Procedural Order No. 4 ("**Procedural Order No. 4**"), in which he rejected the Respondent's request of 12 September 2022 for an additional time extension; ordered the continuation of the proceedings; and directed the Parties to confer and propose a procedural calendar for the next steps of this arbitration by 14 October 2022.

112. On 5 October 2022, the PCA noted that it had received no payment from either Party in response to its request for the establishment of a supplemental deposit dated 31 August 2022.

113. On 11 October 2022, the Claimant informed the PCA that the payment of its share of the supplementary deposit was being processed.

114. On 14 October 2022, the Claimant informed the Sole Arbitrator that the Parties had been unable to reach an agreement regarding a procedural calendar. Instead, the Claimant considered the Response E-mails as the Respondent's Statement of Defence and proposed to reply to them by 4 November 2022. In addition, the Claimant proposed the logistics of the potential oral hearing.

115. On 15 October 2022, the Respondent stated that the Response E-mails did not represent its entire Statement of Defence but a portion of its Statement of Defence.

116. On 19 October 2022, the Sole Arbitrator noted that the Response E-mails were the position of the Respondent and granted the Claimant to reply to the Response E-mails by 4 November 2022. The Sole Arbitrator reiterated that the arbitration proceedings would continue irrespective of whether the Respondent could secure outside counsel but invited the Respondent to augment its position by providing the full Statement of Defence.

117.   On 29 October 2022, the Respondent informed the Sole Arbitrator that it was unable to augment its position by providing the full Statement of Defence until it was represented by outside counsel.

118.   On 2 November 2022, the Claimant requested an extension until 7 November 2022 to reply to the Response E-mails.

119.   On 3 November 2022, the Respondent wrote to the Sole Arbitrator, reiterating its inability to secure outside counsel, but without objecting to the Claimant's request for extension to reply to the Response E-mails.

120.   On the same date, the Sole Arbitrator granted the Claimant's request for an extension.

121.   On the same date, the PCA informed the Parties that the supplementary deposit requested by the Sole Arbitrator on 31 August 2022 still remained unpaid. Accordingly, the Claimant was requested to provide an update on the status of the payment of its share by 7 November 2022 and make a substitute payment on behalf of the Respondent by 30 November 2022.

122.   On 7 November 2022, the Claimant submitted its Reply to Respondent's Information and Documents ("**Reply**"), together with the Witness Statement of Alexander Gunn.

123.   On 9 November 2022, the Sole Arbitrator invited the Respondent to make a response submission in regard to the Reply by 17 November 2022. By the same date, the Sole Arbitrator also requested the Respondent to confirm whether or not it would call upon the Claimant to produce a witness at a hearing.

124.   On 17 November 2022, the Respondent stated that the "only reasonable opportunity" was for it to retain counsel and have them present its case.

125.   On 18 November 2022, the Sole Arbitrator, acknowledging the Respondent's e-mail of 17 November 2022, stated that the matter of the Respondent's representation had been dealt with in Procedural Order No. 4. As such, the Sole Arbitrator held that the Respondent had failed to produce a response submission and any accompanying documents within the timeframe set. Likewise, the Sole Arbitrator stated that the Respondent had not answered his question as to whether it would call on the Claimant to produce a witness at a hearing. The Sole Arbitrator therefore directed the Claimant to make any applications pertaining to its witnesses as it deemed necessary.

126.   On 23 November 2022, the Sole Arbitrator invited the Parties to provide comments on the potential hearing by 30 November 2022.

127.  On 28 November 2022, the Claimant provided its comments on the potential hearing, representing that an oral hearing by videoconference can be scheduled "only if the Tribunal deems it necessary or helpful to the Tribunal." The Claimant asked the Sole Arbitrator to give instructions on the procedural matter in relation to the witness statements.

128.  On 30 November 2022, the Respondent requested that the name of the Afghanistan government be written as "the Government of Islamic Emirate of Afghanistan" instead of "the Government of Islamic Republic of Afghanistan." The Respondent did not provide comments on the potential hearing.

129.  The Claimant failed to make a substitute payment on behalf of the Respondent by 30 November 2022.

130.  On 1 December 2022, the Sole Arbitrator directed the Claimant to the UAE laws in relation to the witness statements.

131.  On 6 December 2022, the Claimant made an application for its two witnesses, Mr. Paul Furlong and Mr. Alexander Gunn, to swear the oath before the Tribunal. The Claimant objected to the Respondent's request to change the name of the Afghanistan government.

132.  On 7 December 2022, the Sole Arbitrator informed the Parties that an oral hearing by videoconference (the "**Hearing**") would be held and invited the Parties to indicate the availability on several dates provided by the Sole Arbitrator to conduct the Hearing. The Sole Arbitrator granted the Claimant's request to call its own witnesses to testify at the Hearing.

133.  On the same date, the Sole Arbitrator rejected the Respondent's request to change the name of the Afghanistan government in this arbitration.

## F.    THE SUSPENSION OF THE ARBITRAL PROCEEDINGS

134.  On 15 December 2022, the Sole Arbitrator ordered the suspension of the arbitral proceedings in light of the Parties' failure to make the supplementary deposit requested on 31 August 2023, in accordance with Article 43(4) of the UNCITRAL Rules.

135.  On the same date, the Claimant indicated its availability to attend the Hearing on 9 or 11 January 2023.

136.  On 22 December 2022, the Sole Arbitrator asked the Parties to update the PCA and him on the status of the payment of the supplementary deposit by 29 December 2022.

137. On 29 December 2022, the Respondent represented that it was available to make the supplementary deposit of its share on the condition that the Sole Arbitrator would grant the Respondent "an ample opportunity for retaining its counsel." No comments were received from the Claimant.

## G.   THE HEARING

138. On 27 February 2023, the PCA acknowledged receipt of a payment of AED 200,000 from the Claimant, constituting the total amount of the supplementary deposit requested by the Sole Arbitrator on 31 August 2022.

139. On 28 February 2023, following receipt of the supplementary deposit in full from the Claimant, the Sole Arbitrator notified the Parties that the suspension of the proceedings was lifted. The Sole Arbitrator invited the Parties to indicate their respective availability on either 15 or 16 March 2023 to conduct the Hearing.

140. On 1 March 2023, the Claimant indicated that it would be available on both 15 and 16 March 2023, with its preference for 16 March 2023.

141. On 6 March 2023, the Respondent stated that it would not participate in the Hearing unless it could secure outside counsel, without objecting to the date of 16 March 2023 for the Hearing. The Respondent requested for "a reasonable and full opportunity of presenting its case by its counsel."

142. On 7 March 2023, the Sole Arbitrator decided that the Hearing would take place on 16 March 2023. The Sole Arbitrator once again noted that the arbitration must progress irrespective of whether the Respondent could secure outside counsel and that the Respondent has had ample time to retain outside counsel.

143. On the same date, the Sole Arbitrator circulated a draft procedural order providing a protocol for the Hearing to the Parties and invited the Parties to provide comments thereon by 13 March 2023.

144. On 8 March 2023, the Sole Arbitrator noted that he would reserve his right to ask clarification questions to the witnesses that would appear at the Hearing. The Sole Arbitrator invited the Parties to indicate whether they wished to apply for a later Hearing date, given that the Parties may need extra time for consideration of the matter.

145. On 9 March 2023, the Claimant confirmed that it did not wish to apply for a Hearing date later than 16 March 2023. On the same date, the Claimant proposed that the Hearing commence at 4:00 PM (UTC+4).

146. On 10 March 2023, the Sole Arbitrator invited the Respondent to make comments on the proposed start time of the Hearing by close of business on 12 March 2023.

147. On 12 March 2023, the Respondent reiterated that it would not participate in the Hearing unless it could secure outside counsel, without objecting to the start time of the Hearing of 4:00 PM (UTC+4).

148. On 13 March 2023, the Sole Arbitrator confirmed that the Hearing would commence at 4:00 PM (UTC+4) on 16 March 2023.

149. On the same date, the Claimant provided its comments on the draft procedural order circulated by the Sole Arbitrator on 7 March 2023. No comments were received from the Respondent.

150. On 14 March 2023, the Sole Arbitrator issued Procedural Order No. 5 ("**Procedural Order No. 5**"), setting out a protocol for the Hearing.

151. On 15 March 2023, the Claimant requested that Mr. Paul Furlong, the Claimant's witness and corporate representative for the Hearing, be permitted to attend the Hearing in its entirety.

152. On the same date, the Sole Arbitrator granted the request. The Sole Arbitrator asked that Mr. Paul Furlong give his evidence first, to which the Claimant agreed on the same date.

153. On 16 March 2023, the Respondent requested to reschedule the Hearing to 26 March 2023, or another date at the Sole Arbitrator's convenience. On the same date, the Claimant objected to the Respondent's request to reschedule the Hearing.

154. Later on the same date, the Sole Arbitrator denied the Respondent's request to reschedule the Hearing.

155. On 16 March 2023, the Hearing was held by video conference using the Zoom platform. The following persons attended the Hearing:

      **Sole Arbitrator**
      Mr. Victor P. Leginsky

**Claimant**
Mr. Enayat Qasimi (Counsel)
Ms. Ilana Subar (Counsel)
Mr. Paul Furlong (Party Representative)

**Respondent**
No participants present

**Claimant's Witnesses**
Mr. Paul Furlong
Mr. Alexander Gunn

**Registry: Permanent Court of Arbitration**
Mr. Túlio Di Giacomo Toledo, Legal Counsel
Mr. Shuyao Li, Assistant Legal Counsel
Ms. Rishi Agarwal, Case Manager

**Court Reporter**
Ms. Nicky Misso (Lloyd Michaux)

156. Both witnesses were sworn to an oath in the form of "I, [name of witness], swear by the mighty God to say all the truth and nothing but the truth" prior to them giving their evidence.[8]

## H.   POST-HEARING MATTERS

157. On the same date after the end of the Hearing, the Sole Arbitrator directed that any corrections to the transcript of the Hearing (the "**Transcript**") be provided by 23 March 2023.

158. On 17 March 2023, the Sole Arbitrator invited the Parties to indicate whether they require a written closing submission by 29 March 2023.

159. On 23 March 2023, the Claimant provided proposed corrections to the Transcript.

160. On 27 March 2023, the Respondent wrote to the Sole Arbitrator, granting authority to "Messrs. / Ahmed Abdullah Al Dhaheri Law Firm and Legal Consultations" to represent the Respondent in the arbitral proceedings.

161. On the same date, the Sole Arbitrator acknowledged receipt of the Respondent's correspondence of 27 March 2023 and invited the Respondent to submit a power of attorney evidencing the authority granted to "Messrs. / Ahmed Abdullah Al Dhaheri Law Firm and Legal Consultations" to represent the Respondent in this arbitration.

---

[8]    *See* Oath of Mr. Furlong, Transcript, p. 4, 1.20; Oath of Mr. Gunn, Transcript, p. 27, 1.11.

162. On 28 March 2023, the Respondent stated that it would submit the requested power of attorney.

163. On 29 March 2023, Mr. Ahmed Al Dhaheri confirmed that the power of attorney was being finalized and asked the Sole Arbitrator to indicate what the next step of the arbitration would be.

164. On the same date, the Sole Arbitrator acknowledged receipt of Mr. Al Dhaheri's e-mail of 29 March 2023 and noted that the Hearing had been concluded. The Sole Arbitrator further noted that if the Respondent wished to become involved in the arbitral proceedings at this late stage of the arbitration, the Respondent would need to make an application as to how it wished to be involved in the proceedings, by 6 April 2023.

165. On 6 April 2023, the Respondent applied for a 21-day period to review the documents and file a submission.

166. By e-mail dated 10 April 2023, the Claimant requested that the Sole Arbitrator reject the Respondent's application for a 21-day period to review the documents and file a submission, on the basis that (i) further delay of the proceedings would prejudice the Claimant; and (ii) the Respondent should not have any further opportunity to make substantive submissions. In the alternative, the Claimant requested that the Respondent be required to make the deposit of its share and to provide the financial security before filing its submission.

167. On 17 April 2023, the Respondent indicated its willingness to pay its share of the deposit but stated that it was unable to provide the financial security sought by the Claimant.

168. On 19 April 2023, the Sole Arbitrator allowed the Respondent to file a submission in accordance with specific parameters by 19 May 2023, subject to the payment of its share of the deposit in the amount of AED 145,625 by 5 May 2023. Further, the Sole Arbitrator noted that, upon receipt of the Respondent's deposit payment, he intended to refund the Claimant the amount of AED 100,000 and credit the sum of AED 45,625 towards any future payment request, if applicable.

169. On 26 April 2023, the Respondent indicated its intention to pay the requested deposit and requested an opportunity "to make its full submission along with the Statement of Defence so that [it] can provide all available related documents and witnesses to the matters as have not been provided so far due to unavailability of counsel and lack of access to expertise."

170. On 28 April 2023, the Sole Arbitrator denied the Respondent's request to make its full submission along with the Statement of Defence, and reiterated the parameters of the submission, as set out on 19 April 2023.

171. On 3 May 2023, the Respondent informed the Sole Arbitrator that it has experienced difficulties in making the deposit payment to the PCA's bank account in the Netherlands and asked whether the payment could be made in other forms.

172. On 4 May 2023, the Sole Arbitrator directed the Respondent to liaise with the PCA to discuss the logistics of the payment. Further, he invited the Parties to provide in writing their agreement to a date for the issuance of the final award in these proceedings, in accordance with article 42(1) of the UAE Arbitration Law.

173. On 6 May 2023, the Claimant agreed pursuant to article 42(1) of the UAE Arbitration Law, that the final award in this arbitration proceeding shall be issued by the Sole Arbitrator within two months after the closure of the proceedings.

174. On 9 May 2023, the PCA confirmed receipt of the payment of the Respondent's share of the deposit in the amount of AED 145,625.

175. On 17 May 2023, the Respondent requested an extension of time until 29 May 2023 to file its "statement of defence."

176. On the same date, the Sole Arbitrator directed the Parties to confer and agree on the timing for the provision of the Respondent's submission as well as for the final award.

177. On 19 May 2023, the Claimant informed the Sole Arbitrator that the Parties had failed to reach an agreement on the two issues directed by the Sole Arbitrator. In particular, the Claimant objected to the Respondent's request for extension until 29 May 2023 to file its submission. However, the Claimant was agreeable to a very brief extension due to a holiday in Afghanistan and proposed that the final award be issued by 31 July 2023.

178. On the same date, the Sole Arbitrator invited the Respondent to comment on the Claimant's e-mail of 19 May 2023 by 22 May 2023. Also, he asked the Respondent to provide by the same date its views on the final award being completed by 31 July 2023.

179. On 21 May 2023, the Respondent requested an extension of time until 30 August 2023 to file its submission.

180. On 22 May 2023, the Sole Arbitrator reiterated that he had invited the Respondent to provide its views on the Claimant's e-mail of 19 May 2023 and on the final award being completed by 31 July 2023.

181. On 22 May 2023, the Respondent stated that the issue of the date of issuance of the final award depended on the date of submission of its defence. Therefore, it reiterated its request for an extension of time until 30 August 2023 to file its submission.

182. On 29 May 2023, the Sole Arbitrator extended the deadline for the Respondent to file its submission until 15 June 2023 and directed the Parties to agree on the date for the issuance of the final award by 2 June 2023.

183. On 31 May 2023, the Respondent requested a virtual case management conference. On the same date, the Sole Arbitrator directed the Parties to confer and agree on the timing and agenda for such a virtual case management conference, while allowing either Party to request such a conference again should they fail to agree.

184. On 5 June 2023 and 7 June 2023, the Claimant and the Respondent respectively reported on their discussions. They explained that they were unable to agree on whether a virtual case management conference should be held. The Parties also failed to agree on a date for the issuance of the final award. In addition, the Respondent reiterated its request for time until 30 August 2023 to file its submission.

185. On 7 June 2023, the Sole Arbitrator reiterated his decision not to extend the deadline for the Respondent's submission and invited the Respondent to confirm whether it intended to apply for a virtual case management conference.

186. On 8 June 2023, the Respondent insisted that it needed additional time to make its submission and applied for a virtual case management conference.

187. On the same date, the Sole Arbitrator rejected the Respondent's request for additional time and confirmed that its submission must be filed by 15 June 2023. As a result, the Sole Arbitrator dismissed the application for a case management conference to discuss an extension of time for the filing of the Respondent's submission. However, the Sole Arbitrator noted that he would consider directing such a conference if either or both Parties had other matters to address at the conference.

188. On 13 June 2023, the Respondent submitted a new request for additional time to submit its statement of defence.

189. On the same date, the Sole Arbitrator rejected the Respondent's request of 13 June 2023 and reminded the Respondent that the submission in question is not in the nature of a full statement of defence, but is a discrete submission as detailed in his directions of 19 April 2023.

190. On 15 June 2023, the Respondent asked the Sole Arbitrator to reconsider his decision of 13 June 2023 and again requested that it be granted time until 30 August 2023 to file its submission.

191. On 16 June 2023, the Sole Arbitrator confirmed his decision of 13 June 2023 and indicated that he was open to an extension of one or two days, if needed by the Respondent.

192. On 18 June 2023, the Respondent reiterated its request for additional time to file its submission.

193. On 19 June 2023, the Sole Arbitrator rejected the Respondent's request of 18 June 2023. As the Respondent failed to meet the deadline of 15 June 2023 to file its submission, the Sole Arbitrator directed that the proceedings continue in the absence of the submission, in accordance with Article 30(1)(b) of the UNCITRAL Rules.

194. On 24 June 2023, the Respondent sent an e-mail to the PCA setting forth its complaint in relation to the decisions taken by the Sole Arbitrator in this matter.

195. On 26 June 2023, the PCA replied to the Respondent, stating that pursuant to the UNCITRAL Rules, the PCA was not in a position to review decisions taken by the Sole Arbitrator or address complaints with respect to the conduct of the arbitration.

196. On 13 August 2023, the Sole Arbitrator noted that, in light of the Parties' failure to agree on the time for the issuance of the final award under the UAE Arbitration Law, the courts of the UAE would now determine the timeframe within which the arbitration award in this case should be issued.

197. On 28 September 2023, the Dubai Courts Court of Appeals (Fifth Commercial Appeals Circuit) set the deadline for the issuance of the final award in this case to 30 November 2023.[9]

198. On 14 November 2023, the Sole Arbitrator issued Procedural Order No. 6 ("**Procedural Order No. 6**") confirming the order of the Dubai Courts in setting the date for the issuance of the final award to 30 November 2023, and closed the proceedings.

---

[9]  Dubai Courts Court of Appeals (Fifth Commercial Appeals Circuit), Appeal No. 118/2023/392, Order on Petition, Arbitration.

199. On 16 November 2023, the Respondent expressed its "strong and unequivocal refusal of the Final Award that will be issued in the matter on 30 November 2023 and its deep disapproval and disagreement with the decision to close the proceedings." The Respondent asserted that the closure of the proceedings at this stage is "premature and unjust."

200. On 17 November 2023, the Sole Arbitrator acknowledged receipt of the Respondent's correspondence of 16 November 2023 and noted that no regard would be taken of the content of its correspondence in view of Procedural Order No. 6.

## IV.    FACTUAL BACKGROUND

### A.    EXECUTION OF THE ANAP CONTRACT, KEY TERMS

201. According to the Claimant, the Respondent has been contracting out aviation security services to international companies via international tenders, so as to meet the standards recommended by the International Civil Aviation Organization (the "**ICAO**").[10]

202. On or about 30 December 2017, the Claimant submitted its bid for the procurement of the Afghanistan National Airports Project ("**ANAP**").[11] On 1 July 2018, after the Claimant had lowered its price for the ANAP at the request of the Respondent,[12] the Respondent issued a letter of acceptance to the Claimant in accordance with Afghan laws and regulations, informing it that the National Procurement Commission (the "**NPC**")[13] approved the Claimant's bid with a total contract value of USD 38,416,547.[14]

203. On 4 August 2018, the Parties formally entered into the ANAP Contract.[15] According to the ANAP Contract, the Claimant was to provide aviation security-related services in support of the Respondent's aviation operations, including passenger and cargo checks and screening, management and training of local aviation security personnel and maintenance of the Respondent's aviation security equipment, as specifically identified in the annexes to the

---

[10]    Statement of Claim, ¶ 26; Witness Statement of Paul Furlong, 28 October 2021, ¶ 18 (**CWS-1**).

[11]    Statement of Claim, ¶ 28; ANAP Contract, p. 27 (**Exhibit C-1**).

[12]    Statement of Claim, ¶ 28; Witness Statement of Paul Furlong, 28 October 2021, ¶ 20 (**CWS-1**); ANAP Contract, p. 26 (**Exhibit C-1**).

[13]    NPC was the highest procurement authority in the Government of Afghanistan, then chaired by the President of Islamic Republic of Afghanistan. *See* Statement of Claim, ¶ 29.

[14]    Statement of Claim, ¶ 29; Witness Statement of Paul Furlong, 28 October 2021, ¶ 21 (**CWS-1**); ANAP Contract, p. 4 (**Exhibit C-1**).

[15]    Statement of Claim, ¶ 30; Witness Statement of Paul Furlong, 28 October 2021, ¶ 22 (**CWS-1**); ANAP Contract, p. 4 (**Exhibit C-1**).

Contract, at Afghanistan's four international airports.[16] The starting date of the ANAP Contract was 4 August 2018 and the intended completion date was 3 August 2021.[17]

204. The ANAP Contract is a "Lump Sum" contract at the contract price of USD 38,416,547.[18] According to the ANAP Contract, payment for the Claimant's services was to be made by monthly progress payments.[19] Over the course of the three-year ANAP Contract, there were to be 36 monthly progress payments in the amount of USD 1,020,605.83 by the Respondent to the Claimant, for a total of USD 36,741,809.90.[20] The balance of the ANAP Contract price (i.e. USD 1,674,737.10) was for the purchase of security-related equipment for the airports.[21]

B.    DELAY IN PAYING THE INVOICES, "PENALTIES" AND A 10% RETENTION

205. During the duration of the ANAP Contract, the Respondent withheld sums for "penalties" which in the aggregate amounted to USD 1,280,967.55 from the Claimant.[22] The Respondent also withheld an amount of USD 2,755,635.74 representing a 10% retention of each monthly progress invoice.[23]

206. According to the Claimant, the Respondent failed to timely pay nearly all of the invoices issued by the Claimant even after the Claimant notified the Respondent of its non-payment by the due date.[24] It contends that, in the aggregate, there were 1,726 days of delay in the payment of invoices by the Respondent.[25]

---

[16]  Statement of Claim, ¶ 37; Witness Statement of Paul Furlong, 28 October 2021, ¶ 26 (CWS-1).

[17]  Statement of Claim, ¶¶ 35-36; Witness Statement of Paul Furlong, 28 October 2021, ¶ 25 (CWS-1); ANAP Contract, SCC, cl. 2.2.2, 2.3 (Exhibit C-1).

[18]  Statement of Claim, ¶¶ 32-33; ANAP Contract, SCC, cl. 1.1(d)-1.1(e) (Exhibit C-1).

[19]  Statement of Claim, ¶ 38; Witness Statement of Paul Furlong, 28 October 2021, ¶ 27 (CWS-1); ANAP Contract, SCC, cl. 6.4 (Exhibit C-1).

[20]  Statement of Claim, ¶ 39; Witness Statement of Paul Furlong, 28 October 2021, ¶ 27 (CWS-1).

[21]  Statement of Claim, ¶ 39; Witness Statement of Paul Furlong, 28 October 2021, ¶ 27 (CWS-1).

[22]  Statement of Claim, ¶ 48; Witness Statement of Paul Furlong, 28 October 2021, ¶ 31 (CWS-1); Chart of Invoices, Payments, Amounts Withheld (Exhibit C-44).

[23]  Statement of Claim, ¶¶ 50, 53; Witness Statement of Paul Furlong, 28 October 2021, ¶ 32-33 (CWS-1); Chart of Invoices, Payments, Amounts Withheld (Exhibit C-44).

[24]  Statement of Claim, ¶¶ 54-55; Witness Statement of Paul Furlong, 28 October 2021, ¶ 35 (CWS-1); Summary Spreadsheet of Invoices, Payments, Amounts Withheld (Exhibit C-44); Letter from Olive Group to ACAA requesting payment of invoices, 17 November 2019 (Exhibit C-50); Letter from Olive Group to ACAA requesting payment of invoices, 28 March 2020 (Exhibit C-51); Letter from Olive Group to ACAA requesting payment of invoice for equipment, 28 March 2020 (Exhibit C-52).

[25]  Statement of Claim, ¶ 54; Summary Spreadsheet of Invoices, Payments, Amounts Withheld (Exhibit C-44).

207. On 13 June 2020, the Claimant issued a notice of termination of the ANAP Contract as a response to the delay in payment and deductions (the "**Claimant's Notice of Termination**").[26] After the Respondent made payment of certain invoices, the Claimant extended the effective date of its termination, and ultimately withdrew the Claimant's Notice of Termination.[27]

### C.    END OF THE ANAP CONTRACT, TRANSITION OF THE SECURITY SERVICES AND EQUIPMENT TO ACAA

208. On or about 15 August 2020, the Respondent proposed to the Claimant to modify the ANAP Contract and reduce the term of the ANAP Contract by 25% (i.e. 9 months).[28] By letter dated 22 August 2020, the Claimant rejected this proposal.[29]

209. On or about 4 October 2020, the Respondent sent a letter to the Claimant purporting to terminate the ANAP Contract (the "**Respondent's Notice of Termination**"), invoking Clause 2.6 of the GCC.[30] The Respondent stated that the termination was in accordance with the NPC Resolution number 4,305 dated 15 September 2020 (the "**NPC's Resolution**"), which was approved by the then President of Afghanistan.[31] The end date was 4 November 2020,[32] which reduced the term of the ANAP Contract by 9 months.[33] The ANAP Contract price for the last 9 months was USD 9,185,452.47.[34]

210. On 7 October 2020, the Claimant sent a letter to the Respondent informing it that it disagreed with the Respondent's Notice of Termination.[35] According to the Claimant, the Respondent

---

[26]    Statement of Claim, ¶ 58; Witness Statement of Paul Furlong, 28 October 2021, ¶ 37 (**CWS-1**); Claimant's Notice of Termination, 13 June 2020 (**Exhibit C-53**).

[27]    Statement of Claim, ¶ 59; Witness Statement of Paul Furlong, 28 October 2021, ¶ 38 (**CWS-1**); First Extension of Termination Date, 10 July 2020, (**Exhibit C-54**); Second Extension of Termination Date, 16 July 2020, (**Exhibit C-55**); Third Extension of Termination Date, 23 July 2020 (**Exhibit C-56**); Fourth Extension of Termination Date, 14 August 2020 (**Exhibit C-57**); Fifth Extension of Termination Date, 20 August 2020 (**Exhibit C-58**).

[28]    Statement of Claim, ¶ 61; Witness Statement of Paul Furlong, 28 October 2021, ¶ 40 (**CWS-1**); Letter from ACAA to Olive Group proposing 25% reduction in the Contract, 15 August 2020 (**Exhibit C-60**).

[29]    Statement of Claim, ¶ 66; Witness Statement of Paul Furlong, 28 October 2021, ¶ 41 (**CWS-1**); Letter from Olive Group to ACAA rejecting ACAA's proposal, 22 August 2020 (**Exhibit C-61**).

[30]    Statement of Claim, ¶ 67; Witness Statement of Paul Furlong, 28 October 2021, ¶ 42 (**CWS-1**); Respondent's Notice of Termination, 4 October 2020 (**Exhibit C-62**).

[31]    Statement of Claim, ¶ 69; Respondent's Notice of Termination, 4 October 2020 (**Exhibit C-62**).

[32]    Statement of Claim, ¶ 69; Respondent's Notice of Termination, 4 October 2020 (**Exhibit C-62**).

[33]    Statement of Claim, ¶ 74; Respondent's Notice of Termination, 4 October 2020 (**Exhibit C-62**).

[34]    Statement of Claim, ¶ 74.

[35]    Statement of Claim, ¶ 76; Letter from Olive Group to ACAA, 7 October 2020 (**Exhibit C-63**).

subsequently awarded a contract identical to the ANAP Contract to another company without a bidding process and at a considerably higher price.[36]

211. The Claimant continued to perform its duties under the ANAP Contract until the end date, i.e. 4 November 2020.[37] Thereafter, the Claimant transferred all equipment and responsibilities to the Respondent.[38] As evidence, the Claimant's and the Respondent's respective representatives signed letters in early November 2020 which served as the "Completion Certifications."[39] Moreover, the Respondent confirmed through its letter No. 503 dated 17 December 2020 that the Claimant "has completed its obligation with regard to aviation security and has cooperated in a satisfactory manner with the ACAA and airport officials with regard to the process of transfer of responsibilities and equipment"[40] However, the Respondent still disputes that the Claimant failed to perform the transfer of all equipment.[41]

### D. REQUIREMENT OF MANNING CAP FEES, DELAY IN THE RENEWAL OF THE CLAIMANT'S PRIVATE SECURITY COMPANY LICENSE, AND LOSS OF OPPORTUNITIES OF ENTERING INTO OTHER SECURITY CONTRACTS

212. According to the Claimant, it has held a valid business license at all relevant times.[42] The Claimant also held a Private Security Company License ("**PSC License**") which allowed the Claimant to employ armed security guards, own weapons, and provide armed security services to its clients.[43] The Claimant required a PSC License to perform other work irrelevant to the ANAP Contract, including provision of security services to foreign embassies in Afghanistan.[44] The period of validity of a PSC License is one Afghanistan solar calendar year, which begins on 21 March and ends on 20 March of the following year. The Claimant explains that, normally, applications for renewal of a PSC License are submitted to the Ministry of Interior (the "**MOI**")

---

[36]   Statement of Claim, ¶ 75.

[37]   Statement of Claim, ¶ 84; Witness Statement of Paul Furlong, 28 October 2021, ¶ 48 (**CWS-1**).

[38]   Statement of Claim, ¶ 85; Witness Statement of Paul Furlong, 28 October 2021, ¶ 49 (**CWS-1**).

[39]   Statement of Claim, ¶ 85; Completion Certificate re: HKIA airport, 7 November 2020 (**Exhibit C-69**); Completion Certificate re: Herat Int'l Airport, 4 November 2020 (**Exhibit C-70**); Completion Certificate re: Mazar-e-Sharif Int'l Airport, 5 November 2020 (**Exhibit C-71**); Completion Certificate re: Kandahar Int'l Airport, 4 November 2020 (**Exhibit C-72**).

[40]   Statement of Claim, ¶ 86; Letter from ACAA to Olive Group certifying that Olive Group has fulfilled its contractual obligations and transfer of responsibilities, 17 December 2020 (**Exhibit C-73**).

[41]   Respondent's e-mail of 18 July 2022.

[42]   Statement of Claim, ¶ 91; Witness Statement of Paul Furlong, 28 October 2021, ¶ 53 (**CWS-1**).

[43]   Statement of Claim, ¶ 92; Witness Statement of Paul Furlong, 28 October 2021, ¶ 54 (**CWS-1**); PSC License Expiry, March 2018 (**Exhibit C-5**); PSC License Expiry, 10 June 2019 (**Exhibit C-6**).

[44]   Statement of Claim, ¶ 92; Witness Statement of Paul Furlong, 28 October 2021, ¶ 54 (**CWS-1**).

approximately 28 days before the current license expiry date and the MOI issues a new PSC License in March.[45]

213.   The MOI's Private Security Company Regulations ("**PSC Regulations**") impose a manning cap of 500 security guards for each private security company operating in Afghanistan. A fee is imposed on the company for each additional employed security guard in excess of the 500 manning cap.[46] From around January 2020, the MOI demanded manning cap fees from the Claimant on the alleged ground that personnel employed under the ANAP Contract were in excess of 650 personnel and therefore violated the PSC regulations.[47]

214.   In or around February 2020, the Claimant submitted its application for renewal of the PSC License.[48] The MOI rejected the application on the basis that (i) documents evidencing internal approval by, *inter alia*, the National Security Council (the "**NSC**") of the ANAP Contract had not been submitted to the MOI and (ii) the Claimant had not paid manning cap fees in relation to the ANAP Contract.[49] According to the Claimant, it immediately brought these two issues to the attention of the Respondent and urged the Respondent to help resolve these issues.[50]

215.   On 18 June 2020, the Claimant sent a letter to the Respondent, requesting the latter's help to resolve the manning cap fee issue and renewal of the PSC License. In this letter, the Claimant gave reasons why the manning cap fees in relation to employees under the ANAP Contract should not be imposed.[51]

216.   On 27 June 2020, the Respondent sent a letter to the MOI, requesting to exclude the airport security services from the manning cap due to its non-military nature.[52] However, the MOI denied

---

[45]   Statement of Claim, ¶ 93.

[46]   Statement of Claim, ¶ 110; Witness Statement of Paul Furlong, 28 October 2021, ¶ 71 (**CWS-1**); Afghanistan Ministry of Interior Private Security Company Regulations 2008 (**CLA-6**).

[47]   Statement of Claim, ¶ 111; Witness Statement of Paul Furlong, 28 October 2021, ¶ 72 (**CWS-1**).

[48]   Statement of Claim, ¶ 93.

[49]   Statement of Claim, ¶ 93, Letter from Olive Group to MOI re: renewal of its PSC license, 17 August 2020 (**Exhibit C-7**); Letter from Olive Group to MOI, 14 September 2020 (**Exhibit C-8**).

[50]   Statement of Claim, ¶¶ 93, 115.

[51]   Statement of Claim, ¶ 115; Witness Statement of Paul Furlong, 28 October 2021, ¶ 77 (**CWS-1**); Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[52]   Statement of Claim, ¶¶ 117-118; Witness Statement of Paul Furlong, 28 October 2021, ¶¶ 77-78 (**CWS-1**); Letter from ACAA to MOI re: manning cap, 27 June 2020 (**Exhibit C-77**).

Case 1:24-cv-02170-SLS    Document 4-1    Filed 07/24/24    Page 42 of 109

PCA Case No. 2021-34
Final Award
Page 41 of 108

waiver of the manning cap fee in relation to the ANAP Contract as well as renewal of the PSC Contract.[53]

217. On 26 October 2020, the Claimant asked the Respondent to get confirmation of the NSC's approval of the ANAP Contract.[54] On 31 October 2020, the Respondent submitted documents evidencing internal approval of the ANAP Contract to the MOI.[55]

218. In November 2020, the Claimant renewed its PSC License with a period of validity for three months, after the Claimant provided a commitment letter to the MOI to pay the manning cap fees once the MOI issued a valid invoice. The MOI did not issue a valid invoice. The Claimant did not pay the manning cap fees. On 1 February 2021, the MOI again demanded payment of the manning cap fees.[56] According to the Claimant, it was able to renew its PSC License after submitting a similar commitment letter.[57]

219. During the period when the Claimant had no valid PSC License (i.e. from February 2020 to November 2020), it suffered damages including penalties associated with delays in work visa renewals, which totalled USD 1,337,770.[58] More importantly, the Claimant lost business opportunities to enter into other services contracts, mainly including a security services contract with the Embassy of Canada to Afghanistan in Kabul, Afghanistan (the "**Canadian Embassy**").[59] The Claimant had a contract with the Canadian Embassy, with a contract period from 16 July 2017 to 15 July 2018. In two subsequent years, the Canadian Government exercised its irrevocable option to extend the term of the contract until 31 July 2021.[60] On 3 October 2020, the Afghanistan Ministry of Foreign Affairs (the "**MOFA**") informed the Canadian Government that

---

[53] Statement of Claim, ¶ 119; Witness Statement of Paul Furlong, 28 October 2021, ¶ 79 (**CWS-1**); Letter from ACAA to Olive Group, 24 October 2020 (**Exhibit C-9**).

[54] Letter from Olive Group to ACAA in response to ACAA's letter dated 24 October 2020, 26 October 2020 (**Exhibit C-11**).

[55] Statement of Claim, ¶ 120; Witness Statement of Paul Furlong, 28 October 2021, ¶ 80 (**CWS-1**); Letter from ACAA to Olive Group in response to Olive Group's letter dated 26 October 2020, 31 October 2020 (**Exhibit C-12**).

[56] Statement of Claim, ¶ 121.

[57] Statement of Claim, ¶ 122.

[58] Statement of Claim, ¶ 108; Witness Statement of Paul Furlong, 28 October 2021, ¶ 69 (**CWS-1**); Spreadsheet re: work visa penalties imposed by Government of Afghanistan on Olive Group (**Exhibit C-88**).

[59] Statement of Claim, ¶ 98; Witness Statement of Paul Furlong, 28 October 2021, ¶ 60 (**CWS-1**); Letter from Canadian Government (DFATD) to Olive Group re: diplomatic note received from MOFA, 3 February 2021 (**Exhibit C-81**); Letter from Canadian Government (DFATD) to Olive Group re: not exercising final option period of Canadian Embassy Contract, 19 May 2021 (**Exhibit C-82**).

[60] Statement of Claim, ¶ 99; Witness Statement of Paul Furlong, 28 October 2021, ¶ 61 (**CWS-1**); Amendment No. 13 to Canadian Embassy Contract, 30 July 2020, p. 2 (**Exhibit C-79**).

"until the license of this security company [Olive Group] is renewed, any changes in its previous contracts is not allowed and the activities of this company have no legal base."[61] The Canadian Government decided not to extend the contract after 31 July and awarded a security services contract to a different company.[62] According to the Claimant, had the Claimant had a valid PSC License and had the MOFA not interfered in the matter, the Claimant's contract with the Canadian Embassy could have been extended for one year.[63] The contract price for that one-year extension is USD 9,337,628.76.[64]

## V.   THE PARTIES' REQUESTS FOR RELIEF

220.  In its Statement of Claim, the Claimant requests as follows:

> 239. Olive Group claims and demands an arbitration award against the Afghanistan Civil Aviation Authority and the Government of Afghanistan as follows:
>
> (a) Award Olive Group monetary damages in an amount not less than $9,185,452.47 USD for the 25% remainder of the Contract;
>
> (b) Award Olive Group for all amounts withheld by ACAA for "retention" in an amount not less than $2,755,635.74 USD;
>
> (c) Award Olive Group all amounts withheld by ACAA for unjustified "penalties" in an amount not less than $1,280,967.55 USD;
>
> (d) Award Olive Group damages for ACAA's delayed and untimely payments of invoices and illegal deductions from invoices in an amount not less than $724,830.93 USD (see calculations contained in Exhibits C-45, C-46, C-47, and C-48);
>
> (e) Award Olive Group monetary damages suffered by Olive Group as a result of delays in the renewal of Olive Group's PSC License caused by ACAA, and improper and tortious interference of the Government of Afghanistan with Olive Group's Canadian Embassy Contract, in an amount not less than $10,675,398.80 USD (i.e. $9,337,628.76 USD in connection with the Canadian Embassy Contract and $1,337,770.00 USD for work visa penalties), and other direct and indirect damages suffered by Olive Group, in an amount to be proven at arbitration;
>
> (f) Award Olive Group damages for the improper and unauthorized delayed return of Olive Group's Performance Guarantee for the period December 2, 2020 until October 5, 2021 in the amount of $67,854.98 USD;
>
> (g) Award Olive Group all attorneys' fees, and costs associated with these proceedings, including all professional and expert fees and disbursements, as well as the fees of the Arbitral Tribunal;
>
> (h) Issue a determination and/or finding that the ANAP Contract personnel employed

---

[61]  Statement of Claim, ¶ 101; Witness Statement of Paul Furlong, 28 October 2021, ¶ 63 (**CWS-1**); Letter from Canadian Government (DFATD) to Olive Group re: diplomatic note received from MOFA, 3 February 2021 (**Exhibit C-81**).

[62]  Statement of Claim, ¶ 100; Witness Statement of Paul Furlong, 28 October 2021, ¶ 62 (**CWS-1**); Letter from Canadian Government (DFATD) to Olive Group re: not exercising final option period of Canadian Embassy Contract, 19 May 2021 (**Exhibit C-82**).

[63]  Statement of Claim, ¶ 103; Witness Statement of Paul Furlong, 28 October 2021, ¶ 64 (**CWS-1**).

[64]  Statement of Claim, ¶ 180; Witness Statement of Paul Furlong, 28 October 2021, ¶ 109 (**CWS-1**); Amendment No. 13 to Canadian Embassy Contract, 30 July 2020, pp. 6-7 (**Exhibit C-79**).

> by Olive Group were not security guards as defined in the PSC Regulations and that Olive Group is not subject to manning cap fees in connection with the ANAP Contract personnel; and
>
> (i) Grant such other and further relief that the Arbitral Tribunal deems just and proper under the circumstances.[65]

221. In its Reply, the Claimant submitted the following:

> For all of the foregoing reasons, Claimant respectfully requests that the Tribunal ignore or disregard Respondent's false and unsupported allegations and statements relating to applicable laws of Afghanistan contained in Respondent's August 2, 2022 and July 18, 2022 submissions.
>
> Claimant requests an arbitration award against the Respondent as detailed its Statement of Claim, submitted on October 28, 2021.[66]

222. The Respondent failed to explicitly state its request for relief.

## VI.   THE PARTIES' POSITIONS

223. This section addresses the Parties' positions on the Respondent's alleged breaches of the ANAP Contract, to the extent that the Respondent submitted comments on the Claimant's claims.

### A.   APPLICABLE LAW

#### 1.   The Claimant's Position

224. The Claimant submits that in the present case, to the extent the ANAP Contract does not address an issue, the Sole Arbitrator must rely on the applicable laws of Afghanistan, and to the extent that Afghan laws do not address an issue, the Sole Arbitrator may then apply principles of Sharia law and customs and practices.

#### 2.   The Respondent's Position

225. The Respondent failed to provide its position on this issue.

### B.   THE "PENALTIES"

226. The Parties do not dispute that the Respondent imposed the "penalties" on the Claimant.[67] The Parties dispute over whether the "penalties" were justified.

---

[65]   Statement of Claim, ¶ 239.

[66]   Reply, p. 15.

[67]   Statement of Claim, ¶ 48, 214; Respondent's e-mail of 18 July 2022; Respondent's e-mail of 2 August 2022.

### 1.    The Claimant's Position

227.    The Claimant submits that the Respondent breached the ANAP Contract by imposing "penalties" in the amount of USD 1,280,967.55.[68] The Claimant denies that there was inactive equipment which the Claimant had the obligation to maintain during the duration of the ANAP Contract.[69] As evidence, the Respondent's letters and certification confirmed that.[70] The Claimant likewise denies that it failed to install certain equipment listed in Appendix F1 or failed to complete delivery and installation in time.[71] Further, the Claimant argues that the Respondent's investigation was conducted before the execution of the ANAP Contract and therefore cannot be relied on with respect to the failure in performance of the ANAP Contract.[72] Moreover, the Claimant points out that there is no Article 29 or even Article 2.9 in the ANAP Contract which the Respondent invokes to justify the "penalties."[73]

228.    The Claimant submits that even if there were delays in delivery of equipment as alleged by the Respondent, such "penalties" are still unjustified for four reasons. First, pursuant to the ANAP Contract and Afghan laws, the penalties were valid only if the Parties agreed on the penalties, but the Claimant never agreed to such penalties.[74] Second, adopting the method submitted by the Respondent to calculate the penalties, the delay penalties should be USD 1,674,737, which is inconsistent with the deducted amount (i.e. USD 1,280,967.55).[75] Third, such penalties would be a one-time deduction from one invoice but the "penalties" were deducted from multiple invoices.[76] Fourth, the penalties deducted from reimbursement for equipment purchased by the Claimant for the Respondent, which is the case here, were against the purpose of the penalty clause and not provided in the ANAP Contract.[77]

### 2.    The Respondent's Position

229.    The Respondent argues that the Claimant failed to perform certain obligations under the ANAP Contract and thus the "penalties" were imposed on the Claimant.

---

[68]    Statement of Claim, ¶ 48.

[69]    Statement of Claim, ¶ 48; Reply, p. 13.

[70]    Reply, p. 13.

[71]    Reply, p. 3.

[72]    Reply, p. 3.

[73]    Reply, p. 3.

[74]    Reply, pp. 3-4.

[75]    Reply, p. 4.

[76]    Reply, p. 4.

[77]    Reply, p. 5.

230. First, the Respondent argues that the Claimant failed to ensure the activity of the equipment from the beginning to the end of the contract.[78] According to the Respondent, the penalties were therefore imposed pursuant to Article 8 of the Statement of Work ("**SOW**") of the ANAP Contract.[79]

231. Second, relying on the findings of its investigation in accordance with Decree No. 810, the Respondent argues that the Claimant "failed to transfer and install the equipment and devices listed in Appendix (F1)" of the ANAP Contract and the Claimant "delayed for 147 days in the transfer and installation of tools and equipment."[80] According to the Respondent, the penalties were therefore imposed pursuant to the ANAP Contract.[81]

## C.    THE 10% RETENTION

232. The Parties do not dispute that the Respondent deducted the 10% retention from the Claimant.[82] The Parties dispute over whether the 10% retention was justified.

### 1.    The Claimant's Position

233. The Claimant submits that the Respondent breached the ANAP Contract by withholding the 10% retention in the amount of USD 2,755,635.74.[83] The Claimant argues that neither the ANAP Contract nor Afghan laws provide for the Respondent to withhold any retention amount, and certainly not a unilateral 10% retention amount.[84] According to the Claimant, even if the Respondent was entitled to withhold such retention, it should return the amount to the Claimant no later than 7 November 2020, the date when ACAA signed the Completion Certificate.[85]

234. The Claimant denies that it failed to hand back any equipment alleged by the Respondent.[86] As evidence, the Claimant points to certification letters confirming completion of transfer and to Mr.

---

[78]    Respondent's e-mail of 18 July 2022.

[79]    Respondent's e-mail of 18 July 2022.

[80]    Respondent's e-mail of 2 August 2022.

[81]    Respondent's e-mail of 2 August 2022. The Respondent argues that "[147] days of delay have been calculated, first, according to paragraph 1, 3 and 7 of the terms of the contract from the general sum of the contract and the calculated penalty is 0.1 percent per day. Secondly, according to article (29) of the contract, the sum of 0.5 percent of the list of tools and equipment penalty has been measured and calculated for the delay per day." While "paragraph 1, 3 and 7 of the terms of the contract" seems to be in reference to Clause 3.7.1 of the SCC, there is no Article 29 in the ANAP Contract.

[82]    Statement of Claim, ¶ 50; Respondent's e-mail of 2 August 2022.

[83]    Statement of Claim, ¶ 142.

[84]    Statement of Claim, ¶ 208.

[85]    Statement of Claim, ¶ 211.

[86]    Reply, p. 5.

Gunn's witness statement.[87] Moreover, the Claimant criticizes that the Respondent failed to provide the report of the director of Kabul International Airport.[88]

### 2.    The Respondent's Position

235.   The Respondent relies on the report of the director of Kabul International Airport and argues that the Claimant failed to hand back 131 items of equipment owned by the Respondent at the end date of the ANAP Contract and therefore the 10% retention was deducted as the damages pursuant to Article 80 of the Procurement Procedure.[89]

### D.   THE DELAY IN MAKING PAYMENTS

### 1.    The Claimant's Position

236.   According to the Claimant, the Respondent has failed to make payments of: (i) the invoices issued pursuant to the ANAP Contract (i.e. the invoices of the equipment purchase plus the monthly invoices for the first 27 months); (ii) the 10% retention amounts; (iii) the "penalties" amounts; and (iv) the monthly invoices for the final nine months.[90] The Claimant submits that the Respondent delayed (or never paid at all) payments of all the above-mentioned categories and therefore breached the ANAP Contract.[91] The Claimant points to Clause 6.5 of the GCC which contemplates payment by the Respondent of damages (i.e. interests) on delayed payments.[92]

237.   Further, the Claimant submits that it is entitled to recovery for unjust enrichment pursuant to Afghan laws and the Respondent unjustly "enjoy[ed] the opportunity cost attributable to the funds in ACAA's bank accounts" as a result of the delay in making payments.[93] The Claimant relies on

---

[87]   Reply, p. 6, *referring to* Completion Certificate re: HKIA airport, 7 November 2020 (**Exhibit C-69**); Completion Certificate re: Herat Int'l Airport, 4 November 2020 (**Exhibit C-70**); Completion Certificate re: Mazar-e-Sharif Int'l Airport, 5 November 2020 (**Exhibit C-71**); Completion Certificate re: Kandahar Int'l Airport, 4 November 2020 (**Exhibit C-72**); Letter from ACAA to Olive Group certifying that Olive Group has fulfilled its contractual obligations and transfer of responsibilities, 17 December 2020 (**Exhibit C-73**); Witness Statement of Alexander Gunn, 5 November 2022 (**CWS-2**).

[88]   Reply, p. 5.

[89]   Respondent's e-mail of 2 August 2022.

[90]   Statement of Claim, ¶ 220.

[91]   Statement of Claim, ¶ 218.

[92]   Statement of Claim, ¶ 157.

[93]   Statement of Claim, ¶ 219.

Article 735(1) of the Afghanistan Civil Code and sets the damages of the delay at the rate of 3% annually.[94] Accordingly, the Claimant calculates the damages at USD 724,830.93 in total.[95]

238. The Claimant denies that the delay was due to governmental non-approval of the budget.[96] Even if the non-approval of the budget resulted in the delay, says the Claimant, "the Respondent fails to provide any explanation about why there were delays in the payment of each monthly invoice during the term of the Contract."[97] The Claimant further argues that even if the non-approval of the budget could explain the delays in all payments, the budgetary issues could not excuse the Respondent's obligation to make payments in time as such obligation was not conditioned on approval of the budget.[98] The Claimant adds that the ANAP Contract was a "Lump Sum" contract and therefore the Respondent had an obligation to set funds aside for the ANAP Contract.[99]

### 2. The Respondent's Position

239. As set out above, the Respondent denies that the final three categories of payments are justified. However, the Respondent does not dispute the first category of payments (i.e., the invoices issued pursuant to the ANAP Contract, including the invoices of the equipment purchase plus the monthly invoices for the first 27 months) and admits the delay in such payments.[100] The Respondent argues that "the delay in payments was due to the non-approval of the budget of the fiscal year," as a result of political issues of the then government.[101] The Respondent adds that the payments were "promptly" completed when the budget was approved.[102]

---

[94]  Statement of Claim, ¶ 158; Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 735(1) (**CLA-7**).

[95]  Calculation of Olive Group's damages for failure to timely pay the invoices (**Exhibit C-45**); Calculation of Olive Group's damages for unpaid retention amounts (**Exhibit C-46**); Calculation of Olive Group's damages for unpaid "penalties" (**Exhibit C-47**); Calculation of Olive Group's damages for remaining 9 months of ANAP Contract (**Exhibit C-48**).

[96]  Reply, p. 7.

[97]  Reply, p. 7.

[98]  Reply, p. 7.

[99]  Transcript, p. 52, lines 10-12.

[100] Respondent's e-mail of 2 August 2022.

[101] Respondent's e-mail of 2 August 2022.

[102] Respondent's e-mail of 2 August 2022.

E.    THE ALLEGED DELAY IN RETURNING THE PERFORMANCE GUARANTEE

1.    The Claimant's Position

240.    The Claimant argues that the Respondent was required to release the Claimant's Performance
Guarantee no later than 2 December 2020 pursuant to the ANAP Contract and Afghan laws.[103]
However, according to the Claimant, the Respondent failed to take the necessary action to cause
Afghanistan International Bank ("**AIB**") to release the Performance Guarantee despite the
Claimant's multiple requests.[104] As a result, says the Claimant, it was not until 5 October 2021
that the Claimant received its Performance Guarantee back in the amount of USD
2,689,158.29.[105] The Claimant argues that it is thus entitled to damages on such delay.[106] The
Claimant relies on Article 735(1) of the Afghanistan Civil Code and sets the damages of the delay
at the rate of 3% annually.[107] Accordingly, the Claimant calculates the damages at USD
67,854.98.[108]

2.    The Respondent's Position

241.    The Respondent failed to provide its position on this issue.

F.    THE END OF THE ANAP CONTRACT

242.    The Parties dispute over (i) whether the Respondent terminated or unilaterally modified the
ANAP Contract; and (ii) whether the Claimant failed to perform any contractual obligations
during the duration of the ANAP Contract.

1.    The Claimant's Position

243.    The Claimant submits that the ANAP Contract was ended through the Respondent's unilateral
modification whereby it reduced the contract term by 25%.[109]

---

[103]    Statement of Claim, ¶ 234, *referring to* ANAP Contract, SCC, cl. 3.8 (**Exhibit C-1**); ANAP Contract,
GCC, cl. 3.8 (**Exhibit C-1**); Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016,
Arts. 28, 29 (**CLA-10**); Afghanistan Rules of Procurement Procedures Circular No. NPA/C08/1395, 16
July 2016, Rule 78(8) (**CLA-11**).

[104]    Statement of Claim, ¶ 185; Witness Statement of Paul Furlong, 28 October 2021, ¶ 113 (**CWS-1**).

[105]    Statement of Claim, ¶ 189; Witness Statement of Paul Furlong, 28 October 2021, ¶ 115 (**CWS-1**).

[106]    Statement of Claim, ¶ 190.

[107]    Statement of Claim, ¶ 236; Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 735(1)
(**CLA-7**).

[108]    Statement of Claim, ¶ 190.

[109]    Statement of Claim ¶ 68.

244. The Claimant argues that pursuant to Clause 2.4 of the GCC and Afghan laws, modification to the contract must be done by written agreement between the Parties.[110] Since the Claimant never agreed to such a modification, it argues that the modification was unlawful.[111] The Claimant further argues that Article 41 of the Afghanistan Procurement Law and Clause 2.6 of the GCC were irrelevant here as there was no termination but only modification to the ANAP Contract.[112]

245. According to the Claimant, in any event, none of the conditions for terminating the ANAP Contract were met.[113] In particular, the Claimant submits that it fully performed its contractual obligations.[114] The Claimant denies every allegation of its failure to perform its contractual obligations.

246. Regarding alleged equipment problems, the Claimant argues that the equipment used was either owned or chosen by the Respondent and all equipment functioned well during the term of the ANAP Contract.[115] Further, the Claimant argues that it conducted timely maintenance for all equipment and that the Respondent's complaint may refer to equipment beyond the responsibility of the Claimant.[116] The Claimant adds that it purchased all equipment required by the ANAP Contract.[117]

247. Regarding alleged lack of qualified personnel, the Claimant argues that it hired all necessary employees in accordance with the ANAP Contract and certain hiring processes were monitored by the Respondent.[118] The Claimant adds that the Respondent continued to employ some experts after the end date of the ANAP Contract.[119]

248. Regarding alleged poor management, the Claimant argues that the dismissal of employees was controlled by the Respondent.[120] Further, the Claimant argues that the training program was

---

[110] Statement of Claim ¶ 200, *referring to* ANAP Contract, GCC, cl. 2.4 (**Exhibit C-1**); Statement of Claim ¶ 204, *referring to* Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016, Art. 30 (**CLA-3**) and Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016, Art. 31 (**CLA-4**); Afghanistan Rules of Procurement Procedures Circular No. NPA/C08/1395, 16 July 2016, Rule 98(2) (**CLA-5**); Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 696(1) (**CLA-16**).

[111] Statement of Claim ¶¶ 199, 201.

[112] Statement of Claim ¶ 71; Reply, p. 9.

[113] Statement of Claim ¶ 71; Reply, p. 9.

[114] Reply, p. 9.

[115] Reply, p. 10.

[116] Reply, p. 10.

[117] Reply, p. 13.

[118] Reply, pp. 10, 12, 14.

[119] Reply, p. 14.

[120] Reply, p. 11.

approved by the Respondent and covered training on new equipment.[121] As evidence, the successor contractor continued to use the same training program.[122] Moreover, according to the Claimant, the operating procedure was approved by the Respondent.[123] The Claimant adds that specific operating procedures existed and were regularly inspected by third parties including the ICAO.[124]

249. Regarding the increase of the number of crimes, the Claimant argues that reducing such numbers is not within the Claimant's contractual obligations.[125]

250. Further, relying on the ANAP Contract terms and Afghan laws, the Claimant argues that it is entitled to the damages in the amount of the last 25% of the lump sum contract price (i.e. USD 9,185,452,47).[126]

### 2.    The Respondent's Position

251. The Respondent's position is that it terminated the ANAP Contract pursuant to Article 41(2)(a) of the Afghanistan Procurement Law and Clause 2.6.1(a) of the GCC.[127]

252. The condition required by Article 41(2)(a) was reduced to contractual terms in the ANAP Contract as Clause 2.6.1(a) of the GCC. The Respondent submits that the condition set out in Clause 2.6.1(a) was met, namely that the Claimant could not remedy the failures in the performance of its obligations under the ANAP Contract.[128] Such alleged failures consist of four categories: (i) equipment problems; (ii) lack of qualified personnel; (iii) poor management; and (iv) the increase of the number of crimes.

253. First, the Respondent complains about inactivity and lack of proper maintenance of equipment, including scanners and X-ray machines in the VIP hall of Ahmad Shah Baba International Airport. The Respondent also states that the Claimant failed to make the timely purchase of

---

[121]   Reply, p. 11.

[122]   Reply, p. 11.

[123]   Reply, p. 11.

[124]   Reply, p. 12.

[125]   Reply, pp. 12, 13.

[126]   Statement of Claim ¶¶ 205-207, *referring to* Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 730 (**CLA-8**); Afghanistan Law of Commercial Contracts and Sale of Goods, Official Gazette No. 1150, 20 October 2014, Arts. 75, 76(1), 77, 79 (**CLA-9**).

[127]   Respondent's e-mail of 18 July 2022; Respondent's e-mail of 2 August 2022.

[128]   Respondent's e-mail of 18 July 2022.



special equipment for checking drugs and new security equipment for the four international airports.[129]

254. Second, the Respondent complains about the insufficiency of qualified personnel to operate scanners or repair security equipment, as well as the failure to hire all 650 employees for security services.[130]

255. Third, the Respondent notes that it was unsatisfied with poor coordination between security departments and poor management at Kabul International Airport.[131]

256. Fourth, the Respondent alleges that an increase in the number of crimes in 2019 was a result of the Claimant's failure to properly carry out its obligations in relation to security equipment.[132]

## G.   MANNING CAP FEES IN RELATION TO EMPLOYEES UNDER THE ANAP CONTRACT

### 1.   The Claimant's Position

257. The Claimant submits that the manning cap fees in relation to employees under the ANAP Contract should not be imposed on it.[133] The Claimant argues that from 2012 to January 2020, it never paid or was required to pay the manning cap fees in relation to the aviation security personnel and experts under the ANAP Contract.[134] The Claimant also argues that the replacement contractor also did not pay manning cap fees in relation to the aviation security services.[135] Furthermore, the Claimant points to the Respondent's representation that the ANAP Contract was exempt from PSC Regulations and manning cap fees.[136] The Claimant gives the reasons why it should not pay such manning cap fees as follows.

258. First, Article 4 of the PSC Regulations (Definitions), in relevant part, provides that:

> Terms used in this procedure shall have the following meanings:
>
> 1. Security Company: A for-profit, non-political and non-governmental company that operates for the purpose of providing security to real and legal persons in accordance with the provisions of this Procedure.
>
> 4. Security Services: Activities for the purposes of security of real or legal persons,

---

[129]   Respondent's e-mail of 18 July 2022.

[130]   Respondent's e-mail of 18 July 2022.

[131]   Respondent's e-mail of 18 July 2022.

[132]   Respondent's e-mail of 18 July 2022.

[133]   Statement of Claim, ¶¶ 171-172.

[134]   Statement of Claim, ¶¶ 94, 112; Witness Statement of Paul Furlong, 28 October 2021, ¶ 73 (**CWS-1**).

[135]   Statement of Claim, ¶ 113; Witness Statement of Paul Furlong, 28 October 2021, ¶ 74 (**CWS-1**).

[136]   Statement of Claim, ¶ 94; Witness Statement of Paul Furlong, 28 October 2021, ¶ 56 (**CWS-1**).

transportation of goods and equipment, training of security personnel and risk awareness services, that are performed in accordance with the provisions of this Procedure.

5. Security Personnel: A real person who is recruited by Security Company in accordance with the provisions of this Procedure to perform [security services] mentioned in Paragraph 4 of this Article.[137]

259.    The Claimant argues that the employees under the ANAP Contract are not "Security Personnel" for the purpose of the PSC Regulations because they do not perform "Security Services" defined in Article 4.[138] These employees under the ANAP Contract instead provided services in screening, operating X-RAY machines, scanners and CCTV and other specific skills required by the ICAO regulations.[139]

260.    Second, Article 6 of the PSC Regulations (Prohibited Activities) provides that:

(1) Security Company is not allowed to perform the following activities:

1. Protect the borders of the country.

2. Provide the security for governmental offices, properties and institutions.

3. Provide security for highways (providing security for private road construction companies, convoys of companies, international organizations, official delegations and diplomatic representatives of foreign countries are exempted from this provision)

4. Provide the security for holy places.

5. Provide the security for archeological sites, mines and forests unless [the security of such areas] are transferred to the private sector in accordance with the provisions of the law.

6. Other issues as decided by the Council of Ministers.

(2) In cases of urgent need, [the task of] providing security for important establishments or for large governmental or quasi-governmental economic establishments can be proposed by the relevant ministry or agency and approved by the Council of Ministers and, after that, the Ministry of Interior can proceed on the matter.[140]

261.    The Claimant argues that the approval of the ANAP Contract by the NPC, the NSC and the then president provided a waiver to the manning cap fees in relation to personnel providing services listed in Article 6.[141]

262.    Third, Article 10 of PSC Regulations (Number of Personnel) provides that "Security Personnel of each Security Company cannot be more than 500 persons, unless the Council of Ministers

---

[137]    Afghanistan Ministry of Interior Private Security Company Regulations 2008, Art. 4 (**CLA-6**).

[138]    Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[139]    Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[140]    Afghanistan Ministry of Interior Private Security Company Regulations 2008, Art. 6 (**CLA-6**).

[141]    Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

approves additional numbers."[142] According to the Claimant, the approval of the ANAP Contract by the NPC, the NSC and the then president should be considered as an authorization of hiring additional personnel.[143]

263.   Fourth, the Claimant argues that the employees under the ANAP Contract are not the Claimant's "Security Personnel" but part of the Respondent's personnel on the basis that the Respondent had the ultimate authority to terminate the employment of these personnel and that they were working and could continue to work for the Respondent after the end of the ANAP Contract.[144]

264.   In the alternative, the Claimant argues that even if there was a conflict between the MOI's PSC Regulations and the NPC's approval of the ANAP Contract, the latter would prevail as the NPC is a higher-ranking body in the Government of Afghanistan than the MOI.[145]

265.   In the further alternative, the Claimant submits that PSC Regulations were never enacted.[146]

### 2.   The Respondent's Position

266.   The Respondent failed to provide its position on whether the manning cap fees in relation to employees under the ANAP Contract should be imposed on the Claimant.

## H.   THE DELAY IN THE RENEWAL OF THE PSC LICENSE AND THE ALLEGED INTERFERENCE WITH THE CLAIMANT'S CONTRACT WITH THE CANADIAN EMBASSY

267.   While the Parties do not dispute that the renewal of the Claimant's PSC License was delayed, the Parties dispute whether the delay was attributable to the Respondent.[147] The Respondent failed to provide its position on the alleged interference with the Claimant's contract with the Canadian Embassy.

### 1.   The Claimant's Position

268.   The Claimant's position is that the Respondent failed to act in good faith or deal fairly with the Claimant. Therefore, the Respondent is liable for the Claimant's damages on work visa penalties

---

[142]   Afghanistan Ministry of Interior Private Security Company Regulations 2008, Art. 10 (**CLA-6**).

[143]   Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[144]   Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[145]   Statement of Claim, ¶ 228.

[146]   Statement of Claim, ¶ 228.

[147]   Reply, p. 8; Respondent's e-mail of 2 August 2022.



(USD 1,337,770) and the deprived one-year optional extension of its contract with the Canadian Embassy (USD 9,337,628.76).[148] In support of its position, the Claimant makes the following arguments: (i) the Respondent's delay to submit evidence of internal approvals of the ANAP Contract to the MOI and failure to resolve the issue of manning cap fees with the MOI resulted in the delay in the renewal of the PSC License;[149] (ii) the delay in the renewal of the PSC License led to penalties in connection with the renewal of work visas in the amount of USD 1,337,770;[150] and (iii) the delay in the renewal of the PSC License and the MOFA's interference with the Claimant's contract with the Canadian Embassy caused the Canadian Government not to extend the contract with the Claimant for one more year, depriving the Claimant of revenues in the amount of USD 9,337,628.76.[151]

269. Expounding on the first argument, the Claimant submits that in accordance with Afghan laws and the principles of good faith and fair dealing, the Respondent was obligated to address the issue of manning cap fees and the issue of evidence of internal approvals.[152] The Claimant further submits that the Respondent had contractual obligations to "provid[e] the necessary notifications" to the MOI and to address these two issues.[153]

270. Although the Claimant requested the Respondent to address two issues of manning cap fees and evidence of internal approvals "immediately" after the two issues arose, says the Claimant, the Respondent did not address these two issues until 27 June 2020 and 31 October 2020 respectively.[154] The Claimant argues that there is no defence that the Respondent has corresponded in relation to the ANAP Contract to the MOI because writing some letters did not

---

[148]   Statement of Claim, ¶¶ 169, 239(e).

[149]   Statement of Claim, ¶ 95.

[150]   Statement of Claim, ¶ 226; Spreadsheet re: work visa penalties imposed by Government of Afghanistan on Olive Group (**Exhibit C-88**).

[151]   Statement of Claim, ¶¶ 103, 105; Witness Statement of Paul Furlong, 28 October 2021, ¶¶ 64, 67 (**CWS-1**); Amendment No. 13 to Canadian Embassy Contract, 30 July 2020, pp. 6-7 (**Exhibit C-79**).

[152]   Statement of Claim, ¶¶ 97, 168, 178, 223, *referring to* Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 697 (**CLA-13**) ("Contract shall be enforced on what included therein and expected in good faith"); Afghanistan Law of Commercial Contracts and Sale of Goods, Official Gazette No. 1150, 20 October 2014, Art. 6 (**CLA-14**).

[153]   Statement of Claim, ¶ 224.

[154]   Statement of Claim, ¶¶ 93, 115, 181. Notably, the issue of evidence of internal approvals first arose in no later than March 2020, but according to the exhibits, the Claimant's first letter addressing this matter to ACAA was dated 26 October 2020. *See* Letter from Olive Group to ACAA in response to ACAA's letter dated 24 October 2020, 26 October 2020 (**Exhibit C-11**). The issue of manning cap fees first arose in January 2020, but according to the exhibits, the Claimant's first letter addressing this matter to ACAA was dated 18 June 2020. *See* Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

absolve the Respondent of liability for continued delay in the renewal of the PSC License.[155] Moreover, the Claimant argues that the Respondent's attempt to resolve the manning cap issue failed and such issue remains unresolved to date.[156] The Claimant adds that addressing the manning cap issue was "quite simple" for the Respondent.[157] Further, the Claimant contends that the Respondent's failure to resolve these two issues in time was the cause of the delayed renewal of the PSC License as the Claimant complied with Afghan laws and the MOI had no other reason for delaying the renewal of the PSC License.[158]

271.  Expounding on the second and third arguments, the Claimant submits that work visa penalties and the deprived one-year optional extension of the contract with the Canadian Embassy were the "proximate result[s]" of the Respondent's inactions.[159] According to the Claimant, the Claimant and the Canadian Embassy had a good cooperation and the Canadian Embassy could have extended the contract for one more year if the Respondent renewed the PSC License in time and did not interfere with their contract.[160]

272.  The Claimant asserts the illegality of the MOFA's interference by informing the Canadian Government that the Claimant's activities were illegal. In the Claimant's view, such interference amounts to the tort of "tortious interference with contract,"[161] which exists in Afghan legal practice despite its origin as a common law concept.[162] Furthermore, the Claimant contends that such interference was also illegal pursuant to, *inter alia*, a Sharia principle that "where two parties that have a compact and a third party with malicious intent interferes to harm the relationship of the parties to the compact, the party has acted wrongfully and is liable to the harmed parties."[163]

273.  The Claimant adds that in accordance with international agreements, the MOI could not "shut down" the Claimant given its special duties to provide security services for foreign embassies

---

[155]  Reply, p. 8.

[156]  Statement of Claim, ¶ 177.

[157]  Statement of Claim, ¶ 96.

[158]  Statement of Claim, ¶ 95.

[159]  Statement of Claim, ¶ 170.

[160]  Statement of Claim, ¶ 103.

[161]  Statement of Claim, ¶ 230.

[162]  Statement of Claim, ¶ 229.

[163]  Statement of Claim, ¶¶ 231-233. The Claimant also points to a Sharia principle of good faith, a principle regarding the destruction of property and a principle that it is a crime to provide false information about someone, which are enshrined and expanded in Article 6(2) and 377 of the Criminal Law of Afghanistan, Article 6 of Afghanistan Criminal Procedure Law and Article 697 of the Civil Law of Afghanistan. *See* Criminal Law of Afghanistan, Official Gazette No. 1260 (2017), Arts. 6(2), 377 (**CLA-19**); Afghanistan Criminal Procedures Code, Official Gazette No. 1132 (2013), Art. 6 (**CLA-19**); Civil Code of Afghanistan, Official Gazette No. 353 (1976), Art. 697 (**CLA-19**).

and international institutions. [164] Lastly, the Claimant complains that such interference was unreasonable on the basis that the MOI "consented to Olive Group's continued operations" and that "usually there were delays in the renewal of PSC licenses of the Claimant and other PSCs."[165]

### 2. The Respondent's Position

274. The Respondent argues that it has corresponded in relation to the ANAP Contract to the MOI.[166]

## VII. ANALYSIS

### A. PROCEDURAL MATTERS

#### 1. Respondent's Opportunity to Present its Case

275. The Respondent complains that it was denied a fair opportunity to present its case in this arbitration.[167]

276. The Respondent's complaint is based, *inter alia*, on (1) the Sole Arbitrator's decision of 19 June 2023 rejecting requests from the Respondent for additional time to make a submission on its case, and (2) the Sole Arbitrator's decision of 19 April 2023 limiting the scope of the submission the Respondent requested to make and subsequent orders confirming his decision.[168]

277. According to the Respondent, the Sole Arbitrator's decisions were made without considering the impact of the regime change and international sanctions on the Respondent's access to legal expertise and ability to secure outside counsel.[169] In doing so, the Sole Arbitrator has "either overlooked or neglected to fully consider" the impact of these circumstances in the Respondent's ability to exercise its right and fully participate in this arbitration. Therefore, the Sole Arbitrator "has compromised the integrity and validity of the arbitration process, denying Respondent a fair opportunity of its request […] to present its case and defend its rights."[170]

---

[164] Statement of Claim, ¶ 102; Witness Statement of Paul Furlong, 28 October 2021, ¶ 64 (**CWS-1**), *referring to* Bilateral Security Agreement between the United States and Afghanistan, other bilateral and multi-lateral agreements, and the President of Afghanistan's Presidential Decrees Nos. 62 and 66. *See* The Bridging Strategy for Implementation of Presidential Decree 62 (**CLA-6**) and Presidential Decree Concerning the Authorization of Security Contracts with Private Security Companies, No. 66 (**CLA-18**).

[165] Statement of Claim, ¶ 102; Witness Statement of Paul Furlong, 28 October 2021, ¶ 64 (**CWS-1**).

[166] Respondent's e-mail of 2 August 2022.

[167] Respondent's e-mail of 24 June 2023.

[168] Respondent's e-mail of 24 June 2023.

[169] Respondent's e-mail of 24 June 2023.

[170] Respondent's e-mail of 24 June 2023.



278. Similarly, by its e-mail of 18 October 2023, the Respondent stated, inter alia, that it "consistently found itself marginalized and unheard" and that it "was not afforded the opportunity to present its defence statement fully." It claimed that it did not have "adequate legal counsel" and that it had "faced significant hurdles in accessing legal counsel due to force majeure events related to the unrecognized status of [its] government."[171] Moreover, the Respondent expressed its disapproval and disagreement with the decision to close the proceedings and noted that it would not accept the Final Award.[172]

279. While the Procedural History, above at paragraphs 11-200, sets out the chronology of proceedings, due to the allegations of the Respondent, it is necessary to recount the following history as to the procedure followed in respect of the opportunities granted to the Respondent to present its case:

    i.    By means of Procedural Order No. 2, the Respondent was ordered to produce its Statement of Defence (including any objection to the Sole Arbitrator's jurisdiction and/or counterclaim) by 2 December 2021, and the Respondent did not do so;

    ii.    Other salient time limits which were set by Procedural Order No. 2 included all of the document production procedure (23 December 2021 through 24 February 2022) as well as the Respondent's Rejoinder (14 April 2022). The Respondent missed all of those time limits and failed to contribute to the proceeding and to make its pleadings or written statements;

    iii.    The Respondent only began participating on 28 April 2022 when it sent an e-mail which stated, in part, *"We are writing to offer our sincere apology for missing the earlier deadlines in regards to the case."* In that e-mail, the Respondent requested a *"time extension to have the opportunity to present our arguments to ensure fair decisions made by the Tribunal."*[173]

    iv.    In response to its initial contact, the Sole Arbitrator assured the Respondent that all evidence to date was uploaded to the site to which the Respondent had access so that it could review all evidence and submissions, and asked the Respondent what sort of participation it was requesting;

---

[171]    Respondent e-mail of 18 October 2023
[172]    Respondent's e-mail of 16 November 2023.
[173]    Respondent e-mail of 28 April 2022

v.   By e-mail dated 12 May 2022, the Respondent requested a ten-day extension to try and obtain outside counsel. The Claimant, by e-mail dated 13 May 2022, requested that the Respondent be ordered to make an immediate payment for its share of the Tribunal – related expenses to that date. By e-mail dated 13 May 2022, the Sole Arbitrator requested the Respondent's view on it paying its share of the advance on costs and also noted:

> As the Parties know, my duty is to render an enforceable award. While enforceability is doubtless aided by the participation of the Respondent, the Parties each have an interest in seeing this arbitration proceed in as expeditious manner as possible. As noted by the Claimant, this arbitration has been in process for over a year and we do need to ensure that we proceed in an expeditious manner.[174]

vi.   By e-mail dated 16 May 2022, the Respondent stated that it had corresponded with the office of the Prime Minister and intimated that it would be liaising with the Ministry of Finance of Afghanistan to arrange payment for its share of the advance on costs. On the strength of this, the Sole Arbitrator granted an extension of time to the Respondent until 23 May 2022 to secure outside counsel;[175]

vii.   On 24 May 2022, the Respondent requested a further extension of 20 days to obtain outside counsel.[176] After seeking and receiving the position of the Claimant on the Respondents further application.[177] The Sole Arbitrator granted a further extension to 30 May 2022 for the Respondent to obtain outside counsel, also directing the Respondent to provide an update by that date as to the Government of Afghanistan's position on paying the advance on costs;[178]

viii.   On 30 May 2022, the Respondent stated that it had not received any reply from the office of the Prime Minister regarding payment of the advance on costs, and, in relation to securing outside counsel stated that it had had an online meeting with a counsel the previous day and hoped that it would reach a possible agreement with the counsel in due course;[179]

---

[174]   Sole Arbitrator's e-mail of 13 May 2022.
[175]   Sole Arbitrator's e-mail of 16 May 2022.
[176]   Respondent's e-mail of 24 May 2022.
[177]   Claimant's e-mail of 26 May 2022.
[178]   Sole Arbitrator's e-mail of 26 May 2022.
[179]   Respondent's e-mail of 30 May 2022.

ix.     In the Respondent's initial e-mail of 28 April 2022, it had stated that it had "evidence
        relevant to the case that may completely change the Tribunal's view." In view of this,
        on 2 June 2022, the Sole Arbitrator directed the Respondent to present that evidence
        by 13 June 2022, and also to update its information as to the retaining of outside counsel
        and also as to its discussions with the Prime Minister's office in respect of paying its
        share of the advance on costs;[180]

x.      On 14 June 2022, the Respondent requested an additional extension of time for three
        months to obtain outside counsel, and did not present the evidence it had earlier referred
        to;[181]

xi.     On 26 June 2022, after seeking and receiving the Claimant's position,[182] the Sole
        Arbitrator made a direction that he would ask some substantial questions of the
        Respondent's in-house Legal Advisor in order to ascertain the Respondent's position
        on the substantive claims of the Claimant, and in order to allow the Respondent to
        provide its views on the claims, evidence and documents of the Claimant;[183]

xii.    On 10 July 2022, the Sole Arbitrator presented his questions to the Parties to allow the
        Respondent to respond to the claims, evidence and documents of the Claimant. The
        Respondent made its initial reply presenting some substantive answers to the questions
        on the claims, documents and evidence of the Claimant on 18 July 2022. The Claimant
        presented its position on those questions on 18 July 2022, requesting any documents
        that the Respondent wished to rely upon, and on 2 August 2022 the Respondent
        presented its further substantive answers to the questions posed by the Sole Arbitrator
        providing its views on the claims, evidence and documents of the Claimant, also
        providing its reference to some documents;

xiii.   On 11 August 2022, the Sole Arbitrator issued Procedural Order No. 2, and consulted
        with the Parties in respect of the Oral Phase of the proceeding. On 18 August 2022, the
        Respondent indicated that there were obstacles in the way of it hiring counsel to prepare
        a Statement of Defence and to appear before the arbitration tribunal, and so it did not
        require an oral phase. In response to the Respondent's and the Claimant's e-mails, on
        20 August 2022 the Sole Arbitrator made an ultimate deadline of 12 September 2022

---

[180]   Sole Arbitrator's e-mail of 2 June 2022.
[181]   Respondent's e-mail of 14 June 2022.
[182]   Claimant's e-mail of 20 June 2022.
[183]   Sole Arbitrator's e-mail of 26 June 2022.

for the Respondent to obtain outside counsel. However, on 12 September 2022, the Respondent sent a letter to the Sole Arbitrator indicating once again that it was unable to find outside counsel;

xiv.    The next communication from the Respondent was on 14 October 2022, when it reiterated its position that it was not able to propose a procedural calendar and was unable to participate in an oral hearing unless the Tribunal had given it sufficient opportunity to retain counsel;

xv.    The Sole Arbitrator, in order to treat the Respondent as fairly as possible, took into account its substantive answers to questions on the merits from 18 July 2022 and 2 August 2022 wherein the Respondent gave its position on the Claimant's claims, evidence and documents. However, by an e-mail dated 15 October 2022, the Respondent objected, saying that those answers did not represent the Respondent's entire Statement of defence but rather a portion of the Respondent's statement of defence; therefore, in order to provide a further opportunity to the Respondent, on 19 October 2022, the Sole Arbitrator allowed a 10 day period within which it could augment its position to provide its full Statement of Defence;

xvi.    However, by e-mail dated 29 October 2022, the Respondent stated it was unable to augment its substantive submissions or to provide its Statement of Defence until it was represented by outside counsel. By e-mail dated 31 October 2022, the Sole Arbitrator stated that the arbitration proceedings would continue, stating the view that the Respondent had been provided with ample opportunity to secure counsel;

xvii.    The next communications from the Respondent were dated 17 November 2022 and 30 November 2022, wherein the Respondent indicated that it still could not retain outside counsel. By this point, the Parties had been ordered by the Sole Arbitrator to prepare for an oral hearing and present witness statements, but the Respondent had failed to do so;

xviii.    As the date for the oral Hearing approached, the Respondent stated, on 14 December 2022, that it had been in contact with a legal firm in Egypt and asked for time to retain that outside counsel;

xix.    At this point in time, the Parties were being pressed to augment the advance on costs. On 29 December 2022, the Respondent said that it would be available to make the

requisite deposit if the Sole Arbitrator granted an ample opportunity for the Respondent to retain its counsel;

xx.    As the proceeding had been suspended from December 2022 to 28 February 2023 while awaiting payment of an advance on costs, the oral Hearing in this proceeding was, on 2 March 2023, proposed to be reset to 16 March 2023. However, on 6 March 2023 the Respondent again stated that it needed time to retain outside counsel as the Egyptian firm was unable to act for it;

xxi.    By e-mail dated 6 March 2023, the Sole Arbitrator ordered the Hearing to proceed on 16 March 2023, restating his determination that the arbitration must progress and that the Respondent had ample time to either retain outside counsel to submit pleadings or for the Respondent to submit pleadings from its in-house counsel;

xxii.    On 12 March 2023, the Respondent indicated that it had been in contact with other law firms and would not take part in the Hearing until outside counsel was retained;

xxiii.    On 16 March 2023, the date of the Hearing, the Respondent applied for an adjournment of the Hearing, indicating that it was in contact with other potential outside counsel. The Claimant objected to this adjournment by e-mail of even date. On 16 March 2023 the Sole Arbitrator, noting the history of the proceeding, refused the Respondent's application for adjournment and the Hearing proceeded on 16 March 2023. The Respondent did not participate;

xxiv.    On 27 March 2023, the Respondent provided a letter to the Sole Arbitrator, which letter indicated that the Respondent had retained outside counsel. On 28 March 2023, the Respondent's outside counsel sent an e-mail noting that a "session" was scheduled for 29 March 2023 and asking the Sole Arbitrator to "postpone hearing the case with a power of attorney and review." On the same date, the Sole Arbitrator responded to the Respondent's outside counsel indicating that the Hearing had already been held, there was no session scheduled for 29 March 2023, and that the Respondent would have to determine what it wished its counsel to do in respect of this proceeding, on a post-hearing basis;

xxv.    On 6 April 2023, the Respondent's outside counsel requested a postponement of the case for 21 days to check documents and to submit a "first response memorandum." The Sole Arbitrator sought and received a reply from the Claimant to that application,

wherein it raised payment by the Respondent of its advance on costs.[184] This resulted in a discussion amongst the Parties and the Sole Arbitrator as to the Respondent paying its advance on costs. This discussion resulted in the Sole Arbitrator, on 19 April, 2023, directing that, if the Respondent were to pay its advance on costs by 5 May 2023, it would be entitled to make a submission by 19 May 2023, in accordance with the directions given in that e-mail of 19 April 2023;[185]

xxvi.    On 26 April 2023, the Respondent stated its intention to pay its advance on costs but predicated that payment on it being allowed to make a full submission along with a Statement of Defence, and to provide documents and witnesses. On 28 April 2023 the Sole Arbitrator denied the Respondent's request to submit a Statement of Defence and to provide documents and witnesses, given the stage of the proceeding, and reiterated the directions given on 19 April 2023 under which the Respondent could make a written submission by 19 May 2023. The Sole Arbitrator further predicated this decision on the basis that there was no evidence that the outside counsel hired by the Respondent or similarly skilled law firm could not have been hired earlier in the proceeding;

xxvii.   The Respondent made its advance on costs payment on or about 5 May 2023 but, on 17 May 2023, applied for an extension of time "to complete and submit the statement of defence," proposing 29 May 2023 as the date for the Respondent's submission. On that date, the Sole Arbitrator directed the Parties to discuss together the timing of the Respondent's submission (not a statement of defence) and of the making of the final award;

xxviii.  By e-mail dated 19 May 2023, the Claimant reported on discussions between the Parties, indicating that the Respondent had changed its request from an extension to 29 May 2023 to a three-month extension of time. By e-mail dated 29 May 2023, the Sole Arbitrator denied the Respondent's extension for a three-month extension, but did allow an extension of time to 15 June 2023 for it to make its submission as was directed on 19 April 2023. By e-mail on 31 May 2023, the Respondent requested a virtual meeting on 1 June 2023 to discuss its requested three-month extension. By e-mail of the same date, the Sole Arbitrator directed the parties to discuss matters of timing and for the holding of a case management conference by means of a virtual meeting;

---

[184]    Claimant's e-mail of 10 April 2023.
[185]    See ¶ 168, above.

xxix.    On 5 June 2023, the Claimant reported that there was no need for a case management conference as the Respondent simply wanted to request a longer extension to make its submission and clarification of the scope of its submission, but that these matters had been clarified by the Sole Arbitrator already. By e-mail dated 7 June 2023, the Respondent requested until 30 August 2023, to submit a "comprehensive statement of defence." By e-mail of even date, the Sole Arbitrator reiterated the deadline of 15 June 2023 for the respondent to make its submission as was directed on 19 April 2023, seeing no reason to change that date. On 8 June 2023, the Respondent reiterated its request for a further extension and, on the same date, the Sole Arbitrator provided a comprehensive response to the Respondent's application for any further extension to make its submission, clearly stating that what the Respondent was allowed to make was not a Statement of Defence but one submission with the precise parameters set out in the e-mail of 19 April 2023;

xxx.    On 13 June 2023, the Respondent once again asked for a time extension to make an "evidence-based submission." The Sole Arbitrator, noting that the Respondent's request made on 13 June 2023 was similar to previous requests, denied the further extension of time for the submission, due 15 June 2023, as there was nothing in the current request upon which the Sole Arbitrator could vary the direction. However, on 15 June 2023, the Respondent once again requested an extension of time until 30 August 2023 "for the submission of its case materials." The Sole Arbitrator denied this request on 16 June 2023;

xxxi.    Ultimately, the Respondent failed or refused to make its submission by the deadline of 15 June 2023;

xxxii.    The Respondent made yet another application for an extension of time on 18 June 2023 due to "unavailability of those involved employees and missing some sort of certain documents," asking for an extension until 30 August 2023. The Sole Arbitrator replied on 19 June 2023 that, given that the submission to be made by the Respondent did not include the provision of new documents, and given that the Respondent had had three months since 19 April 2023 to make its submission, the application for a further extension was denied;

xxxiii.    On 24 June 2023, the Respondent made a complaint to the PCA citing, *inter alia*, a perceived "inadequate opportunity for full submission." By e-mail dated 26 June 2023,

the PCA informed the Respondent that it was not empowered to take any action in relation to the Respondent's complaint;

xxxiv.   On 18 October 2023, the Respondent made an e-mail of complaint, indicating that it felt that the arbitration procedure was not fair to it, finally saying that "it does not seek, nor does it consent to any further discussions or attempts to address this matter."

280.   The Respondent has stated that it was not given a reasonable opportunity to present its defence, among other things. In assessing the treatment afforded to the Respondent during the duration of this arbitration, the Sole Arbitrator refers to the following provisions of the UNCITRAL Rules:

i.     Article 17: by this rule, the Sole Arbitrator "may conduct the arbitration in such manner as it considers appropriate provided that the parties are treated with equality and that at an appropriate stage of the proceedings each party is given a reasonable opportunity of presenting its case[…]." In this instance, the Respondent was given a reasonable opportunity to present its Statement of Defence in December 2021. The Respondent only contacted the Sole Arbitrator in April 2022, knowing that had it had missed the previous time limits, including the time limit for presenting its Statement of Defence.[186] By that time, the Respondent had knowingly missed the time limits for subsequent pleadings and written submissions, only entering the case at a middle stage of the proceedings. The Respondent then was given the benefit of approximately one year to make submissions.[187] Article 17 conditions the granting of a reasonable opportunity of presenting one's case by the phrase "at an appropriate stage of the proceedings." The Respondent was offered a reasonable opportunity of presenting its case at the stage at which it entered the case, and was afforded opportunities to present its side of the story repeatedly, opportunities that it ultimately did not take;

ii.    Articles 21 & 30: a respondent is entitled to make its statement of defence "within a period of time to be determined by the arbitral tribunal." In this case, the period of time determined by the Sole Arbitrator was 2 December 2021. The Respondent knowingly failed to communicate its Statement of Defence within this period of time.[188] Article 30(1)(b) state that if a respondent has failed to communicate its statement of defence

---

[186]   As set out above, by its e-mail of 28 April 2022 the Respondent apologized for missing time limits in the case: "*We are writing to offer our sincere apology for missing the earlier deadlines in regards to the case.*"

[187]   The Respondent entered the case in April 2022, and the ultimate deadline for it to make a submission, within the parameters of the e-mail dated 19 April 2023, was 15 June 2023.

[188]   In its e-mail of 28 April 2022 the Respondent apologised for missing these time limits, thereby showing it had been aware of them.

within that time period, without showing sufficient cause, the arbitral Tribunal "shall order that the proceedings continue, without treating such failure in itself as admission of the claimant allegations." Therefore, as the Respondent had failed to communicate its Statement of Defence within the necessary time period, and as it apologized for missing the time period but did not show sufficient cause for having done so, the Sole Arbitrator necessarily ordered that these arbitration proceedings would continue;

iii.     Article 30(2): The Respondent failed to appear at the Hearing in this case, without showing sufficient cause for such failure, and as such, the Sole Arbitrator was within rights to proceed with the arbitration, as was done.

281. Given the foregoing analysis, the Sole Arbitrator finds that the Respondent was given a reasonable opportunity to present its case, including a reasonable opportunity at the appropriate stage to present its full defence.

282. Further, in response to any allegations of unfairness during the proceedings by the Respondent, it can be seen from the Procedural History generally, and the specific history set out at paragraph 279, all of the applications, allegations and communications from the Respondent were fully considered by the Sole Arbitrator and the Respondent was communicated with in a timely and appropriate fashion.

283. The Sole Arbitrator therefore rejects the allegations made by the Respondent in its letter to the PCA dated 24 June 2023 and in its e-mail of 18 October 2023.

**2.     Time-Limit to Issue the Award**

284. As noted above, the procedural law governing this arbitration is the UAE Arbitration Law.

285. Article 42 of that Law states as follows, in regard to the time for the making of the final award:

1- The Arbitral Tribunal shall give the award terminating the dispute, within the time limit agreed by the Parties. If there is no agreement on a specified time limit or a method to determine said date, the award shall be rendered within six months from the date of the first hearing of the arbitration proceedings. Moreover, the Arbitral Tribunal may decide to extend the period up to no more than six (6) additional months, unless otherwise agreed by the Parties.

2- The Arbitral Tribunal or any party may, in case of non-issuance of the Arbitral Award and after the termination of the period mentioned in Clause (1) of this Article, request the Court to issue a decision determining an additional period for rendering the Arbitral Award or ending the arbitration proceedings, if necessary, and it may extend said period according to the conditions that it may deem appropriate. Unless otherwise agreed by the Parties, its decision in this regard shall be deemed final.

3- If the Court renders a decision ending the arbitration proceedings, then any party may file

his case with the competent Court of original jurisdiction.[189]

286. As set out above in the Procedural History, the Parties were asked to agree on the date for the making of the final award:

    i.    On 4 May 2023, the Parties were invited to provide in writing their agreement to a date for the final award in accordance with Article 42(1) of the UAE Arbitration Law, and, on 6 May 2023, the Claimant agreed to such a date;

    ii.    By 6 May 2023, as the Claimant had agreed to such a date and the Respondent had not, the Sole Arbitrator directed the Parties to confer and agree on such a date;

    iii.    On 19 May 2023, the Claimant proposed a date for the making of the final award and, on the same date, the Sole Arbitrator invited the Respondent to provide its views on that date;

    iv.    Having not heard from the Respondent in respect to the date for the making of the final award, on 22 May 2023, the Sole Arbitrator asked the Respondent again for its position;

    v.    On 22 May 2023, the Respondent did not agree to a date for the making of the final award, but tied its agreement to such a date to allowing it to make a late submission of its defence;

    vi.    On 29 May 2023, the Sole Arbitrator directed the Parties to agree on the date for the making of the final award by 2 June 2023;

    vii.    Subsequent to the Parties discussions between themselves, on 5 June 2023 and 7 June 2023 the Claimant and Respondent respectively reported on such discussions and indicated that they failed to agree on a date for the making of the final award;

    viii.    On 13 August 2023, the Sole Arbitrator noted that, in light of the Parties' failure to agree on the time for the making of a final award under the UAE Arbitration Law, the courts of the UAE would now determine the time within which the arbitration award in this case should be made.

---

[189] Federal Law No. 6, 3 May 2018, Translation from the Official United Arab Emirates' Government portal, <https://elaws.moj.gov.ae/UAE-MOJ_LC-En/00_ARBITRATION%20AND%20RECONCILIATION/UAE-LC-En_2018-05-03_00006_Kait.html?val=EL1>.

287. On 28 September 2023, the Dubai Courts Court of Appeals (Fifth Commercial Appeals Circuit) extended the deadline for issuing the final award in this case to 30 November 2023.[190]

## B.   ISSUES OF MERITS

288. Much of the argumentation and submissions in relation to the Claimant's claims dealt with payment issues. To this end, the Sole Arbitrator was provided with the invoices that the Claimant sent to the Respondent,[191] as well as a summary spreadsheet of Invoices, Payments and Amounts Withheld, Exhibit C-44.[192]

289. In order to ensure that the summary comprising Exhibit C-44 was a document prepared during the performance of the Contract, not simply a document prepared for litigation, Claimant witness Paul Furlong testified that that summary was the way that the Respondent kept track of invoices during their performance of the contract, and that this summary was not prepared merely for the purposes of this litigation.[193]

290. Further, as the Respondent did not take part in the document production phase of the proceeding, and in order to make the proceeding as fair as possible, the Sole Arbitrator ordered the Claimant to produce documents responsive to the following:

> 4.1.1 Any documents not yet produced in this proceeding critical of the Claimant's performance of or under the ANAP Contract between 4 August 2018 and 4 October 2021;
>
> 4.1.2 Any written communications or written records of oral communications to the Claimant dated between August 4, 2018 and October 4, 2021 from any of the entities set out below in sub-paragraphs 4.1.2.1 to 4.1.2.10 relating to the alleged illegal deductions of payments due to the Claimant, alleged unilateral modification of the ANAP Contract, manning cap fees, alleged delay of PSC license renewal and alleged termination of the ANAP Contract not yet produced in this proceeding:
>
> > *4.1.2.1 Afghanistan Civil Aviation Authority ("ACAA") and its departments, including, without limitation, the Aviation Security Department and the four relevant airport authorities of Kabul, Mazar, Herat and Kandahar;*
> >
> > *4.1.2.2   National Procurement Authority of Afghanistan;*
> >
> > *4.1.2.3   National Procurement Commission of Afghanistan;*
> >
> > *4.1.2.4   Office of the President of Afghanistan;*
> >
> > *4.1.2.5   Office of the Administrative Affairs of the President of Afghanistan;*
> >
> > *4.1.2.6   National Security Council of Afghanistan;*

---

[190]   Dubai Courts Court of Appeals (Fifth Commercial Appeals Circuit), Appeal No. 118/2023/392, Order on Petition, Arbitration.

[191]   Exhibits C-15 to C-43.

[192]   Summary Spreadsheet of Invoices, Payments, and Amounts Withheld (**Exhibit C-44**).

[193]   Transcript, p. 9, lines 12-19.

> 4.1.2.7  High Council on Rule of Law of Afghanistan;
>
> 4.1.2.8  Ministry of Foreign Affairs of Afghanistan;
>
> 4.1.2.9  Ministry of Interior of Afghanistan;
>
> 4.1.2.10 Ministry of Justice of Afghanistan.[194]

291. The Sole Arbitrator also requested documents pertaining to the "Presidential Palace Investigation."[195]

292. The Claimant submitted documents responsive to these orders and requests of the Sole Arbitrator.[196]

### 1.    Applicable Law

293. The Claimant submits that in the present case, to the extent the ANAP Contract does not address an issue, the Sole Arbitrator must rely on the applicable laws of Afghanistan, and to the extent that Afghan laws do not address an issue, the Sole Arbitrator may then apply principles of Sharia law and customs and practices.

294. The Respondent failed to provide its position on this issue.

295. As set out in the SCC, Clause 8.2.5 of the GCC states, in relation to the governing law, "in any arbitration hereunder […] (b) The law governing the Contract shall be the laws of Afghanistan."[197]

296. Therefore, as the Claimant submits, the Sole Arbitrator must rely on the applicable laws of Afghanistan in determining the claims in this arbitration proceeding.

297. The relevant parts of Article 35 of the UNCITRAL Arbitration Rules state:

> 1. The arbitral tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the arbitral tribunal shall apply the law which it determines to be appropriate.
>
> […]

---

[194]    Procedural Order No. 3.

[195]    Sole Arbitrator e-mail dated 11 March 2022. The "Presidential Palace Investigation" turned out to be largely irrelevant to the substantive issues in this case. The issues in that Investigation were largely concerned with human resource issues including training of Claimant staff, hiring of local staff and staff retention, as well as a discussion of proper deployment and maintenance of equipment. *See, for example*, OG Presidential Palace Investigation Implementation Plan – Progress Update 22 February 2019, attached to an e-mail from Olive Group to ACAA of 24 February 2019, a copy of which was submitted by the Claimant on 15 March 2022.

[196]    Claimant's e-mail of 15 March 2022.

[197]    ANAP Contract, SCC, cl. 8.2.5 (**Exhibit C-1**).

> 3. In all cases, the arbitral tribunal shall decide in accordance with the terms of the contract, if any, and shall take into account any usage of trade applicable to the transaction.

298.    That Article of the UNCITRAL Arbitration Rules is apropos, showing that:

    i.     The Sole Arbitrator must utilize the laws of Afghanistan as that comprises the rules of law designated by the Parties as applicable to the substance of the dispute;

    ii.    Further, the Sole Arbitrator must also utilize the terms of the contract in determining the claims, and must take into account any trade usage applicable to this contractual relationship between the Parties.

299.    Therefore, the Sole Arbitrator will be governed by, in descending order, the laws of Afghanistan, the terms of the Contract, and applicable trade usage in the airport security industry. Insofar as the Parties use the principles of Sharia law, or refer to them in the Contract, or insofar as they are referred to in the laws of Afghanistan, those principles will also be utilized.

### 2.    The "Penalties"

300.    As noted above, the Parties do not dispute that the Respondent imposed the "penalties" on the Claimant.[198] The Parties dispute over whether the "penalties" were justified.

301.    The Claimant submits that the Respondent breached the ANAP Contract by imposing "penalties" in the amount of USD 1,280,967.55.[199]  The amounts of the penalties deducted were clearly set out on the summary comprising Exhibit C-44.

302.    The Claimant principally argues that the "penalties" deducted had no basis in the ANAP Contract, nor in the law, and comprised improper unilateral deductions.

303.    Respondent, in the Respondent's Position, based a right to make such deductions on item 2(B)(5)(29) from the SOW & Terms of Reference ("**Item 29**"). This item states:

> Service Provider is responsible to Procure, supply and installs [sic] new equipment as listed in appendix Fl by ACAA compliant with ICAO Standards.
>
> The company is responsible for acquiring and installing this equipment with in the first 5 months of the contract at all pre-specified international airports (DAP). In case failure or delay and/or if it is not appropriately acquired or installed in the required period it will result in 0.1 % penalty Charge per day for delay.[200]

---

[198]    Statement of Claim, ¶ 48, 214; Respondent's e-mail of 18 July 2022; Respondent's e-mail of 2 August 2022.

[199]    Statement of Claim, ¶ 48.

[200]    ANAP Contract, Statement of Work (SOW) & Terms of Reference, p.39, Item 29 (**Exhibit C-1**).

304. This matter was addressed by witness Paul Furlong at the Hearing. In questioning from the Sole Arbitrator, Mr. Furlong testified:

> A. … I'm aware there was a delay on equipment, I can't clarify how long, and I'm aware we were penalised for it and paid the penalty.
>
> ARBITRATOR: So that was a matter that was resolved at some earlier stage and it wasn't left unresolved at the point that the contract was terminated?
>
> A. Yes, it was resolved during the contract.[201]

305. In other words, the evidence of the Claimant is that any penalty for delay that occurred flowing from the provision of the required equipment within the first five months of the ANAP Contract had been resolved between the Parties, and there was no amount outstanding for such a penalty necessitating deductions from the amounts invoiced by the Claimant.

306. Further, due to the Respondent's refusal to take part in the proceeding, its arguments were unsubstantiated by evidence. However, the Sole Arbitrator finds the Respondent's arguments in respect of the penalties inconsistent in any event.

307. The Respondent first argues that the Claimant failed to ensure the activity of the equipment from the beginning to the end of the contract[202] but then bases its right to make penalty deductions on Item 29. An alleged failure "to transfer and install the equipment and devices listed in Appendix (F1)" of the ANAP Contract "delayed for 147 days in the transfer and installation of tools and equipment."[203] The only basis for such a deduction under the SOW is a failure to acquire and install equipment within the first five months of the ANAP Contract, as per Item 29. This is inconsistent with an argument that the Claimant failed to ensure the activity of the equipment throughout the term of the ANAP Contract.

308. The evidence of the Claimant through the testimony of Mr. Paul Furlong is more consistent with the ANAP Contract and the remainder of the evidence. Mr. Furlong indicated that there were delays but that any penalties for such delays were already resolved, and were not left unpaid. Therefore, there was no ongoing debt necessitating a deduction by the Respondent from the Claimant's invoices.

309. It is also notable that the Respondent's e-mail dated 2 August 2022 dealing with penalties refers to "decree number (810)" dated 2 May 2018 under which a committee was mandated "to

---

[201]    Transcript, p. 13, lines 7-13.

[202]    Respondent's e-mail of 18 July 2022.

[203]    Respondent's e-mail of 2 August 2022.



investigate the transfer and installation of the equipment included in the contract."[204]  As argued by the Claimant, the setting up of this committee would have predated the signing of the ANAP Contract by a number of months.

310.  The Respondent goes on to allege, in respect of penalties, that "[a]s a result of the investigation, the committee found that the Claimant failed to transfer and install the equipment and devices listed in Appendix (F1) according to the terms of the ANAP Contract, and the company has been delayed for 147 days in the transfer and installation of tools and equipment." Again, that alleged committee could not have been operating prior to the signing of the ANAP Contract. There is also no evidence of such a decree, nor are there communications citing such a decree or referring to the investigations or findings of the alleged committee.

311.  The Claimant has argued, pursuant to the ANAP Contract and Afghan laws, the penalties were valid only if the Parties agreed on the penalties, but the Claimant never agreed to such penalties.[205] There is no evidence that there was agreement to any penalties save for the ones mentioned above,[206] which are contractual but bear no resemblance to the allegations of the Respondent of penalties flowing from the investigations of a committee mandated under a decree.

312.  Also, if the contractual penalties were levied pursuant to Item 29, there would have been evidence of delay within the first five months of the performance of the ANAP Contract.  The Respondent argues that there were 147 days of delay, which amounts to approximately the full five months, and that there was a list of tools and equipment upon which the penalty was levied.[207] However, there is no evidence of which specific tool or tools or pieces of equipment were delayed, for how long each was delayed, or how the "transfer and installation" of such tools and/or pieces of equipment created a delay for the Respondent. Further on that point, there is no evidence as to, if there were such delays, how such delays were the fault of the Claimant.

313.  It is clear from the documents in evidence that the Claimant had made efforts to demonstrate to the Respondent that the penalties were levied in error.  For example, the minutes of a meeting

---

[204]  Respondent's e-mail of 2 August 2022.

[205]  Reply, pp. 3-4.

[206]  ANAP Contract, Statement of Work (SOW) & Terms of Reference, Item 29 (**Exhibit C-1**).

[207]  Respondent's e-mail of 2 August 2022. The Respondent argues that "[147]days of delay have been calculated, first, according to paragraph 1, 3 and 7 of the terms of the contract from the general sum of the contract and the calculated penalty is 0.1 percent per day. Secondly, according to article (29) of the contract, the sum of 0.5 percent of the list of tools and equipment penalty has been measured and calculated for the delay per day." While "paragraph 1, 3 and 7 of the terms of the contract" seems to refer to Clause 3.7.1 of the SCC, there is no Article 29 in the ANAP Contract.

which took place 24 June 2020 shows the Claimant explaining to the Respondent the error in respect of these penalties.[208]

314.   Given the lack of evidence of either demonstrating a contractual basis for the imposition of these penalties, or penalties flowing from an agreement of the Parties, the Sole Arbitrator finds that the amounts deducted from the Claimant invoices which were styled "penalties," USD 1,280,967.55, were actually monies wrongfully withheld from the Claimant. Therefore, those monies should be returned to the Claimant and an order to that effect is granted below.

### 3.    The Ten Percent Retention

315.   The Parties do not dispute that the Respondent deducted the 10% retention from the Claimant.[209] The Parties dispute over whether the 10% retention was justified.

316.   In justifying this retention, the Respondent relies on an alleged report of the director of Kabul International Airport and argues that the Claimant failed to hand back 131 items of equipment owned by the Respondent at the end date of the ANAP Contract and therefore the 10% retention was deducted as the damages pursuant to Article 80 of the Procurement Procedure.[210]

317.   The Claimant denies that it failed to hand back any equipment alleged by the Respondent.[211] As evidence, the Claimant points to certification letters confirming completion of transfer and Mr. Gunn's witness statement.[212] Moreover, the Claimant criticizes that the Respondent failed to provide the report of the director of Kabul International Airport allegedly justifying the retention and that alleged report does not appear in the evidence of the case. [213]

318.   Both witnesses that gave testimony under oath were asked about the retention. Mr. Furlong testified that the retention amount was a separate issue from the performance bond, which was posted.[214] He went on to discuss the Respondent's allegation that 131 items of equipment owned

---

[208]    Minutes, ANAP/ACAA Meeting to discuss equipment fines on 24 June 2020, at ACAA offices, Kabul, Afghanistan provided with Claimant's disclosure of 15 March 2022.

[209]    Statement of Claim, ¶ 50; Respondent's e-mail of 2 August 2022.

[210]    Respondent's e-mail of 2 August 2022.

[211]    Reply, p. 5.

[212]    Reply, p. 6, *referring to* Completion Certificate re: HKIA airport, 7 November 2020 (**Exhibit C-69**); Completion Certificate re: Herat Int'l Airport, 4 November 2020 (**Exhibit C-70**); Completion Certificate re: Mazar-e-Sharif Int'l Airport, 5 November 2020 (**Exhibit C-71**); Completion Certificate re: Kandahar Int'l Airport, 4 November 2020 (**Exhibit C-72**); Letter from ACAA to Olive Group certifying that Olive Group has fulfilled its contractual obligations and transfer of responsibilities, 17 December 2020 (**Exhibit C-73**); Witness Statement of Alexander Gunn, 5 November 2022 (**CWS-2**).

[213]    Reply, p. 5.

[214]    Transcript, p.10, line 14.

by the Respondent was not handed over. He testified that at the end of the ANAP Contract "all equipment was handed over" and "each airport director signed a letter stating that all equipment had been handed over and in a serviceable condition."[215]

319. Mr. Gunn also testified that the retention was a different thing from the performance bond.[216] He went on to state that, although the Respondent had initially refused to release the performance bond, the bank holding the bond ultimately released it to the Claimant.[217] With respect to the alleged 131 items unreturned, Mr. Gunn testified that at the end of the ANAP Contract "everything, from all of the employees, local employees, two international employees, to manuals, operating procedures, spare parts, uniform, everything was transferred to the subsequent contractor to ensure absolutely no disruption."[218]

320. The Claimant has submitted that neither ANAP Contract nor Afghan laws provide for the Respondent to withhold any retention amount, and certainly not a unilateral 10% retention amount.[219] Therefore, it submits that the Respondent breached the ANAP Contract by withholding the 10% retention in the amount of USD 2,755,635.74.[220] There is no evidence that there was a law or an agreement in the ANAP Contract for the withholding of the retention amount.

321. The Claimant argues that, even if the Respondent was entitled to withhold such retention, it should return the amount to the Claimant no later than 7 November 2020, the date when ACAA signed the Completion Certificate.[221]

322. Exhibit C-44 shows the amounts retained by the Respondent in respect of the retention. The amounts invoiced are verified by cross-checking with each of the invoices listed.[222] Exhibit C-44 shows the amount of $2,755,635.74 withheld as retention.

323. By letter dated 6 January 2021, the Claimant demanded immediate payment of the amount retained[223], saying that it had fulfilled and transferred all its responsibilities under the ANAP

---

[215]   Transcript, p. 14, lines 1-5.

[216]   Transcript, p. 52, line 22.

[217]   Transcript, p. 53, line 15.

[218]   Transcript, p. 56, lines 14 - 19.

[219]   Statement of Claim, ¶ 208.

[220]   Statement of Claim, ¶ 142.

[221]   Statement of Claim, ¶ 211.

[222]   Exhibits C-15 to C-43.

[223]   It is noted that that Letter stated the retention amount to be $2,758,991.16; however, the correct amount of the retention, and that amount claimed by the Claimant, was shown in Exhibit C-44 as $2,755,635.74.



Contract, which fulfilment and transfer had been confirmed by officials at all four relevant airports. [224] The letter stated that there was no provision in the ANAP Contract or in the law allowing for such retention.

324.  A review of several e-mail trails concerning the retention indicates that the Respondent was disposed to return the retention, but that the proper approvals were just not obtained in a timely fashion. [225] A typical e-mail trail shows (in reverse chronological order):

> Fri 09/04/2021 10:16 AM
>
> Dear Mr. Kelvin,
>
> Apologies for late reply there is no news from Palace procurement department, im following the retaintion [sic] with airports to send the clearance but about guarantee it is out of my hand just i can send another letter to procurement department as a follow up. Regards, Afghanistan Civil Aviation Authority, M. Farhad Pirzad
>
> ---
>
> On Thursday, April 8, 2021, 06:59:43 AM GMT+4:30, Kelvin Windsor
>
> <kelvin.windsor@constellis.com> wrote:
>
> Good morning Mr Farhad, is there any news on the return of either our retentions or our payment guarantee
>
> ---
>
> **From:** Kelvin Windsor  **Sent:** Monday, April 5, 2021 9:20 AM
>
> **To:** farhad pirzad <farhad_przd@yahoo.com>
>
> **Cc:** Paul Furlong <Paul.Furlong@constellis.com>
>
> **Subject:** RE: [External]Re: Important: OG Retentions owed
>
> Good morning Mr Farhad, any news?
>
> ---
>
> **From:** farhad pirzad <farhad_przd@yahoo.com>
>
> **Sent:** Monday, March 29, 2021 7:57 PM
>
> **To:** Kelvin Windsor <Kelvin.Windsor@constellis.com>
>
> **Cc:** Paul Furlong <Paul.Furlong@constellis.com>
>
> **Subject:** [External]Re: Important: OG Retentions owed
>
> Dear Mr. Kelvin,
>
> Sorry for late reply and there is no news still.
>
> Regards, Afghanistan Civil Aviation Authority M. Farhad Pirzad Acting Avsec Director
>
> ---
>
> On Monday, March 29, 2021, 02:02:17 PM GMT+4:30, Kelvin Windsor

---

[224]   Letter from Olive Group to ACAA demanding release of "retention" amounts, 6 January 2021 (**Exhibit C-74**).

[225]   Four e-mail trails were put into evidence, showing many e-mails between 23 February 2021 and 29 April 2021; some of the e-mails involved return of the performance guarantee as well as return of retentions.



<kelvin.windsor@constellis.com> wrote:

Good afternoon Mr Farhad, Do you have anything positive for me?

---

**From:** Kelvin Windsor

**Sent:** Thursday, March 25, 2021 11:33 AM

**To:** farhad pirzad <farhad_przd@yahoo.com>

**Cc:** Paul Furlong <Paul.Furlong@constellis.com>

**Subject:** RE: [External]Re: Important: OG Retentions owed

Good Afternoon Mr Farhad,

Is there any positive news that I can share with our head office.

Both of these issues are very critical for us.

---

**From:** farhad pirzad <farhad_przd@yahoo.com>

**Sent:** Wednesday, March 17, 2021 8:02 PM

**To:** Kelvin Windsor <Kelvin.Windsor@constellis.com>

**Cc:** Paul Furlong <Paul.Furlong@constellis.com>

**Subject:** [External]Re: Important: OG Retentions owed

Dear Mr. Kelvin,

Apologize for late reply, as I got information still there is no update from palace procurement office, H.E Wafayezada is in contact with them to reply the ACAA letter soon.

Regards, Afghanistan Civil Aviation Authority M. Farhad Pirzad Acting Avsec Director

---

On Wednesday, March 17, 2021, 11:06:57 AM GMT+4:30, Kelvin Windsor

<kelvin.windsor@constellis.com> wrote:

Good morning Farhad, anything to update please? As you can imagine I am under immense pressure to clear the PG and retention issues.

---

**From:** Kelvin Windsor

**Sent:** Sunday, March 14, 2021 7:29 AM

**To:** farhad pirzad <farhad_przd@yahoo.com>

**Cc:** Paul Furlong <Paul.Furlong@constellis.com>

**Subject:** RE: [External]Re: Important: OG Retentions owed

Good morning Mr Farhad,

Is there any good news to update me on, we are 4 ½ months since the contract was terminated surely there must be some progress by now.

---

**From:** farhad pirzad <farhad_przd@yahoo.com>

**Sent:** Wednesday, March 10, 2021 9:32 AM

**To:** Kelvin Windsor <Kelvin.Windsor@constellis.com>

PCA Case No. 2021-34
Final Award
Page 76 of 108

Cc: Paul Furlong <Paul.Furlong@constellis.com>

Subject: Re: [External]Re: Important: OG Retentions owed

Good Morning Mr. Kelvin,

H.E Wafayezada told about meeting and instructed me to shear the letter that ACAA send to Palace Procurement Office with him, I already send copy of the letter, he will follow it with palace to have reply soon.

Regards, Afghanistan Civil Aviation Authority M. Farhad Pirzad Acting Avsec Director

---

On Wednesday, March 10, 2021, 07:48:06 AM GMT+4:30, Kelvin Windsor

<kelvin.windsor@constellis.com> wrote:

Good morning Mr Farhad,

Enayat Qasimi met with the DG last week and the DG promised either the PG or retentions would be resolved this week; would you kindly update me and what is the plan for addressing with urgency.

325. The last e-mail provided with respect to retention, dated 29 April 2021, showed that the Respondent was still proposing meetings with respect to return of the retention:

> **From:** farhad pirzad <farhad_przd@yahoo.com>
>
> **Reply to:** farhad pirzad <farhad_przd@yahoo.com>
>
> **Date:** Thursday, 29 April 2021 at 09:25
>
> **To:** Kelvin Windsor <Kelvin.Windsor@constellis.com>, Paul Furlong
>
> <Paul.Furlong@constellis.com>
>
> **Subject:** Re: [External]Re: Important: OG Retentions owed
>
> Good Morning Mr. Paul,
>
> Hope be fine, i followed the guarantee once again with procurement office on Tuesday and waiting for response, about retention i suggest to have a meeting next week for discussion.
>
> Regards, M. Farhad Pirzad Acting Avsec Director Afghanistan Civil Aviation Authority

326. The notable feature in all of these e-mails is that at no point did the Respondent say that the retention was authorized, or properly withheld, or attempt to justify the retaining of the funds.

327. Based on the documentary evidence and the witness testimony, the Sole Arbitrator finds that the Claimant did not fail to hand over 131 items at the end of the ANAP Contract. The Sole Arbitrator also finds that there was no legal or contractual basis for the retention withheld by the Respondent.

328. The Sole Arbitrator therefore further finds that the amounts deducted from the Claimant invoices, $2,755,635.74, which were styled "retention," were actually monies wrongfully withheld from the Claimant. Therefore, those monies should be returned to the Claimant and an order to that effect is granted below.

4.    **The Delay in Making Payments**

329.    According to the Claimant, the Respondent has failed to make payments of: (i) the invoices issued pursuant to the ANAP Contract (i.e. the invoices of the equipment purchase plus the monthly invoices for the first 27 months); (ii) the 10% retention amounts; (iii) the "penalties" amounts; and (iv) the monthly invoices for the final nine months.[226] The Claimant submits that the Respondent delayed (or never paid at all) payments of all the above-mentioned categories and therefore breached the ANAP Contract.[227] The Claimant points to Clause 6.5 of the GCC which contemplates payment by the Respondent of damages (i.e. interest) on delayed payments.[228]

330.    In respect of the conditions of payment, the GCC state:[229]

| 6.1 | Lump-Sum Remuneration | The Service Provider's remuneration shall not exceed the Contract Price and shall be a fixed lump-sum including all Subcontractors' costs, and all other costs incurred by the Service Provider in carrying out the Services described in Appendix A. Except as provided in Sub-Clause 5.2, the Contract Price may only be increased above the amounts stated in Sub-Clause 6.2 if the Parties have agreed to additional payments in accordance with Sub-Clauses 2.4 and 6.3. |
| 6.2 | Contract Price | (a)    The price payable in legal currency is set forth in the SCC |

[…]

| 6.4 | Terms and Conditions of Payment | Payments will be made to the Service Provider according to the payment schedule stated in the SCC. Unless otherwise stated in the SCC, the advance payment (Advance for Mobilization, Materials and Supplies) shall be made against the provision by the Service Provider of a bank guarantee for the same amount, and |
| | | shall be valid for the period stated in the SCC. Any other payment shall be made after the conditions listed in the SCC for such payment have been met, and the Service Provider have submitted an invoice to the Employer specifying the amount due. |
| 6.5 | Interests on Delayed Payments | If the Employer has delayed payments beyond fifteen (15) days after the due date stated in the SCC, interest shall be paid to the Service Provider for each day of delay at the rate stated in the SCC. |

331.    Also, the SCC show the following:

---

[226]    Statement of Claim, ¶ 220.

[227]    Statement of Claim, ¶ 218.

[228]    Statement of Claim, ¶ 157.

[229]    References to the SCC mean to the "Special Conditions of Contract."



| 6.4 | Payments shall be made according to the following schedule: <br><br> • Advance for Mobilization, Materials and Supplies: Not Applicable. <br> • **Payment for equipment:** Payment for equipment will be paid upon delivery (DAP Kabul, Herat, Kandahar & Mazar e sharif Airports) of equipment (as per List of Equipment Appendix F1) against presentation of separate invoice signed by the supplier and airway bill; approved and verified by related supervisory authority of ACAA. <br> • **Monthly Progress payment:** Other payment will be made on monthly basis of progress, subject to verification and endorsement by related airports of ACAA, that the Services have been executed satisfactorily, in accordance with the description of services and requirements of the contract at related airports. |
|---|---|
| 6.5 | Payment shall be made within [45] days of receipt of the invoice and the relevant documents specified in Sub-Clause 6.4, and within [60] days in the case of the final payment. <br><br> The interest rate is: Not Applicable. |

332. As set out above, the Respondent denies the latter three heads of claim by the Claimant, namely the 10% retention, the "penalties," and the monthly invoices for the final nine months. The Respondent argues that "the delay in payments was due to the non-approval of the budget of the fiscal year," as a result of the political issues of the then government.[230] The Respondent adds that the payments were "promptly" completed when the budget was approved.[231]

333. However, the Claimant denies that the delay was due to governmental non-approval of budget.[232] Even if the non-approval of budget resulted in the delay, says the Claimant, "the Respondent fails to provide any explanation about why there were delays in the payment of each monthly invoice during the term of the Contract."[233] The Claimant further argues that even if the non-approval of budget could explain the delays in all payments, the budgetary issues could not excuse the Respondent's obligation to make payments in time as such obligation was not conditioned on approval of budget.[234] The Claimant adds that the ANAP Contract was a "Lump Sum" contract and therefore the Respondent had an obligation to set funds aside for the ANAP Contract.[235]

334. The Claimant's arguments are borne out by the excerpts of the ANAP Contract set out above. It is a lump-sum contract,[236] and payment is not conditional on approval of a budget or on the Respondent's receipt of monies from another governmental authority. The SCC show that the Parties agreed that the Claimant would be paid within 45 days of issuing its invoice, save for the

---

[230]   Respondent's e-mail of 2 August 2022.

[231]   Respondent's e-mail of 2 August 2022.

[232]   Reply, p. 7.

[233]   Reply, p. 7.

[234]   Reply, p. 7.

[235]   Transcript, p. 52, lines 10-12.

[236]   ANAP Contract, GCC, cl. 6.1 (**Exhibit C-1**).



final payment which would be due 60 days from the date of the invoice.[237] Again, these times of payment are not conditional upon budgetary approval or receipt of funds by the Respondent.

335. Further, the Claimant submits that it is entitled to recovery for unjust enrichment pursuant to Afghan laws and the Respondent unjustly "enjoy[ed] the opportunity cost attributable to the funds in ACAA's bank accounts" as a result of the delay in making payments.[238]

336. With respect to the Claimant's claim for interest, it is noted that GCC clause 6.5 states that delay beyond 15 days after the due date stated in the SCC compels interest to be paid "for each day of delay at the rate stated in the SCC."[239] However, the SCC is silent as to the rate of interest to be paid.[240] Given that the Parties did not agree on a rate of interest, the Claimant relies on Article 735(1) of the Afghanistan Civil Code and sets the damages of the delay at the rate of 3% annually.[241] Accordingly, the Claimant calculates the damages at USD 724,830.93 in total.[242]

337. As set out above, the Respondent denies that the final three categories of payments are justified. However, the Respondent does not dispute over the first category of payments (i.e., the invoices issued pursuant to the ANAP Contract, including the invoices of the equipment purchase plus the monthly invoices for the first 27 months) and admits the delay in such payments.[243]

338. The three claims made by the Claimant for delay of payment that are contested by the Respondent are (ii) the 10% retention amounts; (iii) the "penalties" amounts; and (iv) the monthly invoices for the final nine months.

339. There is no contractual repayment scheme or deadline for return of the retention amounts because the retention as withheld by the Respondent is unknown to the ANAP Contract. These retained

---

[237]    ANAP Contract, SCC, cl. 6.5 (**Exhibit C-1**).

[238]    Statement of Claim, ¶ 219.

[239]    ANAP Contract, GCC, cl. 6.5 (**Exhibit C-1**).

[240]    ANAP Contract, SCC, cl. 6.5 (**Exhibit C-1**) : "The interest rate is: Not Applicable."

[241]    Statement of Claim, ¶ 158; Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 735(1) (**CLA-7**).

[242]    Calculation of Olive Group's damages for failure to timely pay the invoices (**Exhibit C-45**); Calculation of Olive Group's damages for unpaid retention amounts (**Exhibit C-46**); Calculation of Olive Group's damages for unpaid "penalties" (**Exhibit C-47**); Calculation of Olive Group's damages for remaining 9 months of ANAP Contract (**Exhibit C-48**).

[243]    Respondent's e-mail of 2 August 2022.

amounts, totalling USD 2,755,635.74, [244] were determined above to have been withheld improperly.[245] Therefore, they fall into the category of monies owed to the Claimant.

340. The Claimant has claimed interest on these retained amounts. The Claimant cites Article 735(1) of the Afghanistan Civil Code, which provides for interest on overdue sums at the rate stipulated by 3% annually. The Sole Arbitrator finds that this is a legally approved rate, and holds this rate should apply to the improperly withheld retention monies.

341. As to when interest should run on these improperly withheld retention monies, the Claimant provides a chart at Exhibit C-46 which calculates interest at daily rates throughout certain periods of time when the retention was being deducted by the Respondent. However, the Sole Arbitrator notes that a formal demand for return of these monies was made to the Respondent by letter dated 6 January 2021. This letter demands "the immediate release and payment of the total amount of US $2,758,991.16"[246] which is the amount of the retained funds without any interest applicable to that date, 6 January 2021. The Sole Arbitrator therefore finds that that date is an appropriate rate to consider the retained monies due and owing, as at that date, the Claimant would have taken the amount of retained funds without any interest.

342. Therefore, these monies have been owed to the Claimant at least since a reasonable time after its formal demand letter for their return, dated 6 January 2021. A reasonable analysis would hold that this formal demand for return of the retention monies was in the nature of a demand for a final payment. As such, those monies should have been returned to the Claimant by the Respondent within 60 days, as per Clause 6.5 of the SCC. Therefore, the retention monies were due from the Respondent by 7 March 2021. Simple interest shall be calculated on the amount owing, US $2,758,991.16, from 8 March 2021 at the rate of 3% per annum.

343. The second of the three delay claims that the Respondent contests is the "penalties" amounts.

---

[244]  Summary Spreadsheet of Invoices, Payments, and Amounts Withheld (**Exhibit C-44**) *as cited and claimed in* Statement of Claim, ¶ 142

[245]  *See* ¶ 328 above.

[246]  The Sole Arbitrator notes a discrepancy in this amount versus the amount actually claimed in the Statement of Claim, ¶ 146: $2,755,635.74. The Sole Arbitrator utilizes the amount actually claimed in the Statement of Claim, on the principle that an amount in excess of that specifically claimed should not be awarded. Also, as set out in fn. 223 above, Exhibit C-44 sets out the amount as $2,755,635.74.

344. The Sole Arbitrator has found that the amounts deducted from the Claimant invoices which were styled "penalties" were actually monies wrongfully withheld from the Claimant, and determined to order those monies to be returned to the Claimant.[247]

345. The amount deducted as "penalties" amounted to USD 1,280,967.55. Their deduction is set out and totalled in Exhibit C-44.

346. The Claimant has claimed interest on these amounts wrongfully withheld as penalties.[248] The Claimant has also provided a chart calculating interest due at the rate of 3% annually for the Respondent's failure to pay the amounts withheld for penalties at the time that the invoices were due.[249] The Sole Arbitrator finds that the interest as calculated by the Claimant in its chart, Exhibit C-47, is an accurate reflection of the loss suffered by the Claimant. That finding is made because:

    i.     According to the evidence given by Mr. Furlong, the issue of penalties had been discussed, negotiated and settled with the Respondent on an ongoing basis;

    ii.    The evidence of Mr. Furlong and the fact that penalties had been discussed, negotiated and settled with the Respondent on an ongoing basis is borne out by the demand letter dated 17 November 2019 which states, in part:

> In violation of the Contract, ACAA has illegally withheld the sum of $1,766,688.40 from OG's invoices since the beginning of the term of the ANAP Contract under the auspices of retention and penalties. There is no authority for "retention" under the Contract **and the penalties withheld are in excess of penalties agreed to by OG**. ACAA must immediately release these funds to OG.[250]

[Emphasis added].

347. As a result, the amounts that should have been and were paid by the Claimant as penalties would have been excluded from the amounts stated by the Claimant to have been improperly deducted. Therefore, this would be reflected in Exhibit C-47, making the calculations of interest due in that Exhibit accurate.

---

[247]   *See* ¶ 314 above.

[248]   Statement of Claim, ¶ 161.

[249]   Calculation of Olive Group's damages for unpaid "penalties" (**Exhibit C-47**).

[250]   Letter from Olive Group to ACAA requesting payment of invoices, 17 November 2019 (**Exhibit C-50**).

348.  The Sole Arbitrator holds that interest was due as at 31 May 2022 in the amount of US $99,916.55 and, as requested by the Claimant in Exhibit C-47, interest continues to accrue after 31 May 2022 at the rate of 3% simple interest per annum on the "penalty" amount of US $1,280,967.55.

349.  The third category of delay claims contested by the Respondent comprise the monthly invoices for the final nine months.

350.  The distinction between the invoices for the final nine months of the ANAP Contract and the earlier invoices is that the Respondent purported to unilaterally reduce the sums owing to the Claimant under the ANAP Contract by 25%. This decision is evident from a letter dated 15 August 2020 which states that the "High Counsel for Rule Of Law decided to amend and reduce the period of contract by 25%, which the ACA reported to NPC on 07/05/1399 (28 July 2020) for approval" which the Respondent quantified as $9,185,452.47.[251] That decision was remitted to the Claimant for comment, to which the Claimant objected, noting that the term of the ANAP Contract was valid until 4 August 2021.[252] However, by letter dated 4 October 2020, the Respondent stated as follows:

> To Olive Group!
>
> Attached to this letter, please find National Procurement Commission's resolution number 4305 dated 35/06/1399 (15 September 2020) regarding termination of the ANAP contract.
>
> The meeting was chaired by H.E. the President, and His Excellency approved the resolution as follows: "**The proposal is approved. Terminate the contract on 4 November 2020.**"
>
> Therefore, considering Articles 2.6 and 2.6.1 of the General Provisions of the Contract and in accordance with the NPC's resolution, the ending date for the ANAP contract will be 4 November 2020.
>
> You are hereby informed of this matter to send the ACAA your plan for the transition of the project as soon as possible.[253]

351.  The Claimant argues that this unilateral decision deprived the Claimant of the remaining nine months left on the ANAP Contract.[254]

352.  The legality and propriety of the unilateral shortening of the term and purported termination of the ANAP Contract is dealt with below in section VII(B)(6), The End of the ANAP Contract.

---

[251]  Letter from ACAA to Olive Group proposing 25% reduction in the Contract, 15 August 2020 (**Exhibit C-60**).

[252]  Letter from Olive Group to ACAA rejecting ACAA's proposal, 22 August 2020 (**Exhibit C-61**).

[253]  Respondent's Notice of Termination, 4 October 2020 (**Exhibit C-62**).

[254]  Statement of Claim, ¶ 199.

However, germane to this section, the damages for delay of payment for the nine months is calculated by the Claimant in concert with the attached chart:[255]

| Invoice period | Anticipated Amount of Invoice | Anticipated Date of Invoice Submission | Date Payment Due | Days Payment Late (through May 31, 2022) | Calculation of Delay Damages (through May 31, 2022) at 3% per year | Delay Damages for ACAA's Unilateral Modification & Termination of ANAP Contract |
|---|---|---|---|---|---|---|
| Nov. 2020 | $1,020,605.83 | 10-Dec-2020 | 25-Jan.-2021 | 492 | 492 days x $83.88/day | $ 41,268.96 |
| Dec. 2020 | $1,020,605.83 | 10-Jan.-2021 | 25- Feb.-2021 | 461 | 461 days x $83.88/day | $ 38,668.68 |
| Jan. 2021 | $1,020,605.83 | 10-Feb.-2021 | 25-Mar.-2021 | 433 | 433 days x $83.88/day | $ 36,320.04 |
| Feb. 2021 | $1,020,605.83 | 10-Mar.-2021 | 25- April-2021 | 402 | 402 days x $83.88/day | $ 33,719.76 |
| Mar. 2021 | $1,020,605.83 | 10-April-2021 | 25-May-2021 | 372 | 372 days x $83.88/day | $ 31,203.36 |
| April 2021 | $1,020,605.83 | 10-May-2021 | 25- June-2021 | 341 | 341 days x $83.88/day | $ 28,603.08 |
| May 2021 | $1,020,605.83 | 10-June-2021 | 25- July-2021 | 311 | 311 days x $83.88/day | $ 26,086.68 |
| June 2021 | $1,020,605.83 | 10-July-2021 | 25- Aug.-2021 | 280 | 280 days x $83.88/day | $ 23,486.40 |
| July 2021 | $1,020,605.83 | 10-Aug.-2021 | 25-Sept.-2021 | 249 | 249 days x $83.88/day | $ 20,886.12 |
| TOTAL: | $9,185,452.47 | | | | | $ 280,243.08* USD |

*Interest continues to accrue after May 31, 2022 at the rate of 3% per year on the total unpaid contract amount of $9,185,452.47.
This translates into interest in the amount of $754.96/per day.

353. The Sole Arbitrator finds that this chart at Exhibit C-48 accurately calculates the loss suffered by the Claimant caused by the Respondent failing to pay the last nine-month portion of the ANAP Contract. The chart is accurate because it reflects the amounts required of the Respondent to pay to the Claimant under the ANAP Contract.

354. The Sole Arbitrator holds that interest was due as at 31 May 2022 in the amount of US $280,243.08 and, as requested by the Claimant in Exhibit C-48, interest continues to accrue after 31 May 2022 at the rate of 3% simple interest per annum on the portion of the ANAP Contract unpaid, in the amount of US $9,185,452.47.

### 5.    The Alleged Delay in Returning the Performance Guarantee

355. The Claimant argues that the Respondent was required to release the Claimant's Performance Guarantee no later than 2 December 2020 pursuant to the ANAP Contract and Afghan laws.[256]

---

[255]    Calculation of Olive Group's damages for remaining 9 months of ANAP Contract (**Exhibit C-48**).

[256]    Statement of Claim, ¶ 234, *referring to* ANAP Contract, SCC, cl. 3.8 (**Exhibit C-1**); ANAP Contract, GCC cl. 3.8 (**Exhibit C-1**); Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016,



356. Article 28(1)(b) of the Afghanistan Procurement Law No. 1223 (17 September 2016) states:

> Contract performance guarantee is required to secure contractors obligation in the contract, and its type, validity period and amount shall be set in the bidding documents or request for proposal. This guarantee will be returned after the contractual obligations of the contractor are met.[257]

357. Article 29(1) of that Law further states that, "Securities mentioned in article 28 of this law, will be returned according to the conditions set forth in bidding documents, request for proposal and the contract."[258] This is clarified by Rule 78(8) of the Afghanistan Procurement Procedures: "Performance Guarantee shall be returned to the contractor after completion of the procurement by the contractor and issuance of certificate of completion by the [government procuring] agency."[259]

358. The Government of Afghanistan, Civil Aviation Authority, by letter of 17 December 2020, released the Claimant of all responsibility and liability pursuant to its Contract with the Respondent as at 4 November 2020.[260] The SCC, at Clause 3.8 states: "The performance Security shall be valid until a date twenty-eight (28) days from the Completion Date of the Contract."[261] As the ANAP Contract was completed as at 4 November 2020, the PG was returnable on 2 December 2020.

359. However, according to the Claimant, the Respondent failed to take the necessary action to cause AIB to release the Performance Guarantee despite the Claimant's multiple requests.[262] As a result, says the Claimant, it was not until 5 October 2021 that the Claimant received its Performance Guarantee back in the amount of USD 2,689,158.29.[263] The Claimant argues that it is thus entitled to damages on such delay.[264] The Claimant relies on Article 735(1) of the

---

Arts. 28-29 (**CLA-10**); Afghanistan Rules of Procurement Procedures Circular No. NPA/C08/1395, 16 July 2016, Rule 78(8) (**CLA-11**).

[257] Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016, Arts. 28-29 (**CLA-10**).

[258] Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016, Arts. 28-29 (**CLA-10**).

[259] Afghanistan Rules of Procurement Procedures Circular No. NPA/C08/1395, 16 July 2016, Rule 78(8) (**CLA-11**).

[260] Letter from ACAA to Olive Group certifying that Olive Group has fulfilled its contractual obligations and transfer of responsibilities, 17 December 2020 (**Exhibit C-73**).

[261] ANAP Contract, SCC, cl. 3.8 (**Exhibit C-1**), referring to the Performance Guarantee.

[262] Statement of Claim, ¶ 185; Witness Statement of Paul Furlong, 28 October 2021, ¶ 113 (**CWS-1**).

[263] Statement of Claim, ¶ 189; Witness Statement of Paul Furlong, 28 October 2021, ¶ 115 (**CWS-1**).

[264] Statement of Claim, ¶ 190.

Afghanistan Civil Code and sets the damages of the delay at the rate of 3% annually.[265] Accordingly, the Claimant calculates the damages at USD 67,854.98.[266]

360. The Respondent failed to provide its position on this issue.

361. On 11 January 2021 the Claimant wrote a letter to the Respondent requesting the Respondent to "immediately write a letter to Afghanistan International Bank ("AIB") with clear instruction to release Olive Group's Performance Guarantee […] in the amount of US \$2,689,158.29." The letter cited 4 November 2020 as the date under which the Claimant had fulfilled and transferred all of its responsibilities under the ANAP Contract.[267] The letter was marked received by the Respondent. This demand letter was followed up by subsequent letters and e-mails.[268]

362. The Claimant served its Notice of Arbitration in April 2021.[269] The issue of the failure to return the Performance Bond was completed in the Notice of Arbitration[270] as well as in the Statement of Claim in this proceeding.[271] However, according to the evidence of Mr. Gunn, the bank holding the Performance Guarantee returned it to the Claimant upon the expiration of its term. That made the return of the Performance Guarantee "moot," according to his evidence.[272]

363. The Claimant received its cash deposit back in the amount of US\$2,689,158.29 on 5 October 2021.[273]

364. It is clear from the evidence that there was an unexcused delay in the return of US\$2,689,158.29 comprising the sum of the Performance Guarantee from the Respondent to the Claimant between 2 December 2020 and 5 October 2021.

---

[265] Statement of Claim, ¶ 236; Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 735(1) (**CLA-7**).

[266] Statement of Claim, ¶ 190.

[267] Letter No. 1124, 11 January 2021, a copy of which was provided by the Claimant on 10 March 2022.

[268] For example, letter 17 February 2021 and e-mail trails of February to April 2021, copies of which were provided by the Claimant on 10 March 2022.

[269] E-mail from Olive Group's legal counsel to ACAA representatives, transmitting Notice of Arbitration and exhibits thereto, 12 April 2021 (**Exhibit C-84**); Letter from Olive Group to ACAA transmitting Notice of Arbitration and exhibits thereto; and acknowledgement of receipt by ACAA's Archive Dept., 15 April 2021 (**Exhibit C-86**) (delivery and receipt of the Notice of Arbitration).

[270] Notice of Arbitration, Section E, p. 41.

[271] Statement of Claim, Section H, ¶¶ 234-236.

[272] Transcript, p. 53, lines 11-17.

[273] Witness Statement of Paul Furlong, 28 October 2021, ¶ 115 (**CWS-1**).



365. The Sole Arbitrator finds that the Respondent was responsible to have returned the sum comprising the Performance Guarantee to the Claimant in accordance with the ANAP Contract and the law, and failed to do so in a timely fashion, causing wrongful delay. Therefore, the Claimant is due the claimed interest on that sum during the period of delay, comprising the damages at USD 67,854.98, calculated at a rate of 3% per annum simple interest, and an appropriate order is made below.

## 6.    The End of the ANAP Contract

366. The Parties dispute over (i) whether the Respondent terminated or unilaterally modified the ANAP Contract; and (ii) whether the Claimant failed to perform any contractual obligations during the duration of the ANAP Contract.

367. The Claimant submits that the ANAP Contract was ended through the Respondent's unilateral modification by which the contract term was reduced by 25%.[274]

368. The Claimant argues that pursuant to Clause 2.4 of the GCC and Afghan laws, modification to the contract must be done by written agreement between the Parties.[275] As the Claimant never agreed to such modification, says the Claimant, such modification was unlawful.[276] The Claimant further argues that Article 41 of Afghanistan Procurement Law and Clause 2.6 of the GCC were irrelevant here as there was no termination but only modification to the ANAP Contract.[277]

369. In order to ascertain what the Respondent did in respect of the ANAP Contract, it is necessary to reproduce both of their letters to the Claimant in this regard.

370. The first letter they issued was dated 15 August 2020 and stated as follows:[278]

---

[274]    Statement of Claim, ¶ 68.

[275]    Statement of Claim, ¶ 200, *referring to* ANAP Contract, GCC, cl. 2.4 (**Exhibit C-1**); Statement of Claim ¶ 204, *referring to* Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016, Arts. 30 (**CLA-3**); Afghanistan Procurement Law Official Gazette No. 1223, 17 September 2016, Arts. 31 (**CLA-4**); Afghanistan Rules of Procurement Procedures Circular No. NPA/C08/1395 dated 1395/4/26, Rule 98(2) (**CLA-5**); Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 696(1) (**CLA-16**).

[276]    Statement of Claim, ¶¶ 199, 201.

[277]    Statement of Claim, ¶ 71; Reply, p. 9.

[278]    Letter from ACAA to Olive Group proposing 25% reduction in the Contract, 15 August 2020 (**Exhibit C-60**).

**To Olive Group FZ-LLC!**

As you are aware, the contract for aviation security services for four international airports, with contract identification number NPA/ACAA/96/NCS/1889/ICB, was contracted on 4 August 2018 between Afghanistan Civil Aviation Authority (ACAA) and Olive Group for three years with a total price of USD 38,416,547.

Presidential order number 740 dated 27/11/1398 (16 February 2020) instructed evaluating continuance or termination of the contract for aviation security services with Olive Group, including comprehensive audit and inspection of the performance of Olive Group as well as presentation of a master plan for the management of Hamid Karzai International Airport (including survey of the current situation, presentation of recommendations for the management of the airport, and the ACAA's constructive recommendations).

To carry out the Presidential order, on 14 April 2020, the ACAA sent a report titled the Proposal of the ACAA on Aviation Security Services and the Olive Group Contract to the NPA, which in turn forwarded it to the NPC. The NPC, in its Resolution number 4137 dated 29/02/1399 (18 May 2020), instructed to forward the report to the High Economic Council.

Eventually, High Council for Rule of Law decided to amend and reduce the period of contract by 25%, which the ACAA reported to NPC on 07/05/1399 (28 July 2020) for approval.

It is noteworthy to mention that the total amount for the 25% reduction in the period of contract equals USD 9,185,452.47.

You are hereby informed of the decision to express your remarks on the matter as soon as possible.

**Respectfully,**
**Dr. Mohammad Qasim Wafayizada**
**General Director of the ACAA**

371. As this letter called on the Claimant to express its remarks on the matter of the 25% reduction in the period of the contract, the Claimant, by letter dated 22 August 2020, rejected the reduction of term and set out the context of the then current relationship between the Parties as follows:

> Referring to your letter number 168/111, dated 25/5/1399, please be advised that Olive Group hereby respectfully rejects ACAA's proposal to reduce the term of Contract NPA/ACAA/96/NCS-1889/ICB, Afghanistan National Airports Project Contract, by 25%. Olive Group and ACAA are required to comply with the terms of the Contract, which is valid until August 4, 2021. ACAA has repeatedly breached the terms of the Contract and Olive Group has recently issued a Notice of Termination in accordance with Article 2.6 of the Contract, which termination will take effect on September 15, 2020. Unless ACAA performs its obligations and addresses all the outstanding issues through a mutually acceptable Settlement Agreement, Olive Group will stand by its notice of termination.[279]

372. As can be seen from the Claimant letter, the Claimant had already put into place a Notice of Termination of its own due to certain alleged breaches of the ANAP Contract by the Respondent. The initial Notice of Termination was dated 13 June 2020 and referred to regular breaches of Article 6.5 of the Contract, not paying invoices in a timely fashion.

---

[279] Letter from Olive Group to ACAA rejecting ACAA's proposal, 22 August 2020 (**Exhibit C-61**).

373. The Claimant extended the date of termination on five different occasions to aid the Respondent
in its transition to a different service provider. By letter dated 14 September 2020, the Claimant
had actually withdrawn its Notice of Termination due to the Respondent's payment of some
invoices but, in doing so, notified the Respondent of additional disputes beyond the simple non-
– payment of invoices. That dispute was described as:

> [T]he ACAA has failed to obtain all the necessary approvals from the Government of
> Afghanistan, which has caused Olive Group substantial financial harm and penalties
> imposed by the Ministry of Interior; the ACAA has illegally deducted substantial amounts
> from Olive Group's invoices under various auspices; and, the ACAA owes interest and fees
> to Olive Group as a result of substantial delays in the payment of invoices and other amounts
> owed to Olive Group. We hold the ACAA liable for all actual and consequential damages
> suffered by Olive Group as a result of ACAA's breaches, including, but not limited to,
> reputational harm, lost bidding opportunities, and contractual damages assessed by other
> parties.[280]

374. In its letter withdrawing the Claimant's Notice of Termination, 14 September 2020, the Claimant
requested the appointment of an adjudicator to attempt to resolve disputes. However that avenue
of redress was initially refused by the Government of Afghanistan, citing a conflict of interest
between the Ministry of Justice and the ACAA.  The Claimant's proposal to have a neutral
adjudicator appointed was not answered by the Respondent.

375. On 4 October 2020, the Respondent sent the Respondent's Notice of Termination terminating the
ANAP Contract and stating as follows:

> **To Olive Group!**
>
> Attached to this letter, please find National Procurement Commission's resolution number
> 4305 dated 35/06/1399 (15 September 2020) regarding termination of the ANAP contract.
> The meeting was chaired by H.E. the President, and His Excellency approved the resolution
> as follows: "**The proposal is approved. Terminate the contract on 4 November 2020**."
> Therefore, considering Articles 2.6 and 2.6.1 of the General Provisions of the Contract and
> in accordance with the NPC's resolution, the ending date for the ANAP contract will be 4
> November 2020.  You are hereby informed of this matter to send the ACAA your plan for
> the transition of the project as soon as possible.
>
> **Sincerely,**
>
> **Dr. Mohammad Qasim Wafayizada**
>
> **General Director of the ACAA[281]**

376. The Respondent's Notice of Termination makes reference to Clauses 2.6 and 2.6.1 of the GCC.
Clause 2.6.1 states as follows:

> The Employer may terminate this Contract, by not less than thirty (30) days' written notice

---

[280]   Letter from Olive Group to ACAA withdrawing termination notice due to payment of certain invoices, 14
September 2020 (**Exhibit C-59**).

[281]   Respondent's Notice of Termination, 4 October 2020 (**Exhibit C-62**).

of termination to the Service Provider, to be given after the occurrence of any of the events specified in paragraphs (a) through (f) of this Sub-Clause 2.6.1 and sixty (60) days' in the case of the event referred to in (g)[282].

(a) if the Service Provider does not remedy a failure in the performance of its obligations under the Contract, within thirty (30) days after being notified or within any further period as the Employer may have subsequently approved in writing;

(b) if the Service Provider become insolvent or bankrupt;

(c) if, as the result of Force Majeure, the Service Provider is unable to perform a material portion of the Services for a period of not less than sixty (60) days; or

(d) if the Service Provider, in the judgment of the Employer has engaged in corrupt or fraudulent practices in competing for or in executing the Contract.

For the purposes of this Sub-Clause: […][283]

377. Given that there is no evidence in this proceeding of the Claimant becoming insolvent or bankrupt, of Force Majeure or of the Claimant engaging in corrupt or fraudulent practices in competing for it or in executing the ANAP Contract, the only possible reason for the Respondent's Notice of Termination was 2.6.1(a), not remedying failure of performance within 30 days of a notice of that failure.

378. According to the Claimant, in any event, none of the conditions for terminating the ANAP Contract was met.[284] In particular, the Claimant submits that it fully performed its contractual obligations.[285] The Claimant denies every allegation of its failure to perform the contractual obligations.

379. The Sole Arbitrator agrees with the Claimant that there is no evidence of a notice from the Respondent under which the Claimant was bound to remedy a failure of performance of an obligation under the ANAP Contract. In fact, the evidence shows that it had been the Claimant who had put the Respondent on notice of termination of the Contract, which notice had been withdrawn given that the Respondent had paid some of its invoices. However, the disputes set out at paragraph 366 and following above were still live at the time of the termination of the Contract.

380. As noted above, the Respondent made some submissions in e-mails dated 18 July 2022 and 2 August 2022 alleging failures on the part of the Claimant to discharge its obligations under the

---

[282]   The Sole Arbitrator notes that there is no sub – clause (g) in Article 2.6.1. *See* ANAP Contract, GCC, cl. 2.6.1 (**Exhibit C-1**).

[283]   ANAP Contract, GCC, cl. 2.6.1 (**Exhibit C-1**). What follows to the end of Article 2.6.1 are definitions of Corrupt Practice, Fraudulent Practice, Collusive Practice, Coercive Practice and Obstructive Practice. Given that there is no evidence of any of those proscribed practices, the definitions are omitted.

[284]   Statement of Claim ¶ 71; Reply, p. 9.

[285]   Reply, p. 9.

ANAP Contract. However, no evidence was put forward by either Party to show particular failings on the part of the Claimant in discharging its obligations under the ANAP Contract or, more importantly, evidence of a failure to "*remedy a failure in the performance of its obligations under the Contract, within thirty (30) days after being notified or within any further period as the Employer may have subsequently approved in writing*" as would be necessary for the Respondent to terminate the ANAP Contract pursuant to Clause 2.6.1 of the GCC.[286]

381.  The Respondent's position is that it terminated the ANAP Contract pursuant to Article 41(2)(a) of the Afghanistan Procurement Law and Clause 2.6.1(a) of the GCC.[287]

382.  The condition required by Article 41(2)(a) was reduced to contractual terms in the ANAP Contract as Clause 2.6.1(a) of the GCC. The Respondent submits that the condition set out in Clause 2.6.1(a) was met, namely that Claimant could not remedy the failures in the performance of its obligations under the ANAP Contract.[288] Such alleged failures consist of four categories: (i) equipment problems; (ii) lack of qualified personnel; (iii) poor management; and (iv) the increase of the number of crimes.

383.  However, as noted above, there is no evidence before the Sole Arbitrator that the Respondent had given the Claimant a 30-day notice to remedy the failures in the discharge of its obligations under the ANAP Contract.

384.  As noted above in the Parties' Positions, the Claimant has denied all allegations that it failed to discharge its obligations under the ANAP Contract. However, it is not necessary to go through all of these explanations put forward by the Claimant, as the Respondent has not properly utilized Article 2.6.1 of the GCC in purporting to terminate the ANAP Contract, and so the ANAP Contract was not properly terminated by the Respondent upon its own terms. The Respondent is therefore in breach of the ANAP Contract by terminating it prematurely.

385.  Therefore, relying on the ANAP Contract terms and Afghan laws, the Claimant argues that it is entitled to the damages in the amount of the last 25% of the lump sum contract price (i.e. USD 9,185,452.47).[289]

---

[286]  ANAP Contract, GCC, cl. 2.6.1 (**Exhibit C-1**).

[287]  Respondent's e-mail of 18 July 2022; Respondent's e-mail of 2 August 2022.

[288]  Respondent's e-mail of 18 July 2022.

[289]  Statement of Claim ¶¶ 205-207, *referring to* Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 730 (**CLA-8**); Afghanistan Law of Commercial Contracts and Sale of Goods, Official Gazette No. 1150, 20 October 2014, Arts. 75, 76(1), 77, 79 (**CLA-9**).

386. That amount, USD 9,185,452.47, was agreed by the Respondent in its letter of 15 August 2020.

387. The laws of Afghanistan include the following in respect of breach of contract:

> Article 730:
>
> In the event a person who makes a commitment cannot fulfil that commitment as in the contract, or delays the performance of the commitment beyond the determined time, court can order for damages against that person. Unless it is proved that the impossibility of performance or delay in performance of the commitment is derived from a cause in which she was not involved
>
> Article 731:
>
> Signatories can determine the amount of damages to be paid as a result of non-performance or delay, upon signing or agree later.
>
> Article 823:
>
> In the event a person breaches her commitment for performance or omission, the other party can demand for damages from the person who made the commitment for what that occurred against the contract.[290]

388. In respect of the calculation of the quantum of damages flowing from the breach of a contract, the laws of Afghanistan further state:

> General Principle Article 75:
>
> In the event that one of the parties cannot perform her commitments based on the terms of the contract or performs in a way which is inconsistent with the terms of the contract, in that case she is recognized as person-in-breach of the contract and the other party is recognized to be proportionally entitled to damages resulted from that breach.
>
> Damages Article 76(1):
>
> In cases of breach of contract, the objective of damages is to pay to the party that suffered from the breach, the benefit of the bargain of the contract.
>
> Damages As A Result Of Non-Payment Article 77:
>
> In the event one of the parties cannot pay, in whole or in part, the amount for goods or services at the determined time, the payment for damages as cash shall be made as follows:
>
> A- The unpaid portion of the amount
>
> B- The additional amount that compensates the claimant for damages the claimant has suffered as a result of opportunity lost of money during the period of non-payment.
>
> Calculation of Damages Article 79:
>
> (1) The amount of damages which are payable proportionally to the one of the parties as a result of breach of contract include the following:
>
> 1- Any amounts which the non-breaching party would receive in the event of no breach of contract
>
> 2- Lost profit as long as not anticipated illegally and are directly related to the breach of contract
>
> 3- Other calculable damages suffered as a result of the breach of contract which could have

---

[290]   Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977 (**CLA-8**).

been predictable when signing the contract.[291]

389. Given that the Respondent did not terminate the ANAP Contract properly, and given that under the laws of Afghanistan a party can claim damages for breach of contract "proportionally entitled to damages resulted from that breach," the Sole Arbitrator holds that the Claimant is due damages from the Respondent for breach of the ANAP Contract.

390. The quantification of such damages can be readily measured pursuant to Article 77 of the Afghanistan Law of Commercial Contracts and Sale of Goods which states that the non-breaching party is entitled to the unpaid portion of the amount caused by the breach, in this case USD 9,185,452.47 (which amount had been agreed by the Respondent) as well as the "opportunity lost of money during the period of non-payment."[292]

391. Flowing from the breach of the Contract, the Claimant requested damages estimated to be in the amount of at least $9,185,452.47 USD, plus pre-judgment interest, post-judgment interest, attorneys' fees, costs, and such other relief that the Arbitrator deems just and proper under the circumstances.[293] Therefore, the Claimant is entitled to the payment of USD 9,185,452.47, being the unpaid portion of the amount, and an order to that effect is made below.

392. The Claimant is entitled, as well, to damages equivalent to the simple interest on the sum from the point of non-payment to the date of this final award.

393. To calculate the interest damages, it is difficult and complex to estimate when over the nine-month breach period the Claimant would have received the USD 9,185,452.47. At the very least, it would have been due to have received that amount of money 60 days after the end of the Contract Period,[294] 3 October 2021 (4 August 2021 plus 60 days, Final Payment provision).

394. Therefore, damages for interest would be payable from 1 June 2022, in concert with paragraph 354 above, to the date of the final award, and an order to that effect is made below.

---

[291] Afghanistan Law of Commercial Contracts and Sale of Goods, Official Gazette No. 1150, 20 October 2014, Arts. 75, 66(1), 77, 79 (**CLA-9**).

[292] Afghanistan Law of Commercial Contracts and Sale of Goods, Official Gazette No. 1150, 20 October 2014, Art. 77 (**CLA-9**).

[293] Statement of Claim, ¶ 138.

[294] Per Clause 6.5 of the SCC, 60 days after the end of the Contract, Final Payment. *See* ANAP Contract, SCC, cl. 6.5 (**Exhibit C-1**).

7.    **Manning Cap Fees in relation to Employees under the ANAP Contract**

395.   The Claimant submits that the manning cap fees in relation to employees under the ANAP Contract should not be imposed on it.[295] The Claimant argues that from 2012 to January 2020, it never paid or was required to pay the manning cap fees in relation to the aviation security personnel and experts under the ANAP Contract. [296] The Claimant also argues that the replacement contractor also did not pay manning cap fees in relation to the aviation security services.[297] Furthermore, the Claimant points to the Respondent's representation that the ANAP Contract was exempt from PSC Regulations and manning cap fees.[298] The Claimant gives several cogent reasons why it should not pay such manning cap fees:

i.      Employees under the ANAP Contract are not "Security Personnel" for the purpose of PSC Regulations because they do not perform "Security Services" defined in Article 4;[299]

ii.     The approval of the ANAP Contract by the NPC, the NSC and the then president provided a waiver to the manning cap fees in relation to personnel providing services listed in Article 6;[300]

iii.    The approval of the ANAP Contract by the NPC, the NSC and the then president should be considered as an authorization of hiring additional personnel exempting it from Article 10 of PSC Regulations (Number of Personnel); and

iv.     Employees under the ANAP Contract are not the Claimant's "Security Personnel" but part of the Respondent's personnel on the basis that the Respondent had the ultimate authority to terminate the employment of these personnel and that they were working and could continue to work for the Respondent after the end of the ANAP Contract.

396.   The Claimant submits two arguments in the alternative:

---

[295]   Statement of Claim, ¶¶ 171-172.

[296]   Statement of Claim, ¶¶ 94, 112; Witness Statement of Paul Furlong, 28 October 2021, ¶ 73 (**CWS-1**).

[297]   Statement of Claim, ¶ 113; Witness Statement of Paul Furlong, 28 October 2021, ¶ 74 (**CWS-1**).

[298]   Statement of Claim, ¶ 94; Witness Statement of Paul Furlong, 28 October 2021, ¶ 56 (**CWS-1**).

[299]   Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[300]   Statement of Claim, ¶ 116; Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

    i.      If there was a conflict between the MOI's PSC Regulations and the NPC's approval of the ANAP Contract, the latter would prevail as the NPC is a higher-ranking body in the Government of Afghanistan than the MOI;[301] and

    ii.     The PSC Regulations were never enacted.[302]

397.    The Respondent failed to provide its position on whether the manning cap fees in relation to employees under the ANAP Contract should be imposed on the Claimant.

398.    Evidence in respect of the manning cap fees was provided by Mr. Furlong in his witness statement.

399.    He indicates that the Claimant's security-related activities in Afghanistan are regulated by the MOI in accordance with the PSC Regulations. The manning cap is 500 security guards employed by a private security company, and the MOI imposes a monetary fine for each security guard employed over the 500 limit.[303]

400.    Mr. Furlong's evidence is that prior to January 2020, manning cap fees were not imposed upon the Claimant in respect of the ANAP Contract but, after January 2020, the MOI began imposing such limits. Although the Claimant "did not agree with" the MOI's imposition on this, and "issued commitment letters under duress only in order to avoid further delay in the renewal of PSC license, which impacted [Claimant's] operations."[304]

401.    He testifies:

> Until November 2020, the MOI refused to renew Olive Group's PSC License or register Olive Group personnel until it paid the manning cap fines levied against it or until the ACAA provided evidence of exemption of ANAP Contract from manning cap limitation. In November 2020, Olive Group succeeded to renew its PSC License with a validity of only three months, due to year-end, only after ACAA provided certain documents relating to approval of ANAP Contract by the NPC and Olive Group provided a commitment letter to MOI to pay the manning cap fees to MOI as soon as MOI issued a valid and legal invoice.[305]

402.    Finally, he testifies:

> On February 1, 2021, the MOI once again demanded payment of manning cap fees from [the Claimant] in connection with the ANAP Contract. [The Claimant] requested issuance of invoice, but the MOI did not issue an invoice because the MOI was not sure if the manning

---

[301]    Statement of Claim, ¶ 228.

[302]    Statement of Claim, ¶ 228.

[303]    Witness Statement of Paul Furlong, 28 October 2021, ¶¶ 70, 71 (**CWS-1**).

[304]    Witness Statement of Paul Furlong, 28 October 2021, ¶¶ 72, 73 (**CWS-1**).

[305]    Witness Statement of Paul Furlong, 28 October 2021, ¶ 72 (**CWS-1**).



cap actually applied to the ANAP personnel. [The Claimant] was able to renew its license after [it] submitted another Commitment Letter to address the manning cap issue. Again, [the Claimant] did not agree with MOI's manning cap assessment and issued commitment letters under duress only in order to avoid further delay in the renewal of PSC license, which impacted [its] operations. Even if [the Claimant] had been forced to pay manning cap fees, it would have pursued claims against the Government of Afghanistan to recoup the manning cap fees because it was illegal.[306]

403. Evidence on the record also contains a number of letters written with respect to the manning cap issue. These include:

i.    A letter from the Respondent to the MOI dated 28 October 2019 regarding this issue, which states that it is a "referral for your consideration";

ii.   A letter dated 4 April 2020 from the Respondent to the MOI asking for the MOI's cooperation in this matter;

iii.  A letter dated 27 June 2020 from the Respondent to the MOI asking that the MOI "proceeds with the matter as it deems necessary";

iv.   A letter from the Claimant to the MOI dated 17 August 2020 raising these issues fully;

v.    Two letters written by the Claimant on 22 October 2020, one to the Counter Terrorism Department and the other to the MOI raising these issues;

vi.   A letter dated 26 October 2020 from the Claimant to the Respondent asking the Respondent to write to the NSC on these issues.

404. By this period of time, late October/November 2020, the ANAP contract was in its termination phase.

405. The Sole Arbitrator has reviewed the ANAP Contract to see if any responsibility upon the Respondent resides therein in respect of this issue.

406. Clause 5.1 of the GCC provides: "The Employer [the Respondent] shall use its best efforts to ensure that the Government shall provide the Service Provider [the Claimant] such assistance and exemptions as specified in the SCC."[307] The related article in the SCC, Article 5.1 states: "The

---

[306]   Witness Statement of Paul Furlong, 28 October 2021, ¶ 81 (**CWS-1**).

[307]   ANAP Contract, GCC, cl. 5.1 (**Exhibit C-1**).



assistance and exemptions provided to the Service Provider are: **Not Applicable**" (Emphasis added).[308]

407. There is nothing else in the ANAP Contract which would levy responsibility on the Respondent to ensure that the Claimant is exempted from the manning cap, or requiring the Respondent to do anything in this regard. If any, those would have been evident in Clause 5.1 of the SCC, the "assistance and exemptions" provision, but the Parties did not agree anything in that Clause in that regard.

408. Having reviewed all of the evidence, the Sole Arbitrator is of the considered view that there is no legal duty upon the Respondent that can be accessed by the Claimant within the bounds of this arbitration to make any order against the Respondent in respect of manning cap fees.

409. From a review of all of the evidence, it appears that, although the Respondent may have been slow and/or inept at liaising with the MOI in respect of the manning cap fee issue, it did take the matter up with the MOI on three or four occasions in an effort to assist the Claimant. It is telling that in those communications, the Respondent asked for consideration and cooperation. Clearly, the Respondent had no legal authority in respect of this matter, and the Claimant had no contractual right to demand that the Respondent do any particular thing or take any particular action in respect of the manning cap fee issue.

410. It is axiomatic that the only responding party in this arbitration is the Respondent. The MOI is not a party to this arbitration, as no other Government of Afghanistan department or entity is a party. As a result, any breach of legal duty on the part of the MOI or any other emanation of the Government of Afghanistan, other than the Respondent, harming the Claimant cannot be taken up in this arbitration.

411. The Claimant argues that the Respondent had an implied duty of good faith and fair dealing to address the manning cap issue with the MOI. However, the evidence failed to demonstrate that the Respondent failed to act in good faith or fair dealing. There was no evidence of this. There was no evidence, for example, of collusion between the MOI and the Respondent to try and harm the Claimant, or other evidence of actions taken intending to harm the Claimant.

412. The evidence on the record is that the Respondent wrote to the MOI and advocated on behalf of the Claimant in respect of the manning cap issue. If it did not do so early or often enough, or forcefully enough, is, perhaps, a political matter, but it is not an actionable legal matter giving

---

[308] ANAP Contract, SCC, cl. 5.1 (**Exhibit C-1**).

rise to a remedy in this arbitration.  Claims by the Claimant against the Respondent relating to the manning cap fee issue are denied, and appropriate orders are made below.

### 8.   The Delay in the Renewal of PSC License and the Alleged Interference with the Claimant's Contract with the Canadian Embassy

413.   While the Parties do not dispute that the renewal of the Claimant's PSC License was delayed, the Parties dispute whether the delay was attributable to the Respondent.[309] The Respondent failed to provide its position on the alleged interference with the Claimant's contract with the Canadian Embassy.

414.   The Claimant's position is that the Respondent failed to act in good faith or deal fairly with the Claimant. Therefore, the Respondent is liable for the Claimant's damages on work visas penalties (USD 1,337,770) and the deprived one-year optional extension of its contract with the Canadian Embassy (USD 9,337,628.76).[310] In support of its position, the Claimant makes the following arguments: (i) the Respondent's delay to submit evidence of internal approvals of the ANAP Contract to the MOI and failure to resolve the issue of manning cap fees with the MOI resulted in the delay in the renewal of the PSC License;[311] (ii) the delay in the renewal of the PSC License led to penalties in connection with the renewal of work visas in the amount of USD 1,337,770;[312] and (iii) the delay in the renewal of the PSC License and the MOFA's interference with the Claimant's contract with the Canadian Embassy caused the Canadian Government not to extend the contract with the Claimant for one more year, depriving the Claimant of revenues in the amount of USD 9,337,628.76.[313]

415.   As noted above, the Claimant submits that, in accordance with the Afghan laws and the principles of good faith and fair dealing, the Respondent was obligated to address the issue of manning cap fees and the issue of evidence of internal approvals.[314] The Claimant further submits that the

---

[309]   Reply, p. 8; Respondent's e-mail of 2 August 2022.

[310]   Statement of Claim, ¶¶ 169, 239(e).

[311]   Statement of Claim, ¶ 95.

[312]   Statement of Claim, ¶ 226; Spreadsheet re: work visa penalties imposed by Government of Afghanistan on Olive Group (**Exhibit C-88**).

[313]   Statement of Claim, ¶¶ 103, 105; Witness Statement of Paul Furlong, 28 October 2021, ¶¶ 64, 67 (**CWS-1**); Amendment No. 13 to Canadian Embassy Contract, pp. 6-7 (**Exhibit C-79**).

[314]   Statement of Claim, ¶¶ 97, 168, 178, 223, *referring to*, Afghanistan Civil Code, Official Gazette No. 353, 5 January 1977, Art. 697 (**CLA-13**) ("Contract shall be enforced on what included therein and expected in good faith"); Afghanistan Law of Commercial Contracts and Sale of Goods, Official Gazette No. 1150, 20 October 2014, Art. 6 (**CLA-14**).

Respondent had contractual obligations to "provid[e] the necessary notifications" to the MOI and to address these two issues.[315]

416.    Although the Claimant requested the Respondent to address two issues of manning cap fees and evidence of internal approvals "immediately" after two issues arose, says the Claimant, the Respondent did not address these two issues until 27 June 2020 and 31 October 2020 respectively. [316] The Claimant argues that there is no defence that the Respondent has corresponded in relation to the ANAP Contract to the MOI because writing some letters did not absolve the Respondent of liability for continued delay in the renewal of the PSC License.[317] Moreover, the Claimant argues that the Respondent's attempt to resolve the manning cap issue failed and such issue remains unresolved to date.[318] The Claimant adds that addressing the manning cap issue was "quite simple" for the Respondent.[319] Further, the Claimant contends that the Respondent's failure to resolve these two issues in time was the cause of the delayed renewal of the PSC License as the Claimant complied with Afghan laws and the MOI had no other reason for delaying the renewal of the PSC License.[320]

417.    Expounding on the second and the third arguments, the Claimant submits that work visas penalties and the deprived one-year optional extension of the contract with the Canadian Embassy were the "proximate result[s]" of the Respondent's inactions.[321] According to the Claimant, the Claimant and the Canadian Embassy had a good cooperation and the Canadian Embassy could have extended the contract for one more year if the Respondent renewed the PSC License in time and did not interfere with their contract.[322]

418.    The Claimant asserts the illegality of the MOFA's interference by informing the Canadian Government that the Claimant's activities were illegal. In the Claimant's view, such interference

---

[315]   Statement of Claim, ¶ 224.

[316]   Statement of Claim, ¶¶ 93, 115, 181. Notably, the issue of evidence of internal approvals first arose in no later than March 2020, but according to the exhibits, the Claimant's first letter addressing this matter to ACAA was dated 26 October 2020. *See* Letter from Olive Group to ACAA in response to ACAA's letter dated 24 October 2020, 26 October 2020 (**Exhibit C-11**). The issue of manning cap fees first arose in January 2020, but according to the exhibits, the Claimant's first letter addressing this matter to ACAA was dated 18 June 2020. *See* Letter from Olive Group to ACAA re: manning cap restrictions and fines, 18 June 2020 (**Exhibit C-76**).

[317]   Reply, p. 8.

[318]   Statement of Claim, ¶ 177.

[319]   Statement of Claim, ¶ 96.

[320]   Statement of Claim, ¶ 95.

[321]   Statement of Claim, ¶ 170.

[322]   Statement of Claim, ¶ 103.



amounts to the tort of "tortious interference with contract,"[323] which exists in Afghan legal practice despite its origin as a common law concept.[324] Furthermore, the Claimant contends that such interference was also illegal pursuant to, *inter alia*, a Sharia principle that "where two parties that have a compact and a third party with malicious intent interferes to harm the relationship of the parties to the compact, the party has acted wrongfully and is liable to the harmed parties."[325]

419.  The Claimant adds that in accordance with international agreements, the MOI could not "shut down" the Claimant given its special duties to provide security services for foreign embassies and international institutions.[326] Lastly, the Claimant complains that such interference was unreasonable on the basis that the MOI "consented to Olive Group's continued operations" and that "usually there were delays in the renewal of PSC licenses of the Claimant and other PSCs."[327]

420.  The Respondent argues that it has corresponded in relation to the ANAP Contract to MOI.[328]

421.  Taking the Claimant's principal arguments in turn:

   i.    The Claimant argues that it was the Respondent's delay to submit evidence of internal approvals of the ANAP Contract to the MOI and failure to resolve the issue of manning cap fees with the MOI that resulted in the delay in the renewal of the PSC License;[329] to make this argument, the Claimant depends on the evidence of Mr. Furlong, who states that the Claimant "brought the issue to ACAA's attention, but the ACAA continuously failed to address the issue."[330] This argument was addressed above in the section dealing with the manning cap issue, and the Sole Arbitrator determined that the Respondent's tardiness in addressing the MOI did not reach any legal duty that it had to the Respondent. The Claimant points to no evidence other than the bare statement

---

[323]  Statement of Claim, ¶ 230.

[324]  Statement of Claim, ¶ 229.

[325]  Statement of Claim, ¶¶ 231-233. The Claimant also points to a Sharia principle of good faith, a principle regarding the destruction of property and a principle that it is a crime to provide false information about someone, which are enshrined and expanded in Criminal Law of Afghanistan, Official Gazette No. 1260 (2017), Arts. 6(2), 377 (**CLA-19**); Afghanistan Criminal Procedures Code, Official Gazette No. 1132 (2013), Art. 6 (**CLA-19**); Civil Code of Afghanistan, Official Gazette No. 353 (1976), Art. 697 (**CLA-19**).

[326]  Statement of Claim, ¶ 102; Witness Statement of Paul Furlong, 28 October 2021, ¶ 64 (**CWS-1**), *referring to* Bilateral Security Agreement between the United States and Afghanistan, other bilateral and multi-lateral agreements, and the President of Afghanistan's Presidential Decrees Nos. 62 and 66. *See* The Bridging Strategy for Implementation of Presidential Decree 62 (**CLA-6**) and Presidential Decree Concerning the Authorization of Security Contracts with Private Security Companies, No. 66 (**CLA-18**).

[327]  Statement of Claim, ¶ 102; Witness Statement of Paul Furlong, 28 October 2021, ¶ 64 (**CWS-1**).

[328]  Respondent's e-mail of 2 August 2022.

[329]  Statement of Claim, ¶ 95.

[330]  Witness Statement of Paul Furlong, 28 October 2021, ¶ 57 (**CWS-1**).

made Mr. Furlong. While the Claimant makes legal arguments relating to duties of good faith and fair dealing, there is no evidence that the Respondent acted with an intention to harm the Claimant or negligently or in breach of contractual duty causing harm to the Claimant;

ii. The Claimant argues that (i) the delay in the renewal of the PSC License led to penalties in connection with the renewal of work visas in the amount of USD 1,337,770;[331] and (ii) the delay in the renewal of the PSC License and the MOFA's interference with the Claimant's contract with the Canadian Embassy caused the Canadian Government not to extend the contract with the Claimant for one more year, depriving the Claimant of revenues in the amount of USD 9,337,628.76.[332] Again, no emanation or entity of the Government of Afghanistan is a party to this arbitration save for the Respondent, and the evidence points to delays on the part of the MOI or other Afghanistan Government departments. As set out above in the section dealing with the manning cap issues, the Respondent was under no contractual duty to provide an exemption from the manning cap issue[333] or to guarantee the renewal of the PSC License, and there is no evidence that the Respondent acted with an intention to harm the Claimant or negligently or in breach of contractual duty causing harm to the Claimant;

iii. The Claimant asserts the illegality of the MOFA's interference by informing the Canadian Government that the Claimant's activities were illegal, saying such interference amounts to the tort of "tortious interference with contract."[334] Again, the MOI and the MOFA are not parties to this arbitration, and there is no evidence that the Respondent acted with an intention to harm the Claimant or negligently or in breach of contractual duty causing harm to the Claimant in its relations with any other Government of Afghanistan department;

iv. The Claimant argues that the MOI could not "shut down" the Claimant given its special duties to provide security services for foreign embassies and international institutions and that such interference was unreasonable on the basis that the MOI "consented to

---

[331] Statement of Claim, ¶ 226; Spreadsheet re: work visa penalties imposed by Government of Afghanistan on Olive Group (**Exhibit C-88**).

[332] Statement of Claim, ¶¶ 103, 105; Witness Statement of Paul Furlong, 28 October 2021, ¶¶ 64, 67 (**CWS-1**); Amendment No. 13 to Canadian Embassy Contract, pp. 6-7 (**Exhibit C-79**).

[333] As noted above at ¶ 406, the SCC, at clause 5.1 state: "The assistance and exemptions provided to the Service Provider are: **Not Applicable**" meaning the Parties did not negotiate assistance for the Claimant in this regard. *See* ANAP Contract, SCC, cl. 5.1 (**Exhibit C-1**).

[334] Statement of Claim, ¶ 230.

Olive Group's continued operations."[335] As set out above, the MOI is not a party to this arbitration, so no order can be made against it; there is no evidence that the Respondent acted with an intention to harm the Claimant or negligently or in breach of contractual duty causing harm to the Claimant in its relations with any other Government of Afghanistan department.

422.  In summary, after a thorough review of the evidence of the case, the Sole Arbitrator finds that the Respondent did not breach any legal or contractual duty in relation to the loss by the Claimant for a contract with the Government of Canada to provide security services for the Embassy of Canada to Afghanistan in Kabul.  Claims by the Claimant against the Respondent relating to that matter are denied, and appropriate orders are made below.

## VIII. COSTS AND POST-AWARD INTEREST

423.  The Claimant requests that the Sole Arbitrator award it all attorney fees, and costs associated with these proceedings, including all professional and expert fees and disbursements, as well as the fees of the Arbitral Tribunal.[336] The Respondent failed to make any submission with respect to this issue.

### A.  APPLICABLE RULES AS TO COSTS

424.  The provisions relevant to the Tribunal's decision on the matter of costs are to be found in Articles 40 to 42 of the UNCITRAL Rules. Article 40 of the UNCITRAL Rules provides:

> 1. The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems appropriate, in another decision.
>
> 2. The term "costs" includes only:
>
> > (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 41;
> >
> > (b) The reasonable travel and other expenses incurred by the arbitrators;
> >
> > (c) The reasonable costs of expert advice and of other assistance required by the arbitral tribunal;
> >
> > (d) The reasonable travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
> >
> > (e) The legal and other costs incurred by the parties in relation to the arbitration to the

---

[335]  Statement of Claim, ¶ 102; Witness Statement of Paul Furlong, 28 October 2021, ¶ 64 (**CWS-1**), *referring to* Bilateral Security Agreement between the United States and Afghanistan, other bilateral and multilateral agreements, and the President of Afghanistan's Presidential Decrees Nos. 62 and 66. *See* The Bridging Strategy for Implementation of Presidential Decree 62 (**CLA-6**); Presidential Decree Concerning the Authorization of Security Contracts with Private Security Companies, No. 66 (**CLA-18**).

[336]  Statement of Claim, ¶ 239(g).

extent that the arbitral tribunal determines that the amount of such costs is reasonable;

(f) Any fees and expenses of the appointing authority as well as the fees and expenses of the Secretary-General of the PCA.

425.  The principle governing the allocation of the costs of arbitration, according to Article 42 of the UNCITRAL Rules, is as follows:

> 1.  The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2.  The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.

## B.   COSTS OF THE SOLE ARBITRATOR AND THE PCA

426.  In accordance with Article 43 of the UNCITRAL Rules, a tribunal may request the parties to make deposits in equal shares as advances for the costs of arbitration. The deposit called by the Tribunal was in a total amount of AED 436,875, comprising:

i.    An initial deposit of AED 91,250, which was fully paid by the Claimant;

ii.   A supplementary deposit of AED 200,000 paid the Claimant; and

iii.  A supplementary deposit of AED 145,625 paid by the Respondent.

427.  The fees in these proceedings of Mr. Victor P. Leginsky, the Sole Arbitrator, amount to AED 291,952.39. His travel and other expenses amount to AED 4,114.45.

428.  Pursuant to Section 9 of Procedural Order No. 1, the PCA was designated to serve as Registry in these proceedings. The PCA's fees and expenses amount to AED 119,040.

429.  Other arbitration expenses include:

i.    Court Reporting: AED 9,768.59

ii.   Telecommunication: AED 2,448.31

iii.  Disbursements to the law firm retained by the Sole Arbitrator regarding the setting of the time for the final award: AED 4,568.25

iv.   Other costs (incl. bank fees, currency translation variances, printing and supplies, courier, IT/AV support): AED 4,983.01

430. Based on the above figures, the costs comprising the items covered in Article 40(a) to (c) of the UNCITRAL Rules, total AED 436,875. After payment of these costs from the deposit, there is no unexpended balance to be returned in accordance with Article 43(5) of the UNCITRAL Rules.

## C.    ALLOCATION OF THE COSTS OF THE ARBITRATION

### 1.    The Claimant's Position

431. By e-mail dated 27 October 2023, the Claimant requested its legal and other costs (Article 40(2)(e) of the UNCITRAL Rules), setting them out as follows:

| Arbitration counsel fees | $741,971.71 | Statement of Invoices attached |
| Arbitration counsel current fees | $5,421 | Not yet invoiced |
| UAE court counsel fees | AED 45,790.50 | Attached |
| Payments to PCA | AED 291,250 | Confirmed by PCA on record |
| PCA administrative fee | EUR 3,000 | Confirmed by PCA on record |

### 2.    The Respondent's Position

432. The Respondent did not provide a submission or evidence in respect of its costs or in respect of the Claimant's claims for costs.

### 3.    Decision

433. The Claimant provided evidence of its legal and other costs in a form satisfactory to the Sole Arbitrator. Further, the Sole Arbitrator finds the amounts of the Claimant's legal and other costs to be reasonable, in accordance with Article 40(2)(e) of the UNCITRAL Rules.

434. Under Article 42(1) of the UNCITRAL Rules, "The costs of the arbitration shall in principle be borne by the unsuccessful party or parties." The Sole Arbitrator follows this rule taking into account certain salient factors such as conduct of the Parties and their relative efficiency.

435. As was stated by Jeffrey Waincymer in *Procedure and Evidence in International Arbitration* in relation to this rule:

> The notion of costs following the event traditionally means that if a party wins as to part, it should obtain its entire costs unless the amount awarded was de minimis, trivial or nominal, although that is not a uniformly held view. Most domestic jurisdictions follow the loser-pays principle with the clear exception being the US […].[337]

436. As Mr. Waincymer stated in relation to the consideration of the conduct of the Parties in regard to its effect on a costs determination:

---

[337]    Jeffrey Waincymer, *Procedure and Evidence in International Arbitration*, Kluwer Law International, 2012, ¶ 15.7.1 (p. 1217).

> Examples of conduct by the parties that might lead to adverse costs awards include failure to comply with deadlines requiring follow-up communications and amendments to timetables, late delivery of materials requiring postponement of the hearing, failure to produce documents when required, non-appearance without notice, failure to agree or sign reasonable terms of reference, and waste-fully revisiting matters already decided by the tribunal [ …].[338]

437.    The Respondent in this case, despite being properly notified, refused to fully take part in the arbitration. It continually asked for extensions of time, especially in the retaining of outside counsel. Once it finally retained outside counsel, it did not provide any evidence that such retainer could not have been accomplished much earlier in the proceeding. As well, it did not provide its pleadings or other written submissions in accordance with the timetable or the directions and orders of the Sole Arbitrator. This resulted in a delay of proceedings and extra costs, to the detriment of the Claimant.

438.    The Claimant was largely successful in its claims. The only claims it was not successful on was its claims related to the manning cap issue and the claim for compensation in relation to its loss of a contract with the Government of Canada to provide security services for the Embassy of Canada.

439.    The Sole Arbitrator has the power and authority to award the arbitration costs and legal fees and disbursements, and given the success of the Claimant and the conduct of the Respondent, the Tribunal grants the full costs as sought by the Claimant in the amounts as set out in the order below.

## D.    POST-AWARD INTEREST

440.    The Claimant claimed post-award interest on the sum of US \$9,185,452.47, the amount it was not paid for the final nine months of the ANAP Contract.[339]

441.    The Claimant also requested (i) an award of "not less than" the various amounts claimed; and also (ii) that the sole arbitrator "[g]rant such other and further relief that the Arbitral Tribunal deems just and proper under the circumstances."[340]

---

[338]    Jeffrey Waincymer, *Procedure and Evidence in International Arbitration*, Kluwer Law International, 2012, ¶ 15.9.4, (p. 1224).

[339]    Statement of Claim, ¶ 138.

[340]    Statement of Claim, ¶ 239.

442. The Sole Arbitrator is of the considered view that post-award interest should be awarded as claimed to act as an incentive on the paying party to pay the amounts that have been ordered to be paid by it.

443. The Sole Arbitrator therefore considers that the Claimant has requested post-award interest on all amounts claims by use of the phraseology "at least" in making its claims for certain amounts, and in allowing the Sole Arbitrator to award such other and further relief that he deems just and proper under the circumstances.

444. The Sole Arbitrator therefore orders that post-award simple interest at the rate of 3% per annum be paid on all of the ordered sums, and an appropriate order is made below.

## IX.    DISPOSITIVE

445. Having fully considered the Parties' written and oral submissions, and the evidence and legal authorities to which they have referred, the Sole Arbitrator issues the following decision in this final award.

446. The Sole Arbitrator hereby declares and orders as follows:

    i.    The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the sum of USD 1,280,967.55, monies wrongfully withheld from the Claimant as penalties.

    ii.    The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the sum of USD 99,916.55 as interest on the monies wrongfully withheld as penalties, due as at 31 May 2022.

    iii.    The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the sum of USD USD 57,380.34 as simple interest on USD 1,280,967.55, the monies wrongfully withheld as penalties, from 1 June 2022 to the date of this final award, 28 November 2023.

    iv.    The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the sum of USD 2,755,635.74, monies wrongfully withheld from the Claimant as retention.

v.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the sum of USD 225,358.12 as simple interest on the amount owing, USD 2,755,635.74, at the rate of 3% per annum from 8 March 2021 to the date of this final award, 28 November 2023.

vi.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC the sum of USD 67,854.98 as interest calculated at a rate of 3% per annum simple interest due to the Respondent's delay in repaying the Performance Guarantee to the Claimant.

vii.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC the sum of USD 9,185,452.47, being the amount that the Claimant is owed under the ANAP Contract for the unpaid nine-month final portion thereof.

viii.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC the sum of USD 280,243.08 as interest on USD 9,185,452.47, the unpaid nine-month final portion of the ANAP Contract, due as at 31 May 2022.

ix.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the sum of USD 411,457.94 as simple interest on USD 9,185,452.47, the unpaid nine-month final portion of the ANAP Contract, from 1 June 2022 to the date of this final award, 28 November 2023.

x.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall bear the arbitration costs in the sum of AED 436,875 (Article 40(2)(a)-(c) of the UNCITRAL Rules), as fixed in this final award, and, thus, shall pay to Olive Group FZ LLC, Claimant, the sum AED 291,250, corresponding to the portion of these costs borne from the Claimant's share of the deposits paid by it to the PCA.

xi.   The Afghanistan Civil Aviation Authority, Government of Islamic Republic of Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, the amounts of USD 747,392.71, AED 337,040.50 and EUR 3,000 as the Claimant's legal and other costs under Article 40(2)(e) of the UNCITRAL Rules.

xii.    The Afghanistan Civil Aviation Authority, Government of Islamic Republic of
        Afghanistan, Respondent, shall pay to Olive Group FZ LLC, Claimant, simple interest
        at the rate of 3% per annum on all of the amounts as ordered to be paid at paragraphs
        446(i), 446(ii), 446(iii), 446(iv), 446(v), 446(vi,) 446(vii), 446(viii), 446(ix), 446(x)
        and 446(xi) from 28 December 2023 until full payment is made, as post-award interest.

xiii.   The Sole Arbitrator hereby dismisses all other claims made by or against the
        Afghanistan Civil Aviation Authority, Government of Islamic Republic of
        Afghanistan, Respondent or Olive Group FZ LLC, Claimant, specifically, but without
        derogating from the generality of this dismissal:

        a)    any claims made by the Claimant against the Respondent in respect of manning
              cap fees; or

        b)    any claims in relation to a contract with the Government of Canada to provide
              security services for the Embassy of Canada to Afghanistan in Kabul.

                              *(signature page follows)*

**Place of Arbitration: Dubai, United Arab Emirates**

Signed, this 28th day of November 2023.

Mr. Victor P. Leginsky
(Sole Arbitrator)